# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

### Case No. 14-3495

_____

### BILLIE JEROME ALLEN,

### Appellant,

### v.

### UNITED STATES OF AMERICA,

### Appellee.

_____

### PETITION FOR CERTIFICATE OF APPEALABILITY
_____

### CAPITAL § 2255 PROCEEDINGS
(District Court Case No. 4:07-CV-0027-ERW)

Timothy Kane
Eric Montroy
Assistant Federal Defenders
Federal Community Defender Office
 for Eastern District of  Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

February 9, 2015

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

PRELIMINARY STATEMENT ................................................................................ ii

BACKGROUND AND PROCEDURAL HISTORY ..............................................1

STANDARD FOR GRANTING A CERTIFICATE OF APPEALABILITY ..........3

REASONS FOR GRANTING A CERTIFICATE OF APPEALABILITY.............5

     I.      THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE MR. ALLEN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE EMPANELLING OF AN ANONYMOUS JURY ...............................................5

     II.     THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT GUILT PHASE BY FAILING TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE THAT WOULD HAVE RAISED A REASONABLE DOUBT AS TO MR. ALLEN'S GUILT ................................16

     III.    THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE MR. ALLEN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN APPELLATE COUNSEL FAILED TO LITIGATE A *BATSON* CHALLENGE.........................................................................27

     IV.    THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE DISTRICT COURT ERRED IN DISMISSING, WITHOUT AN EVIDENTIARY HEARING, APPELLANT'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE IN CONNECTION WITH THE PRE-TRIAL MOTION TO SUPPRESS THE STATEMENT APPELLANT ALLEGEDLY MADE TO POLICE.............................................................41

# PRELIMINARY STATEMENT

Appellant, who was the Movant/Petitioner below, is referred to herein by name or as Appellant.  The United States is referred to as the government.

The transcripts from Mr. Allen's trial in the underlying criminal case (District Court Case No. 4:97-cr-141) are reported in nineteen separate volumes, some with sub-parts.  Citations to the trial transcript set forth the volume number (by Roman numeral) and page numbers, as in "Vol. I at 131-32."  Transcripts of all other proceedings are cited with the date of the proceeding and the page number, as in "Tr. 5/16/97 at 26."

The District Court's opinion denying a hearing and denying relief on the claims at issue here is available at *Allen v. United States*, 2011 WL 1770929 (E.D. Mo. 2011).  It is cited herein as "DCO" and is attached as Exhibit 1.  The District Court's Judgment is attached as Exhibit 2.

All citations to court documents refer to filings in the § 2255 proceedings below (District Court Case No. 4:07-cv-27), unless otherwise indicated.  Pin cites to court documents refer to the page numbers applied by the ECF system, not necessarily to the page number on the original document.

Parallel citations are generally omitted.  All emphasis is added unless otherwise indicated.

Appellant, Billie Jerome Allen, a death-sentenced federal prisoner, sought relief from his convictions and death sentence under 28 U.S.C. § 2255 in the United States District Court for the Eastern District of Missouri. The District Court denied discovery and denied an evidentiary hearing on all but one of Appellant's claims. After a hearing on that one claim, the District Court denied relief and denied a certificate of appealability. This Petition follows.

## BACKGROUND AND PROCEDURAL HISTORY[1]

In April 1997, Mr. Allen was indicted on two charges stemming from the murder of a security guard during an armed bank robbery in St. Louis on March 17, 1997. Count I charged Mr. Allen with killing the guard in the course of committing an armed bank robbery, in violation of 18 U.S.C. § 2113(a) & (e), and Count II charged the use of a firearm to commit a crime of violence resulting in the guard's murder, in violation of 18 U.S.C. § 924(j)(1). The government filed a notice of intent to seek the death penalty, and following a jury trial, Mr. Allen was convicted on both counts. At the penalty hearing, the jury found identical aggravating and mitigating circumstances on the two counts, but returned a sentence of life imprisonment on Count I and death on Count II. The District Court formally sentenced Mr. Allen on June 4, 1998.

---

[1] Specific facts relevant to this Petition are set forth within the text of individual claims, below.

1

On appeal, this Court affirmed. *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001). Mr. Allen petitioned the Supreme Court for a writ of certiorari, and following its decision in *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court granted the petition, vacated this Court's decision, and remanded for reconsideration in light of *Ring*. *Allen v. United States*, 536 U.S. 953 (2002).

On remand, a panel of this Court vacated the death sentence, finding that the indictment's failure to charge a statutory aggravating factor violated Mr. Allen's Fifth Amendment right to indictment by a grand jury, and that the error was not harmless beyond a reasonable doubt. *United States v. Allen*, 357 F.3d 745 (8th Cir. 2004). The en banc Court reversed, finding that the error was harmless, and reinstated Mr. Allen's death sentence. *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005) (en banc). The Supreme Court denied certiorari. *United States v. Allen*, 549 U.S. 1095 (2006).

In 2007, Mr. Allen initiated proceedings pursuant to 28 U.S.C. § 2255, and on February 11, 2008, he filed an Amended Motion under 28 U.S.C. § 2255, raising eighteen grounds for relief. Doc. 60. In a Memorandum and Order on May 10, 2011, the District Court denied, without granting discovery or an evidentiary hearing, all but one of the claims. Doc. 147. In 2012, the District Court conducted an evidentiary hearing limited to the claim that trial counsel were ineffective for

failing to investigate and present available mitigating evidence at the penalty phase. On June 25, 2014, the District Court denied the claim, and denied a certificate of appealability on all claims raised in the Amended Motion. Docs. 374-75.

After the District Court denied his motion pursuant to Fed. R. Civ. P. 59, Appellant timely filed a Notice of Appeal on October 20, 2014. Doc. 383. This Court subsequently granted counsel until February 9, 2015, to file this Petition for Certificate of Appealability.

## STANDARD FOR GRANTING A CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability (COA) should issue if the appellant has made "a substantial showing of the denial of a constitutional right." To meet this modest standard, the applicant need only show that "reasonable jurists could debate . . . whether the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) ("We look to the district court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason.").

As *Miller-El* emphasized, "We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." 537 U.S. at 338. This Court has accordingly recognized that the "reasonable-jurists-could-debate" threshold is a "modest standard." *Randolph v. Kemna*, 276 F.3d 401, 403 n.1 (8th Cir. 2002) (internal quotation marks omitted). It is satisfied if "'a court could resolve the issues in a different manner.'" *Id.* (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.1 (1983)) (internal alterations omitted).

"Any doubt regarding whether to grant a COA is resolved in favor of the petitioner," and, in a capital case, "the severity of the penalty may be considered in making this determination." *Haynes v. Quarterman*, 526 F.3d 189, 193 (5th Cir. 2008); *accord Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir. 1997). Finally, as this is a federal case, analysis of Appellant's claims does not incorporate deference to any state court ruling, rendering the claims more open to debate than in a typical § 2254 case. *Cf. Miller-El*, 537 U.S. at 337 (ruling that denial of COA was error despite "AEDPA hav[ing] placed more, rather than fewer, restrictions on the power of federal courts to grant writs of habeas corpus to state prisoners."); *accord id.* at

4

348 (Scalia, J., concurring) ("the Court's willingness to consider the [AEDPA's] limits on habeas relief in deciding whether to issue a certificate of appealability (COA) is in accord with the text of 28 U.S.C. § 2253(c).").

## REASONS FOR GRANTING A CERTIFICATE OF APPEALABILITY

**I.      THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE MR. ALLEN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE EMPANELLING OF AN ANONYMOUS JURY[2]**

The District Court empaneled an anonymous jury. Each prospective and seated juror completed a questionnaire in which they identified themselves only by number. Throughout trial, the court, the parties, and the jurors themselves referred to jurors by number. The parties and the parties' counsel did not know the jurors by name – a fact of which the jurors were well aware. Only the court had the key to match a juror's number and name, and the court admonished the jurors not to state their names aloud. The jurors were made to understand both that concealing their names was unusual, and that the unusual procedure was related to the capital charges in this case.

Under precedent that was well-established at the time of trial, this Court has recognized "the danger that use of an anonymous jury could prejudice the jurors against the defendant[]." *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir.

---

[2] This issue was raised below as Claim D.1 in the Amended § 2255 Motion. *See* Doc. 60 at 27-29; Doc. 94 at 54-60.

1995).  The Court accordingly requires trial courts to analyze multiple factors and find "strong reason to believe the jury needs protection" before ordering such a drastic measure.  *Id*.  The District Court in this case utterly failed to conduct this analysis; had it done so, the *Darden* factors would have foreclosed juror anonymity.

Nonetheless, trial counsel failed to object.  Counsel had no strategic reason for this failure, and in fact found the jury's anonymity cumbersome and problematic.  Appellant was prejudiced by counsel's failure at both the guilt and penalty phases, as explained below.

In these § 2255 proceedings, the District Court denied this claim without permitting discovery and without an evidentiary hearing based on its unsupportable view that jurors identified by number are not truly anonymous; its misapprehension of the trial record; and its misreading of this Circuit's precedent.

Appellant has made a strong showing of constitutional error, which easily satisfies the "modest" standard for issuance of a certificate of appealability.

### A.    Factual Background

The District Court summoned more than two hundred venirepersons for Mr. Allen's trial.  *See* Vol. I at 3, 6-7.  Before trial, each venireperson completed an unsigned questionnaire in which they identified themselves only by a number

designated by the Court.  *See* Doc. 94-48, Ex. 41.  Copies of the questionnaires were provided to counsel but were not made available to the public.  In providing the questionnaires to the parties, the Court ordered that the information contained therein was not "to be used to do any background checks or independent investigations about any juror."  Case No. 4:97-cr-141, Doc. 206.

To comply with 18 U.S.C.A. § 3432, the court provided to counsel a list of names and addresses of the two hundred venirepersons, but the list did not match names to the assigned juror numbers and was never updated as jurors were dismissed or seated.  *See* Doc. 234.  The jurors thus remained anonymous to everyone but the court.  This fact became abundantly clear to the jurors.

At the outset of trial, the court told the jury venire: "in this case you are treated more as a number because you have a number, and *you will be referred to only by number during this whole process*."  Vol. I. at 10.  He explained that "each time there is a reference to you, you will state I am number so and so" and told the prospective jurors they would only "be addressed by number."  *Id*. at 11, 12; *see also* Vol. II at 5.  The court explicitly warned them: "Do not state your name."  Vol. I at 17.  Prospective jurors and seated jurors followed these admonitions throughout trial.

It was unmistakable to the jurors that their anonymity was an unusual

measure. *See, e.g.*, Vol. I at 17 (court mistakenly telling jurors to state their names, then immediately correcting itself and telling them not to share their names); Vol. II at 186-87 (court telling prospective jurors that it is "[k]ind of weird we are talking in numbers here" and commenting that it "[k]ind of reminds me of that old show with Maxwell Smart, where they referred to 'number 6' and 'number 5'"); Vol. III at 95 (defense counsel telling prospective jurors: "Some day you'll memorize your numbers. We're getting pretty good at it"; venireperson responding: "I always look to make sure.").

It was also clear to the jurors that the parties did not know their names and thus that the numbering procedure was not limited to statements made in open court. As the prosecutor told prospective jurors: "We did not know your names which is why we are calling you by your numbers." Vol. II at 203. Defense counsel similarly complained, "I hate to use the numbers, but that's what we got." Vol. I at 158; *see also* Vol IV-A at 48 (the United States Attorney remarking that "we were ordered not to run any record checks on anybody or do any background investigation on any of these panelists, *which would be hard to do without their names anyway*."); Vol. XII at 3 (defense counsel stating, on the final day of the guilt phase, that "[w]e don't know names" of the jurors).

Indeed, venirepersons used their numbers to sign communications with the

court, *see* Vol. IV at 4, in completing their questionnaires, *see* Doc. 94-48, Ex. 41, and in referring to each other, *e.g.*, Vol. X at 187-88. *See also* Vol. XII at 115 & Vol. XIX at 139-41 (jurors being polled only by number).

The jurors were led to understand that concealing their names was related to the capital charges in the case. For example, the court told prospective jurors:

> Each of you has been assigned a number, and you have been seated in numerical order. You will be addressed by number in this questioning process. This is a capital case in which one of the possible penalties conviction is death.

Vol. II at 6. The jurors were not instructed that their names were being concealed to protect them from exposure to the media.

**B. The Anonymous Jury Violated Mr. Allen's Fifth and Sixth Amendment Rights**

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to an impartial jury. In addition, due process has long required that a jury "consider only the evidence developed before it at trial," and not information received from outside sources. *Chandler v. Florida*, 449 U.S. 560, 575 (1981); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A jury's exposure to inadmissible influences, including the suggestion that the defendant is particularly dangerous, violates due process. *Shepherd v. Maxwell*, 384 U.S. 333, 351 (1966); *Marshall v. United States*, 360 U.S. 310, 313 (1959).

The anonymity of Mr. Allen's jury violated his right to an impartial jury, because the awkward and unusual reference-only-by-number approach made the jurors likely to conclude that Mr. Allen was dangerous and that their safety was at risk. This Court has thus recognized "the danger that use of an anonymous jury could prejudice the jurors against the defendant[]." *Darden*, 70 F.3d at 1532. *Darden* adopted a five-factor test to determine if an anonymous jury is permissible:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

This case does not implicate the first three *Darden* factors, as the government conceded below. *See* Doc. 79 at 76-78. The fourth factor, and often the fifth factor, are inherent in federal capital cases and thus cannot, in and of themselves, justify jury anonymity.[3] *Cf. Darden*, 70 F.3d at 1533 (finding an anonymous jury appropriate where all five factors were present). In the context of federal capital cases, Mr. Allen's case was not remarkable in either the potential punishments or the extent of publicity.

---

[3] In any event, the publicity in this case was not so extensive as to induce a motion for change of venue, which is a touchstone for establishing the fifth factor. *See Darden*, 70 F.3d at 1533.

Most fundamentally, there was no evidence that the jurors needed protection, let alone "strong reason to believe" as much. *Id.* at 1532. There was never a shred of evidence suggesting that Mr. Allen had threatened jurors, or was connected with any group that might intimidate or harass jurors. This was not an organized crime prosecution. Mr. Allen had never been convicted of a violent crime; his only prior conviction was for motor vehicle tampering as a juvenile, for which he was sentenced to probation. And Mr. Allen's potential conviction was never likely to garner public sympathy that could have engendered criticism of the jurors. This case was nothing like *Darden* or other cases where federal courts have approved the use of an anonymous jury. *See id.; see also United States v. Ross*, 33 F.3d 1507, 1521 (11th Cir. 1994) (cited approvingly in *Darden*).

## C. Counsel Were Ineffective

*Darden* was decided three years before trial. Trial counsel should therefore have been aware of "the danger that use of an anonymous jury" entailed. *Darden*, 70 F.3d at 1532. At an evidentiary hearing, Appellant would prove that counsel did not have a strategic reason for failing to object, and that such an objection was called for under prevailing professional norms for capital defense counsel in 1998. Counsel's performance was deficient.

Appellant was prejudiced. The "danger" inherent in an anonymous jury is that juries will infer that the defendant is extremely dangerous, and that jurors will therefore prejudge his guilt. *See id.*

Appellant was especially prejudiced at penalty phase. No issue weighs more heavily on a capital sentencing jury's decision than whether the defendant is likely to be a future danger. *See, e.g., Kelly v. South Carolina*, 534 U.S. 246, 253-54 (2002) ("a defendant's demonstrated propensity for violence reasonably will [lead a jury to] conclude that he presents a risk of violent behavior" in the future); *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) ("Consideration of a defendant's past conduct as indicative of his probable future behavior is ... inevitable."). Undoubtedly, the jury inferred that their anonymity was necessary to protect them from danger posed by Mr. Allen or his cohorts, and that the trial court had a sound reason for ordering their anonymity. This is particularly true here because, unlike in *Darden*, the court failed to take "reasonable precautions" by telling "the venirepersons that they were being identified by numbers rather than their names so that members of the media would not ask them questions." *Darden*, 70 F.3d at 1533.

Moreover, this was a close sentencing decision, in which the jury returned one life verdict and one death verdict based on the same mitigating and

aggravating factors for the same murder. Under these circumstances, there is a reasonable likelihood that Mr. Allen's death sentence was influenced by the improper empanelling of an anonymous jury, a circumstance made possible by counsel's failure to object.

**D.    The District Court Erred in Denying an Evidentiary Hearing**

A movant is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the movant] to relief." *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (quoting *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986)). A court may dismiss a claim without an evidentiary hearing only "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (citation omitted). The District Court erred in denying an evidentiary hearing here.

Tellingly, the District Court did not find that the *Darden* factors supported juror anonymity. *See* DCO at *12. Instead, the court ruled that "the jury panel was not truly anonymous," because the parties learned information about the jurors through the questionnaires and voir dire. *Id*. The court's reasoning was fundamentally flawed and overlooked the plain meaning of "anonymous."

As is clear from the record citations discussed above in part A, the parties

never knew the jurors by name and only knew them by number. The jurors were repeatedly apprised of this fact, and of the unusualness of such anonymity. Anonymous means "without any name acknowledged," "of unknown name," or "whose name is withheld." Random House Dictionary, Random House, Inc. (2015) *available at* http://dictionary.reference.com/browse/anonymous?s=t. Here, the jurors' names were "withheld," as the prosecutor and defense counsel repeatedly told the jury.

The District Court nonetheless opined that "Allen and his counsel were provided with [the jurors'] names," DCO at *12, but this is misleading. Before voir dire began, the court gave the parties a list of more than two hundred names in the venire, in order to comply with 18 U.S.C.A. § 3432. The list, however, was never matched to the jurors' numbers, and was never updated to specify the names of the seated jurors. In providing the list, the Court did little more than if it had given the parties a St. Louis phone book. Most importantly, the prejudice inherent in an anonymous jury derives from the danger *the jurors perceive* themselves to face should their identities be revealed. Because the jurors understood that their names were concealed from the parties and their counsel, the § 3432 list did nothing to ameliorate the harm.

The District Court also stated that jurors were referred to by numbers only

14

"in open court." DCO at *12. Again, this assertion is belied by the record. The jurors were directed to refer to themselves "*only by number during this whole process*," Vol. I. at 10, even in their non-public jury questionnaires and in communications sent to the judge. *See supra.* Nothing in the record supports the notion that the jurors' names were concealed only "in open court."

Finally, the court erroneously suggested that *Darden* does not apply where numbers are used to identify jurors. DCO at *12 (citing *United States v. Peoples*, 250 F.3d 630, 635 (8th Cir. 2001)).[4] This view misreads *Darden* itself, where this Court recognized that the trial court empanelled "an anonymous jury" where the jurors were "identified by numbers rather than their names." *Darden*, 70 F.3d at 1533.

### E.    Conclusion

The record makes clear that the District Court empaneled an anonymous jury without considering the *Darden* factors and in a case where the *Darden* test foreclosed the use of an anonymous jury. The District Court erroneously overlooked these facts. Appellant's allegations that trial counsel were ineffective in failing to object, "if true, would entitle him to relief." *Payne*, 78 F.3d at 347.

---

[4] The District Court apparently misread a sentence from *Peoples* as authorizing *carte blanche* the use of numbers to identify jurors "in any case." *See* DCO at *12. In citing *Darden*, however, the *Peoples* court clearly meant that the numerical approach analyzed in *Darden* might apply in any case *if it meets the Darden test. See Peoples*, 250 F.3d at 635.

Accordingly, the District Court erred in denying an evidentiary hearing.

At a minimum, this issue is debatable among jurists of reason, and a certificate of appealability should therefore be granted.

**II.** **THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT GUILT PHASE BY FAILING TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE THAT WOULD HAVE RAISED A REASONABLE DOUBT AS TO MR. ALLEN'S GUILT[5]**

It is undisputed that two masked gunmen committed this crime. After the robbery, the two men fled the bank in a van. A concerned citizen followed the van into Forest Park and watched as the van caught fire and one of the perpetrators – Norris Holder – was apprehended. The second perpetrator fled.

At the scene in Forest Park, police recovered blood evidence on a strap from a bulletproof vest worn by one of the perpetrators. Subsequent DNA testing excluded the victim and Mr. Allen as possible sources of the blood. The government has since represented that the blood was not tested against co-defendant Holder's blood, Doc. 79 at 104, but has asserted that the "strap was consistent with the evidence at trial that Holder was arrested at the scene of the burning van while wearing body armor." Doc. 380 at 8. In other words, the government presumes that DNA testing would provide additional evidence against Holder.

---

[5] This ground for relief was raised as claim "I" in the Amended § 2255 Motion. *See* Doc. 60 at 33-36; Doc. 94 at 106-16.

Before trial, defense counsel did not seek further testing of the blood to determine its source. Counsel likewise failed to seek DNA testing of other biological evidence and failed to pursue a number of leads that would have led to evidence implicating a different person as the second perpetrator and exculpating Mr. Allen, as discussed below.

Appellant's Amended § 2255 Motion alleged that trial counsel were ineffective in failing to investigate and present the available exculpatory evidence. The evidence would show that Appellant was not the second perpetrator, and would likely identify one Jerry Bostic as Holder's accomplice. *See* Doc. 60 at 33-36; Doc. 94 at 106-16.

In support of these allegations, Appellant sought discovery and an evidentiary hearing, but the District Court denied Appellant's requests. Doc. 165. Because the requested discovery "may . . . be able to demonstrate that he is . . . entitled to relief," *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997), and because Appellant's allegations, "if true, would entitle him to relief," *Payne*, 78 F.3d at 347, the District Court erred in denying discovery and an evidentiary hearing on this claim. At a minimum, the issue is debatable among jurists of reason, and a COA should therefore be granted.

17

### A.    Background

This crime was committed by two masked gunmen.  *See* Vol. VI at 52; Vol. VII at 82, 143, 170; Vol. XI at 162.  After the robbery, the two men fled the bank in a van, which was followed into Forest Park by a concerned citizen named William Green.  Vol. VI at 68; Vol. VIII at 160-64.  Mr. Green watched as the van caught fire in Forest Park and one of the perpetrators – Norris Holder – was immediately apprehended at the scene.  Vol. VI at 55; Vol. VIII at 165-66.  The second perpetrator fled.[6]

Near the burned-out van, police recovered a bloody strap from a bulletproof vest worn by one of the perpetrators.  *See* Doc. 94, Ex. 6.  Subsequent DNA testing excluded the victim and Mr. Allen as possible sources of the blood, but was not tested against Holder's profile.  *See* Doc. 95, Ex. 7; Doc. 380 at 8.  Counsel was provided with pre-trial discovery of this evidence.

Counsel was also aware of evidence that an individual named "J.B." was involved in the crime.  *E.g*., Vol. VI at 71; Doc. 94, Ex. 46.  Trial counsel failed to adequately investigate this lead.  If a proper investigation had been conducted, counsel would have learned important information, including that "J.B." was Jerry Bostic, that Mr. Bostic fit the description of the second perpetrator whereas Mr.

---

[6] Mr. Green did not identify Mr. Allen as the person who fled the scene.  Tr. 5/16/97 at 247; Vol. VIII at 169.

Allen did not, and that Mr. Bostic was in and out of police custody in Saint Louis before trial. *See* Doc. 94 at 90 & Exs. 14-17, 39.

The exculpatory potential of the requested DNA testing is significant. If the strap is found to contain blood belonging to Mr. Bostic, then the evidence strongly supports that Mr. Allen was not the person who accompanied Mr. Holder into the bank.

Trial counsel's investigation was also deficient in failing to investigate and/or present other evidence that would have raised reasonable doubt as to Mr. Allen's guilt, including:

**1.     Gas Chromatographic Analysis**

At trial, Police Officer Carroll testified that when Mr. Allen was arrested on the night after the robbery, he smelled strongly of smoke, thus suggesting that Mr. Allen was in the getaway van when it caught fire. *See* Vol. IX at 177. Gas chromatographic analysis of the clothing Mr. Allen was wearing when he was arrested, however, showed that the clothing was negative for the presence of petroleum distillates. Doc. 94, Ex. 42. Counsel did not present this evidence to impeach Officer Carroll's testimony.

### 2. Police Interview with Greg Prater and Joe Powell

Trial counsel failed to present evidence contained in a police report that witnesses Greg Prater and Joe Powell told police that they observed a man who was 5 feet 8 inches tall, fleeing from the burning van and running through Forest Park. Doc. 94, Ex. 43. Jerry Bostic was 5 feet and 8 inches tall. Doc. 94, Ex. 14. Mr. Allen is considerably taller: six feet one inch. Doc. 94, Ex. 44.

### 3. Police Report of Fleeing Suspect

Counsel failed to investigate and present evidence that a witness in Forest Park observed the fleeing suspect at 11:12 a.m. "going north and east towards the bike path towards Kingshighway." Doc. 379, Ex. 3 at 4; *see also* Doc. 363 at 15, 20. In conjunction with the undisputed evidence that the robbery occurred at 10:30 a.m., such evidence would have shown that Mr. Allen could not be the suspect. Indeed, both the government and the defense knew from a witness, Chris Shegog, that he met Mr. Allen at the Northwest Plaza Mall that morning around 10 a.m. or 11 a.m.,[7] a fact that Mr. Shegog maintains to this day. Doc. 379, Ex. 5. Mr.

---

[7] Mr. Shegog, who was employed as a security guard at the time and had previously dated Mr. Allen's sister, told the defense that he saw Mr. Allen when Mr. Shegog arrived at Northwest Plaza "around 10:00 a.m." or "between 10:15 and 10:30 a.m.," and that Mr. Allen had already been shopping when he first saw him. Mr. Shegog told the FBI that he saw Mr. Allen at "about eleven," although he also told the FBI that he left his home at about 9:30 a.m. and that it would have taken him thirty to forty minutes to get to Northwest Plaza. Regardless of the exact time they met, it is clear that Mr. Allen could not have robbed the bank at 10:30 a.m.,

Shegog could not have met Mr. Allen at the Northwest Plaza around 10 a.m. or 11 a.m. if Mr. Allen had been the perpetrator who escaped from the van and fled through Forest Park at 11:12 a.m.

### 4. Additional DNA Testing

During their investigation, police recovered additional biological material from a rag in another car to be used in the getaway. *See* Doc. 381 at 4-5 & Ex. 1. The police sought DNA testing of the material, *see id.*, but those DNA test results were not obtained and/or disclosed to the defense. Counsel did not seek test results for the material, yet the results of such a test would likely help identify the second suspect.

### 5. Statement of Wayne Ross

Trial counsel failed to cross examine government witness Wayne Ross regarding his statements to the FBI. *See* Doc. 94, Ex. 46. Mr. Ross told the FBI that "J.B." called Ross's grandmother's house looking for Norris Holder a few days before the robbery. *Id.* This evidence would have helped to corroborate that Bostic and Holder were planning, and in fact committed, the crime.

---

fled through the park around 11:00 a.m., traveled to Northwest Plaza and shopped, all before Mr. Shegog arrived. *See* Doc. 379, Ex. 4.

### 6. Interview of Broderick Bonner

Counsel failed to present evidence from an interview with Broderick Bonner that on the evening when Mr. Allen and Mr. Holder allegedly met in a bowling alley, Mr. Bonner did not sit with them nor was he in a position to overhear any conversation between Mr. Holder and Mr. Allen. Doc. 94, Ex. 47. Mr. Bonner also indicated that Mr. Holder did not discuss a bank robbery that night and that Mr. Ross did not know anything about Mr. Holder having a plan to rob a bank. *Id*. This would have contradicted Wayne Ross's trial testimony about overhearing a conversation between Mr. Holder and Mr. Allen about the robbery.

### 7. FBI Report of the Anonymous Phone Call

Trial counsel failed to investigate and present evidence from an FBI report of an anonymous telephone call in which the caller indicated that Mr. Holder had been seen at the bowling alley, North Oaks Bowl, discussing the bank robbery with someone *other than* Mr. Allen. Doc. 94, Ex. 48. This information included the name of another suspect or witness, "DeMarco," and the identity of other witnesses who recognized Holder and his associates. *See id*. This evidence would have impeached the allegation that Mr. Allen and Mr. Holder planned the crime together at the bowling alley, but counsel failed to investigate or present this evidence.

## B.    Legal Principles

Trial counsel have a clear duty to investigate defenses and leads that would contradict the government's case. Trial counsel here failed to fulfill this duty. Appellant was prejudiced because the available evidence would have created a reasonable doubt as to Mr. Allen's guilt.

## 1.    Deficient Performance

The Sixth Amendment requires counsel to investigate and consider viable theories relevant to the innocence of the accused. *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993); *see Williams v. Taylor*, 529 U.S. 362, 398 (2000); *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). Where counsel "ignored pertinent avenues for investigation of which he should have been aware," counsel's "decision not to investigate did not reflect reasonable professional judgment." *Porter v. McCollum*, 558 U.S. 30, 40 (2009). Further, counsel must make reasonable decisions in challenging the government's case with available evidence. *See Delo v. Driscoll*, 71 F.3d 701 (8th Cir. 1995) (counsel ineffective for failing to impeach state witness with prior inconsistent statement and for failing to adequately cross-examine another witness). In failing to meet these obligations here, counsel provided deficient representation.

Indeed, "[m]odern DNA testing can provide powerful new evidence unlike anything known before." *District Attorney's Office v. Osborne*, 557 U.S. 52, 62 (2009). Counsel's failure to investigate such "powerful" evidence was deficient, and was not based on any reasonable tactical decision. Pre-trial discovery had already excluded Mr. Allen as the contributor of the blood, and thus further investigation could have only strengthened the defense. Similarly, counsel's failure to investigate and present the other evidence discussed above was also deficient.

### 2. Prejudice

Prejudice is established if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This "undermines confidence" – "reasonable probability" standard is less demanding than proof by a preponderance of the evidence. *Id.*; *Williams*, 529 U.S. at 405-06; *Kenley v. Armontrout*, 937 F.2d 1298, 1304 n.5 (8th Cir. 1991).

The totality of the unpresented evidence in this case – including the two sources of DNA evidence, evidence linking Jerry Bostic to the crime, and evidence contradicting the government's theory that Mr. Allen planned the robbery with

Holder, *see supra* – would have created a reasonable probability of a different result at trial. *See, e.g.*, *White v. Roper*, 416 F.3d 728, (8th Cir. 2005) (finding prejudice from counsel's ineffectiveness in failing to investigate and call two witnesses).

### 3. Discovery and Evidentiary Hearing

Under these circumstances, the allegations set forth in District Court required discovery and an evidentiary hearing. The District Court's contrary rulings were erroneous because the requested discovery plainly "may . . . be able to demonstrate that he is . . . entitled to relief," *Bracy*, 520 U.S. at 908-09, and because Appellant's allegations, "if true, would entitle him to relief," *Payne*, 78 F.3d at 347.

*United States v. Fasano*, 577 F.3d 572 (5th Cir. 2009), further demonstrates that the District Court erred and, at a minimum, that the question is debatable among jurists of reason. In *Fasano*, as here, a bank robber wore various items that were then discarded near the bank shortly after the robbery. 577 F.3d at 574. In *Fasano*, as here, other evidence pointed to the defendant's guilt including testimony of eyewitnesses and fingerprint evidence. *Id.* at 578. The Fifth Circuit found that, where a house guest with a criminal record had been staying with the defendant at the time of the robbery and the defendant claimed the houseguest

committed the robbery, testing was appropriate because DNA test results linking the clothing items to the houseguest would have established a reasonable probability that the defendant would have been acquitted. *Id*. This Court should reach the same conclusion or, at a minimum, recognize that other jurists would find the question debatable.

A hearing is particularly necessary given the allegations of ineffectiveness. To the extent that any of counsel's failures were based on strategic considerations, those issues should be considered at a hearing. *See Parkus v. Delo*, 33 F.3d 933, 938-39 & n.6 (8th Cir. 1994) (remanding for evidentiary hearing to address counsel's failure to thoroughly investigate guilt phase defense). Under *Strickland*, a court may not speculate about possible strategic decisions where, as here, the record fails to demonstrate that counsel's actions were based on such decisions. *See Wiggins*, 539 U.S. at 526-27 ("the strategic decision [invoked] to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations"); *Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986) (under *Strickland*, courts cannot use hindsight to supply a strategy for counsel); *Williams v. Roper*, 695 F.3d 825, 846 (8th Cir. 2012) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it

26

should also not construct strategic defenses which counsel does not offer")
(quoting *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)). Accordingly,
discovery and a hearing are necessary to fully consider Appellant's claims.

**III.    THE COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE
MR. ALLEN WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN
APPELLATE COUNSEL FAILED TO LITIGATE A *BATSON* CHALLENGE[8]**

It is axiomatic that "the Equal Protection Clause forbids the prosecutor to
challenge potential jurors solely on account of their race or on the assumption that
black jurors as a group will be unable impartially to consider the State's case
against a defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

Here, trial counsel objected to the government's peremptory strikes of
several African-American venirepersons. The District Court recognized that there
was a *prima facie* showing of racial discrimination, but then denied relief after
hearing the government's proffered reasons. Vol. V-A at 124, 136-37.

The *Batson* issue was meritorious, but appellate counsel performed
deficiently by failing to raise it on appeal. Had it been raised on appeal, there is a
reasonable probability this Court would have found that the government's reasons
for at least one of the peremptory strikes were pretextual.

---

[8] This issue was raised below as Claim D.2 in the Amended § 2255 Motion. *See*
Doc. 60 at 27-30; Doc. 94 at 60-76.

### A.     Factual Backgound

The government used peremptory challenges to strike five of the eight African-American venirepersons[9] on the panel: Jurors 83, 102, 124, 134, and 139. Vol. V-A 119-20.  The defense objected and the District Court ruled that there was a *prima facie* case of discrimination.  *Id*. at 124.  The Court asked for the government's reasons for the five strikes.  After the government gave its reasons, defense counsel conceded that two of the strikes, Jurors 102 and 124, were justified by their reservations regarding the death penalty.  *Id*. at 128.  The defense maintained its objections to the strikes of Jurors 83, 134 and 139.  The specific circumstances of these three strikes are discussed below.

### B.     Legal Principles

"[U]nder *Batson*, the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987).

When considering a prosecutor's asserted reasons for exercising a strike, "[i]f the stated reason does not hold up, its pretextual significance does not fade

---

[9] Ultimately, Mr. Allen's jury consisted of ten white jurors and two African-American jurors. The third African-American venireperson who was not struck during voir dire served as an alternate and did not participate in any deliberations.

because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). In other words, a prosecutor's invocation of a false reason supports a finding of racial discrimination.

The failure to strike similarly-situated non-minority jurors also supports a finding that the prosecutor's explanation is pretextual. *Id.* at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."). In *Davidson v. Harris*, 30 F.3d 963, 966 (8th Cir. 1994), this Court rejected the explanation that the defense attorney struck an African-American because she had young children: "Because the defendants did not apply their theory for striking Jones consistently to strike white venirepersons with characteristics identical to Jones, the defendants' explanation for striking Jones is pretextual." This Court has also rejected a prosecutor's explanation that an African-American prospective juror had unacceptable views on the death penalty because a similarly situated white juror was not stricken. *Ford v. Norris*, 67 F.3d 162, 169 (8th Cir. 1995); *accord Doss v. Frontenac*, 14 F.3d 1313, 1316-17 (8th Cir.1994) (peremptory challenges

"cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged.").

An analysis of the government's asserted reasons for the strikes of Jurors 83, 134, and 139, when viewed against the record and when compared with the characteristics of white venirepersons who were not stricken, shows that the government's stated reasons were pretextual.

## C.      Analysis

### 1.      Juror 83

At trial, the government's proffered reasons for striking Jurors 83 included that she "raised [her] hand[] and said that blacks are treated unfairly in the system." Vol. V-A 127, 133.  This reason was false, as the government apparently conceded in the § 2255 proceedings below.[10]  *See* Doc. 79 at 80.  The voir dire record shows that the five jurors who responded to that question were Jurors 16, 63, 100, 139, and 195 – not Juror 83.  *See* Vol. I 79-82; Vol. II 103-05; Vol. IV 3-5.  The fact that the government at trial gave a factually incorrect reason for its strike of No. 83 indicates that the strike was pretextual.  *See Miller-El v. Dretke*, 545 U.S. at 252.

In these § 2255 proceedings, the government asserted four other reasons for striking No. 83: (1) she was sympathetic to psychological testimony; (2) her

---

[10] The fact that the Government has different explanations now than it had at trial underscores the necessity of an evidentiary hearing to resolve this claim.

husband was once charged with a narcotics crime; (3) she was a legal secretary; and (4) she had a problem with partiality in response to one of the questions. DCO at *14.

The first reason does not distinguish No. 83 from other jurors. Every venireperson who was not excused for cause had to answer that she or he could consider factors, including psychological evidence, as a reason to impose a sentence less than death. The parties and the Court, in fact, extensively discussed the wording of these questions during voir dire. *See*, *e.g.*, Vol. III 68-73. Thus, the fact that Juror 83 could consider psychological evidence in mitigation does not distinguish her from the other venirepersons eligible to serve. Indeed, the law has long required the sentencing jury to be able to consider and give effect to the character, background, and record of the defendant himself. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

The District Court nonetheless found that the government's strike was appropriate on account of her answer to question 22 on the juror questionnaire, which asked, "Do you have any prejudice in favor, against, or any fixed opinions concerning psychiatric or psychological testimony?" Juror 83 answered yes to this question, and wrote, "I do believe that a person's attitude and actions can be affected by psychological problems." Doc. 94, Ex. 41; *see* DCO at *14. To the

extent this was the government's asserted reason for the peremptory strike, it was pretextual in two ways. First, the government did not ask Juror 83 any questions regarding this issue. The failure to question prospective jurors about matters the prosecutor later says were reasons for a peremptory strike is evidence of pretext. *See Miller-El v. Dretke*, 525 U.S. at 244; *Davidson v. Harris*, 30 F.3d 963, 966 (8th Cir. 1994).

Second, the government did not strike two white venirepersons who also answered "yes" to the question about psychological evidence. Jurors 121 and 169, both white females, answered "yes" and provided written comments on this question. *See* Doc. 94, Ex. 41 (prospective juror 121's explanation indicating: "I have a strong background of work experience in the mental health field."). The District Court thus erred in finding that Juror 83's response to question 22 "was a facially sufficient, race-neutral reason." DCO at *14.

The government's other asserted reasons are also unavailing. Juror 83 stated that her husband, who was on probation for two years, was treated fairly by the criminal justice system, and that she would not be influenced by his situation. Vol. I at 86-87. Her response was indistinguishable from the responses of white jurors who were not struck by the government. *See infra*.

The government's third asserted reason for striking Juror 83 was her work as a legal secretary. She testified, however, that her work was in a brokerage firm, that it would not affect her ability to be fair and impartial, that she had no training or experience in the area of criminal law, and that she would be able to follow the court's instructions on the law. Vol. III-A at 78-79. Tellingly, Juror 70, a white female who was seated on the jury, worked as a paralegal. Vol. II at 212-15. There is no meaningful distinction between Juror 70's and Juror 83's work in the legal field. Indeed, Juror 70's testimony about her legal work was almost identical to Juror 83's. *See* Vol. III-A at 60 (Juror 70 testifying that her employer does not do criminal law work, she has no legal training in criminal law, and that she would be able to base her verdict on the evidence in this case and the court's instructions). This proffered race-neutral reason for the strike of Juror 83 also fails.

As to the government's fourth asserted reason, it has not specified what "partiality" caused the strike of Juror 83, but she did not hold any personal, moral, religious, philosophical or other beliefs that would substantially impair her ability to return a verdict of death. Vol. III-A at 77-80. Her feelings about the death penalty would not affect her ability "to reach a fair and impartial verdict in the first phase of the case." *Id*. at 79. If the government was nonetheless concerned, follow-up questions should have been asked, but were not.

33

### 2. Juror 134

The government justified its strike of Juror 134 based on her response to question 42 of the questionnaire, in which she endorsed the following multiple choice option: "I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose the death penalty if it is called for by the facts and the law in this case." Doc. 94, Ex. 41; Doc. 79 at 81. When questioned by the government, however, Juror 134 testified that she had no personal, moral, religious, ethical or philosophical beliefs against the death penalty that would prevent or substantially impair her ability to return a death verdict; her feelings about the death penalty would not affect her ability to be fair during the guilt phase; she would always follow the Court's instructions; she would weigh the mitigating evidence against the aggravating evidence before returning a verdict; and she could vote for a verdict of death if she found that the aggravating factors outweighed the mitigating factors. Vol. V at 41-43. All of these answers are perfectly appropriate for a juror who serves in a capital case and provide no particular reason to strike this venireperson.

In addition, Juror 149, a white venireperson, also answered E to question 42, and gave similar answers as 134 during voir dire. Vol. V-A at 24-28; Doc. 94, Ex. 41. The government did not strike Juror 149, and she was in fact selected as an

34

alternate juror.  Thus, this reason for the peremptory strike of No. 134 was also pretextual.

### 3.    Juror 139

The government asserted three reasons for striking No. 139: (1) she saw news about the case after being instructed not to; (2) she had a cousin in prison, a brother arrested for drug possession and a sister charged with shoplifting; and (3) she believed African-Americans are treated unfairly in the criminal justice system. Doc. 79 at 81.

As to the first reason, many venirepersons – more than fifty – testified that they read, watched, or heard media coverage about the crime before they were called as jurors. Vol. I at 26-53; Vol. II at 24-63. The government asserted at trial that No. 139 was the only person who told the Court she viewed media coverage in error after her first day of jury selection.  The Court examined her, and she explained that what she had heard on television was that there was a jury selection in the case, and she didn't realize it was the same case she had been summoned on until hearing that.  She also testified that despite what she heard, she could set it aside and decide the case based solely on the evidence and the Court's instructions. Neither the Court nor counsel asked further questions. *See* Vol. II at 27-29.

Meanwhile, Jurors 70, 98, and 132, and alternate Juror 162 – who were white – all testified that they had heard or read news coverage about the offense. In answer to the Court's questions, all four of them answered that they had not formed any opinion as to the defendant's guilt or innocence, and they would be able to decide the case based on the evidence and the Court's instructions. *See* Vol. I at 49, 51-52; Vol. II at 37, 46-47. The government did not ask any follow-up questions of these venirepersons. The brief television coverage seen by No. 39 was no more significant to the case than the news reports heard by the four white jurors who served on the jury.

A party bears a heavy burden to show that a juror is actually prejudiced by news accounts. "[A]lthough [the government] has established that a juror read some of the news accounts, 'it is not required that jurors be totally ignorant of the facts and issues involved.'" *Frank v. Brookhart*, 877 F.2d 671, 675 (8th Cir. 1989) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1963)). A similar burden should apply here where the District Court found a *prima facie* case of discrimination. As in *Frank*, the information in the news account accidentally heard by No. 139 was information she already knew – jury selection had begun – and was not inflammatory. The government's assertion of news coverage as the reason for this peremptory strike was pretextual.

36

The government's second reason is equally unavailing. Fifty venirepersons – including thirty-nine white people – told the District Court that a family member or friend had been arrested or convicted, and nine white venirepersons told the Court that they themselves had been arrested or convicted. The government struck eight venirepersons in this category, four of whom were African-American (Jurors 83, 124, 134, and 139). Seven of the fifty venirepersons in this category served as jurors, and one served as an alternate. *See* Doc. 94 at 51-52 & n.17-n.21. Having relatives with a criminal history did nothing to differentiate Juror 139 from numerous white jurors accepted by the government, including seated jurors.

The government's final reason for the peremptory strike of No. 139 is clearly pretextual. The government argued that her affirmative answer to the Court's question whether she believed that African-American males are treated unfairly by the criminal justice system was a racially-neutral reason for the strike. First, this question is not race-neutral and is not a valid reason for a peremptory strike. Of the five venirepersons who answered affirmatively to this question, *see* Vol. I at 79-82; Vol. II at 103-05, four were African Americans (Nos. 16, 63, 139 and 139); No. 195 was a white male. Clearly this question has a disparate effect on African-American venirepersons and thus does not provide a valid reason to defeat a defendant's *prima facie* case of racially-discriminatory peremptory strikes.

Second, No. 134 testified that her opinion would not affect her ability to be a completely fair and impartial juror in this case. Vol. II at 104-05. Third, the government did not question No. 134 about this statement, and therefore it is suspect as a ground for a peremptory challenge.

### D. Appellate Counsel Were Ineffective

Although the trial court found that the reasons for the strikes were not "generally or merely pretext for purposeful discrimination," Vol. V 137, this record presented a strong issue for appeal. There is a reasonable probability that, had this issue been raised on appeal, this Court would have found a *Batson* violation and vacated Mr. Allen's conviction and sentence. Appellate counsel failed to identify and litigate this entirely record-based issue, and that failure was ineffective.

Where, as here, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, . . . counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." *Claudio v. Scully*, 982 F.2d 798, 799 (2d Cir. 1992); *see also Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001) (finding appellate counsel ineffective for failure to raise meritorious claim, even though the appellate claim would have been reviewed under the plain error standard); *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (finding trial and

appellate counsel ineffective for failing to object to and raise an erroneous jury instruction*)*; *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (where the basis for a claim "was obvious on the record, and must have leaped out upon even a casual reading of transcript," and the law on the subject was "known at the time," appellate counsel was ineffective for failing to raise it).

Counsel's failure is particularly evident here, because counsel raised several claims for which no objections had been made, thus obtaining review only under the plain error standard. *See Allen*, 247 F.3d at 767-68, 778. By contrast, the *Batson* error was preserved and provided significant grounds for relief.

### E. The District Court Erred in Denying the Claim Without a Hearing and in Denying a Certificate of Appealability

Where, as here, an appellant made a prima facie showing of racial discrimination, it follows that he raised an issue that is "adequate to deserve encouragement to proceed further," *Slack*, 529 U.S. at 483-84, and thus merits issuance of a certificate of appealability.

The District Court nonetheless relied on *United States v. Brown*, 528 F.3d 1030, 1033 (8th Cir. 2008), to reason that appellate counsel must winnow out

weaker arguments for appeal and that, "absent contrary evidence," courts will assume that the decision not to raise a claim "was an exercise of sound appellate strategy." DCO at \*14. The court's reliance on *Brown* was misplaced.

First, and most importantly, the district court in *Brown* held an evidentiary hearing, thus giving Brown an opportunity to present "contrary evidence." The District Court here denied Appellant such an opportunity, despite allegations that, "if true, would entitle him to relief." *Payne*, 78 F.3d at 347.

Second, *Brown* was not a capital case, and heightened profession norms apply to capital appellate counsel, just as they do to capital trial counsel. *See, e.g.*, *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001) ("in a capital case ... appellate attorneys must err on the side of inclusion particularly where, as here, there appear to exist a significant number of facts to support the claim"). Third, Brown obtained a COA, despite Circuit law indicating that his effort to rely on retroactive application of *Booker* was foreclosed. *Brown*, at 1034. Appellant's instant claim raises a far stronger basis for relief and, accordingly, a COA should issue.

In short, the District Court's ruling that "Allen had non-frivolous arguments that these strikes were *Batson* violations," DCO at \*16, itself shows that a certificate of appealability should issue, because "[a] prisoner seeking a COA must prove something more than the absence of frivolity." *Miller-El v. Cockrell*, 537

U.S. at 338.  Appellant meets that standard.

**IV.** **THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY BECAUSE THE DISTRICT COURT ERRED IN DISMISSING, WITHOUT AN EVIDENTIARY HEARING, APPELLANT'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE IN CONNECTION WITH THE PRE-TRIAL MOTION TO SUPPRESS THE STATEMENT APPELLANT ALLEGEDLY MADE TO POLICE**[11]

Counsel advised Mr. Allen not to testify at the pre-trial suppression hearing because counsel believed that the suppression court would allow the government to cross-examine Mr. Allen on all topics related to his case and not merely the topics pertaining to his alleged confession.  Appellant followed counsel's advice and did not testify.  The suppression court then relied solely on the incredible and uncontested testimony of St. Louis Police Officer Henderson, which Mr. Allen's testimony would have rebutted, to deny the motion to suppress.  Mr. Allen was deprived of his right to testify and his right to effective counsel, and the suppression court erroneously denied Mr. Allen's suppression motion based solely on false, misleading, and incomplete evidence.

Mr. Allen sought an evidentiary hearing on this issue.   The District Court denied this claim without an evidentiary hearing.  Docs. 147, 165, 382.  In denying this claim, the Court made findings that were both erroneous and incomplete.

---

[11] This ground for relief was raised as claim "A" in the Amended § 2255 Motion. *See* Doc. 60 at 14-16; Doc. 94 at 16-24.

First, the District Court erred by determining that the magistrate court did *not* rule that Mr. Allen would be subject to cross examination on anything other than the issues pertaining to his motion to suppress. The plain language of the magistrate court's ruling shows that the court did authorize the government to cross examine Mr. Allen on all matters related to his case. *See* Doc. 147 at 11.

Second, the District Court erred by not granting an evidentiary hearing to determine whether counsel misunderstood the ruling of the magistrate court and whether counsel's performance was therefore deficient for advising Appellant not to testify because of that misunderstanding.

Third, the District Court clearly erred by determining that counsel submitted a timely offer of proof to the magistrate court concerning Mr. Allen's proffered testimony, when the record is clear that counsel submitted the offer of proof after the magistrate had already denied Appellant's motion to suppress. The court further erred by not granting an evidentiary hearing to determine whether counsel was ineffective for failing to submit a timely offer of proof. *See id*. at 11-12.

**A.     The Magistrate Court Ruled That Mr. Allen Was Subject to Cross Examination on All Matters If He Testified at the Suppression Hearing**

During the suppression proceedings, the magistrate court unequivocally stated that, were Mr. Allen to testify at the suppression hearing, he would be

subject to cross examination on all matters related to his case, and not merely those relevant to the suppression hearing. Tr. 5/16/97 at 348. Thus, the magistrate judge erroneously accepted the government's argument that Mr. Allen was subject to cross examination on all issues that "might pop up":

> COURT: Unless [the prosecutor] Mr. Landolt agrees to cross only on the issues addressed in the questioning.
>
> LANDOLT: Judge, I think once he takes the stand he's, – the issues in the case are the scope of the cross examination.
>
> [Defense Counsel]: Well, my position, – my argument is that just as the Government has objected all day long about being limited in the scope of this proceeding, I think that his testimony is limited to the scope of this proceeding.
>
> COURT: Yeah, it is except that I just think it goes a lot broader because Mr. Allen and Mr. Holder for that matter, —Mr. Holder and Mr. Allen I should say, were participants in this questioning and answer process in the police department from get to go, ...that the cross examination is going to be a lot wider and more open that I permitted with the police officers who were here to,– or the witnesses who were just here to testify about the specific identification process.

*Id*. at 348. Based on this ruling, Mr. Allen declined to testify at the suppression hearing, even though he had important, and if credited, dispositive testimony to offer. *See id*. at 357.

Contrary to the plain reading of the magistrate court's ruling that Mr. Allen would be subject to "whatever cross examination that may pop up," the District Court, in denying this § 2555 claim, determined that "the magistrate did not

43

suggest that Allen would be subject to cross examination on anything other than the 'preliminary matter' of issues relevant to his motion to suppress." Doc. 147 at 11. This finding is belied by the record, as the magistrate court never stated or suggested that it was limiting the scope of the cross examination to "preliminary matters of issues relevant to his motion to suppress." To the contrary, the magistrate court informed counsel that Mr. Allen would be subject to broad cross examination on any issue that arose.

The magistrate court's ruling violated Fed. R. Evid. 104(d) and Supreme Court precedent. *See Simmons v. United States*, 390 U.S. 377 (1968) (holding that a criminal defendant cannot be made to forego his right Fifth Amendment right against self-incrimination at the suppression hearing in order to avail himself of the full process offered to demonstrate that the police did not honor his Fifth Amendment right at an earlier time); *see also United States v. Roberts*, 14 F.3d 502, 517 (10th Cir. 1993) (acknowledging that Rule 104(d) circumscribed the government's cross examination and finding that the lower court did not err in allowing cross examination on the defendant's mental capacity because it directly related to the voluntariness of the confession); *see also* Fed. R. Evid. 104, Note to Subdivision (d) ("The limitation upon cross-examination is designed to encourage participation by the accused in the determination of preliminary matters. He may

testify concerning them without exposing himself to cross-examination generally. The provision is necessary because of the breadth of cross-examination under Rule 611(b)."). The District Court clearly erred in its mischaracterization of the magistrate's ruling.

**B. Even Assuming That the District Court Correctly Interpreted the Magistrate Court's Ruling, Counsel Was Ineffective**

Assuming arguendo that the District Court's interpretation of the magistrate court's ruling on the scope of cross examination at the suppression hearing was accurate, counsel was ineffective for failing to understand the ruling, to ask for clarity if he did not understand, and to properly advise Mr. Allen about testifying in light of that ruling.

1. **Deficient Performance**: Trial counsel recognized the importance of Mr. Allen's testimony and clearly intended to present his testimony at the suppression hearing. *See* Tr. 5/15/97 at 350. Likewise, counsel understood that the law limited the potential cross examination of Mr. Allen at the suppression hearing. *Id*. In anticipation of presenting Mr. Allen's testimony, counsel considered moving *in limine* to limit the scope of the government's cross examination in accordance with the law. *Id*. Counsel discussed the issue in chambers with the court in advance of the suppression hearing. *Id*.

Based on the magistrate court's ruling however, counsel believed, and so advised Mr. Allen, that the court would permit the government to cross examine Mr. Allen on all subjects were he to testify at the hearing. Based on counsel's advice, Mr. Allen did not testify.

To the extent counsel misapprehended the magistrate's ruling, counsel was deficient in failing to seek clarification. If the magistrate had actually intended to rule as the District Court has now interpreted, then counsel would have advised Mr. Allen to testify, and Mr. Allen would have testified. Counsel's advice to Mr. Allen that he not testify was based solely on his understanding of the magistrate court's ruling, which is squarely at odds with the District Court's determination.

**2.     Prejudice:** Mr. Allen was prejudiced by counsel's deficient performance. Had he been permitted to testify, Mr. Allen would have rebutted the government's case that any statements were voluntary. Instead, the magistrate court simply accepted Officer Henderson's uncontested testimony.

The magistrate court's evidentiary findings turned on two key points: first, whether officers honored Mr. Allen's rights after he requested an attorney; and, second, whether Mr. Allen initiated contact with officers after he was purportedly identified in a lineup. A close look at the evidence presented at the suppression hearing, in conjunction with the trial evidence, shows that the magistrate court's

findings were undermined by the contradictory testimony and lies of government witnesses. Thus, the government's contention that Mr. Allen waived his rights is belied by the record.

FBI Agent Janet Hartman provided credible testimony that, when she advised Mr. Allen of his rights, he invoked his right to counsel. Tr. 5/16/97 at 88. Hartman also testified that she did not inform anyone of Mr. Allen's request for counsel. Vol. XI at 20.

By contrast, Lieutenant Henderson's testimony at the suppression hearing was contradicted by Detective Harper's testimony at trial. At the suppression hearing, Officer Henderson testified that he did not personally know that Mr. Allen had requested an attorney, but that Detective Harper informed him that Mr. Allen invoked his right to counsel. Tr. 5/16/97 at 297-98. Officer Harper, however, testified that Officer Henderson *told him* that Mr. Allen had requested an attorney:

Sindel: Okay. Did you ask [Billie Allen] any questions?

Harper: No Sir.

Sindel: Why didn't you ask him any questions?

Harper: I'd been informed that he had requested an attorney prior to the line-up and, therefore, I was told not to ask him any questions.

Sindel: Okay. Who told you that.

47

Harper: That would be Lieutenant Ron Henderson.

*Id*. at 228. Harper's testimony was equally incredible. He testified to taking notes of Mr. Allen's statement, but that he inexplicably destroyed those notes sometime before trial. Tr. 5/16/97 262, 265. Henderson, meanwhile, testified that he did not recall Officer Harper taking notes of Mr. Allen's statement. *Id.* at 292.

Additionally, Henderson provided incredible testimony that Mr. Allen requested to speak with him because Mr. Allen said he knew him from "another contact." *Id.* at 292-93. This other contact was a reference to the police investigation of the prior murder of Mr. Allen's friend, Marquise Taylor. Yet, counsel possessed police paperwork from that investigation indicating that Henderson did not interview or meet with Mr. Allen during that investigation.

The scope of the inconsistences and incredible testimony became fully apparent at trial when Henderson directly contradicted *his own* testimony from the suppression hearing. While Henderson had initially testified at the suppression hearing that he had been told by Harper that Mr. Allen invoked his right to counsel (a claim contradicted by Agent Hartman), he testified at trial that he had not been told that Mr. Allen requested counsel:

> Q. Listen to my question. I don't care if you spoke with Agent Hartman or not. What I want to know is at the time that you interviewed Mr. Allen, were you aware that he had told Agent Hartman [about his request.]

48

A.    No.  No, I was not, sir.

Vol. VI at 203.

It is thus clear that Henderson did not learn of Appellant's request for counsel until after the alleged confession was given, and that the contrary testimony given by law enforcement amounted to a fraud on the court.  This point directly undermines the government's position, and the position adopted by the District Court, that Mr. Allen waived his rights *after* the lineup.  Counsel failed to identify the timing of these events at the suppression hearing or at trial to effectively argue that Mr. Allen had not given a confession and/or that any statement should be suppressed.[12]

Counsel was ineffective for failing to call into question the inconsistent and incredible testimony of Officers Henderson and Harper at the suppression hearing and at trial. Had counsel effectively exposed the incredible testimony of these witnesses, and properly advised Mr. Allen about his right to testify at the suppression hearing, there is a reasonable likelihood that Mr. Allen's alleged confession would have been suppressed and Mr. Allen acquitted at trial.  Similarly, there is a reasonable likelihood that the jury would have correctly surmised from

---

[12] There are no notes or recordings of what actually took place, so both the magistrate court, and later the jury, could only rely on the testimony of Harper and Henderson, which was inconsistent and not credible.

the officers' incredible testimony that Mr. Allen never made a confession, and thus would have acquitted him.

In light of the major inconsistences between the law enforcement witnesses, there is a reasonable probability that the statements would have been suppressed had the Court, or the magistrate judge, had Mr. Allen's testimony been before them. Moreover, the testimony of Officers Henderson and Harper undermines the reliability of Mr. Allen's purported confession and ultimately the jury's verdict, given the great weight afforded confessions by juries. *See Skilling v. United States*, 130 S. Ct. 2896, 2916 (2010) ("The defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.").

**C.  The District Court Incorrectly Found that this Issue Was Not Presented until the Rule 59 Motion and Was Therefore Waived**

The District Court refused to consider the merits of Appellant's claim that counsel was ineffective for failing to understand the ruling, to ask for clarity if he did not understand, and to properly advise Mr. Allen about testifying in light of that ruling. Instead, the court determined that Appellant waived this argument because he did not raise it until the Rule 59 motion. *See* Doc. 382 at 7-8. This is incorrect.

Appellant explicitly raised these arguments during the litigation of his Motion under 28 U.S.C. 2255, years prior to his Rule 59 Motion. *See* Doc. 149 at

5; Doc. 157. These allegations were integral to the claim raised in the Amended § 2255 Motion, and the government did not claim that this issue was waived in response to Appellant's arguments. *See* Doc. 151 at 3-4. Similarly, the District Court did not find that Appellant's arguments were waived at that time. *See* Doc. 165 at 4. The District Court determined that this claim was waived only after Appellant argued it again in his Rule 59 Motion. The District Court's determination that Appellant raised this argument for the first time in his Rule 59 motion was incorrect.

### D.     Counsel Was Ineffective in Failing to Present a Timely Offer of Proof of Mr. Allen's Testimony to the Magistrate Court

Having effectively denied Mr. Allen the right to testify at the suppression hearing by ordering him subject to wide-ranging cross examination, the magistrate court ordered counsel to file an offer of proof as to Mr. Allen's proffered testimony. Counsel failed to file the ordered offer of proof until several months *after* the Magistrate Court had already denied the motion.[13] The magistrate court thus did not have Mr. Allen's proffered testimony when it denied the motion to suppress.

---

[13] In summary, Appellant would have testified that he was first advised of his *Miranda* rights by Agent Hartman, that he told Hartman that he wanted counsel, that he was never again advised of his rights, and that he never waived his right to counsel to Henderson or any other law enforcement official. *See* Case No. 4:97-cr-141, Doc. 92.

In its order denying an evidentiary hearing on this ground, the District Court found that the proffer was actually available to the magistrate judge before he issued his amended report and recommendations, and that Mr. Allen was therefore not harmed by trial counsel's failure to present it earlier. Doc. 147 at 11. In so holding, the District Court conceded that the proffer had been submitted after the magistrate judge issued his Report and Recommendations, but held that the Magistrate Judge had it available before filing his "amended report" and recommendations. An examination of the two reports shows that, although the offer was filed before the magistrate judge's second order, he did not consider it.[14]

The order of January 12, 1998 did *not* address the motion to suppress Mr. Allen's confession, but instead related to other, subsequent motions regarding identification procedures that were *not* addressed in the first evidentiary hearing:

> A previous evidentiary hearing on these two motions was held on May 16, 1997. Thereafter, the Assistant United States Attorney advised Defendants and the Court that three additional identification procedures occurred after the May 16 evidentiary hearing, thereby requiring another evidentiary hearing.

Case No. 4:97-cr-141, Doc. 202 at 1 n.1.

---

[14] On May 16, 1997, the magistrate ordered counsel to submit Mr. Allen's offer of proof. On June 13, 1997, the magistrate issued "Order and Report and Recommendation of the United States Magistrate Judge" (Case No. 4:97-cr-141, Doc. 89) recommending that Mr. Allen's suppression motion be denied. On January 23, 1997, the magistrate issued an additional order denying the suppression motion on other grounds.

The only findings made in the January 12, 1998 order concern the new identification evidence. There is no mention of Mr. Allen's offer of proof regarding the admissibility of his statements. The magistrate judge's statement in the January 12, 1998 order makes clear that he did not reconsider the motion to suppress statements in light of Mr. Allen's offer of proof.  Mr. Allen was thus harmed by trial counsel's failure to submit the offer of proof in a timely manner. An evidentiary hearing is required to resolve issues of any trial strategy relating to this failure, and to allow the District Court to consider the motion in light of the offer of proof, something which has never been done.

E.      **The District Court Erred in Denying an Evidentiary Hearing**

A movant is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the movant] to relief." *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996) (quoting *Wade v. Armontrout*, 798 F.2d 304, 306 (8th Cir. 1986)).  A court may dismiss a claim without an evidentiary hearing only "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994) (citation omitted).  The District Court erred in denying an evidentiary hearing here.

Appellant would demonstrate at an evidentiary hearing that 1) counsel's

misunderstanding of the magistrate's ruling and his failure to ask for clarification of that ruling rendered his performance deficient; 2) had counsel's advice to Appellant not been based on counsel's erroneous understanding of the ruling, Appellant would have provided testimony that would have likely altered the magistrate court's decision denying his motion to suppress; 3) counsel had no reasonable strategy in filing Appellant's proffer months late, after the motion had already been decided, and the magistrate court therefore never considered the proffer when it denied the motion; 4) counsel had no reasonable strategy for not renewing his motion to suppress at trial after Officer Henderson directly contradicted his testimony from the suppression hearing concerning facts that the suppression court relied upon to deny Appellant's motion to suppress. It was also necessary for the District Court to grant an evidentiary hearing to evaluate the testimony of Appellant concerning his alleged confession against the inconsistent testimony of Officers Henderson and Harper.

This Court should hear this appeal, vacate the District Court's judgment, and remand for a hearing. At a minimum, this issue is debatable among jurists of reason, and a COA should therefore be granted.

WHEREFORE, Appellant respectfully requests that the Court issue a Certificate of

Appealability.


Respectfully Submitted,


/s/ Timothy Kane
Timothy Kane
Eric Montroy
Federal Community Defender Office
 for Eastern District of  Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

Dated:       February 9, 2015

**Certificate of Service**

I, Timothy Kane, hereby certify that on this 9th day of February, 2015, I filed the foregoing Petition for Certificate of Appealability with service via electronic delivery to:

Ms. Carrie Costantin
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102


/s/ Timothy Kane
Timothy Kane