<u>Exhibit 1</u>

District Court Opinion
*Allen v. United States*, 2011 WL 1770929 (E.D. Mo. 2011)

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**



Only the Westlaw citation is currently available.

United States District Court,
E.D. Missouri,
Eastern Division.
Billie Jerome ALLEN, Movant,
v.
UNITED STATES of America, Respondent.

No. 4:07CV00027 ERW.
May 10, 2011.

Elizabeth U. Carlyle, Kansas City, MO, Joseph M. Cleary, Collignon and Dietrick, Indianapolis, IN, Matthew Lawry, Michael Wiseman, Federal Community Defender Office, Philadelphia, PA, for Movant.

Steven E. Holtshouser, Carrie Costantin, Joseph M. Landolt, Office of U.S. Attorney, St. Louis, MO, for Respondent.

***MEMORANDUM AND ORDER***
E. RICHARD WEBBER, Senior Judge.

**\*1** This matter comes before the Court on Movant Billie Jerome Allen's Amended Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody under a Sentence of Death [doc. # 60].

**I. PROCEDURAL BACKGROUND**
In April 1997, Movant Billie Jerome Allen ("Allen") was indicted for crimes stemming from the March 17, 1997 armed bank robbery of the Lindell Bank and Trust Company in St. Louis, Missouri that resulted in the death, by multiple gunshot wounds, of bank security guard Richard Heflin. Allen was charged in Count I of the indictment with killing Mr. Heflin in the course of committing an armed bank robbery, in violation of 18 U.S.C. § 2113(a), (e), and in Count II with using a firearm to commit a crime of violence resulting in the death of another under circumstances constituting first-degree murder, in violation of 18 U.S.C. § 924(j)(1). The Government filed a timely notice of intent to seek the death penalty, and following trial before a jury, Allen was found guilty on both Counts. The jury returned a sentence of life imprisonment on Count I and death on Count II, and this Court formally sentenced Allen on June 4, 1998.

On appeal, the Eighth Circuit affirmed Allen's convictions and sentence, rejecting his argument that the Fifth Amendment required the indictment to include, for consideration by the grand jury, the statutory aggravating factors that trigger eligibility for the death penalty. *United States v. Allen,* 247 F.3d 741, 761–64 (8th Cir.2001). Allen filed a petition for writ of certiorari to the United States Supreme Court, and following its decision in *Ring v. Arizona,* 536 U.S. 584 (2002), holding that the aggravating factors are equivalent to the elements of a capital offense for purposes of the Sixth Amendment, the Supreme Court granted Allen's petition, vacated the Eighth Circuit's decision as to Allen's sentence, and remanded the case to the Eighth Circuit for reconsideration in light of *Ring. Allen v. United States,* 536 U.S. 953 (2002).

The Eighth Circuit initially concluded on remand that Allen's sentence of death should be vacated, finding that the indictment's failure to charge at least one statutory aggravating factor violated Allen's Fifth Amendment right to indictment by a grand jury, and that although the error was not structural, it nevertheless required that his sentence be vacated because it was not harmless beyond a reasonable doubt.[FN1] *United States v. Allen,* 357 F.3d 745 (8th Cir.2004). Following a subsequent rehearing *en banc,* however, the Eighth Circuit affirmed Allen's sentence, concluding that the defect in the indictment was both non-structural and harmless beyond a reasonable doubt. *United States v. Allen,* 406 F.3d 940 (2005). The Supreme Court denied Allen's petition for writ of certiorari with respect to that decision on December 11, 2006, *United States v. Allen,* 549 U.S. 1095 (2006), and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

for rehearing on February 20, 2007. *United States v. Allen,* 549 U.S. 1246 (2007).

> FN1. In *Chapman v. California,* 386 U.S. 18 (1967), the Supreme Court held that constitutional errors that are harmless beyond a reasonable doubt do not require reversal of a criminal conviction. Since then, the Supreme Court has clarified that certain, limited classes of constitutional errors are "structural" and do require automatic reversal, while all other constitutional errors are "non-structural" and subject to the "harmless beyond a reasonable doubt" standard. *See Neder v. United States,* 527 U.S. 1, 8 (1999) (listing those cases in which the Supreme Court concluded an error was structural).

**\*2** In the present Motion under 28 U.S.C. § 2255, Allen asks the Court to set aside his death sentence on grounds of numerous alleged constitutional violations prior to trial, during trial, and throughout the appellate process.

## II. LEGAL STANDARD FOR MOTIONS UNDER 28 U.S.C. § 2255

Under 28 U.S.C. § 2255(a), a federal prisoner who contends that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." To obtain relief under § 2255, the movant must establish a constitutional or federal statutory violation constituting "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Gomez,* 326 F.3d 971, 974 (8th Cir.2003) (quoting *United States v. Boone,* 869 F.2d 1089, 1091 n. 4 (8th Cir.1989)). Subject to this "miscarriage of justice standard," requiring newly-discovered evidence of actual innocence or other, similarly extraordinary circumstances, issues that were raised

and decided on direct appeal cannot be relitigated in a § 2255 motion. *United States v. Wiley,* 245 F.3d 750, 752 (8th Cir.2001).

Claims brought under § 2255 may also be limited by procedural default. A movant "cannot raise a nonconstitutional or nonjurisdictional issue in a § 2255 motion if the issue could have been raised on direct appeal but was not." *Anderson v. United States,* 25 F.3d 704, 706 (8th Cir.1994) (citing *Belford v. United States,* 975 F.2d 310, 313 (7th Cir.1992)). Additionally, constitutional or jurisdictional claims not raised on direct appeal cannot be raised in a § 2255 motion "unless a petitioner can demonstrate (1) cause for default and actual prejudice or (2) actual innocence." *United States v. Moss,* 252 F.3d 993, 1001 (8th Cir .2001) (citing *Bousley v. United States,* 523 U.S. 614, 621 (1998) ).

If the movant's claims are not procedurally barred, the Court must hold an evidentiary hearing to consider the claims "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Shaw v. United States,* 24 F.3d 1040, 1043 (8th Cir.1994). Thus, a movant is entitled to an evidentiary hearing "when the facts alleged, if true, would entitle [the movant] to relief." *Payne v. United States,* 78 F.3d 343, 347 (8th Cir.1996) (quoting *Wade v. Armontrout,* 798 F.2d 304, 306 (8th Cir.1986)). A court may dismiss a claim without an evidentiary hearing, in contrast, "if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." *Shaw,* 24 F.3d at 1043 (citing *Larson v. United States,* 905 F.2d 218, 220–21 (8th Cir.1990)).

## III. DISCUSSION

**\*3** Allen makes numerous claims of constitutional error in his § 2255 Motion. The Court first considers his claims alleging violations of his Sixth Amendment right to counsel, and then turns to his remaining claims alleging violations of rights secured by the Fifth, Sixth, and Eighth Amendments.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

### A. Claims of Ineffective Assistance of Counsel

Notwithstanding the general rule that § 2255 claims not raised on direct appeal are procedurally defaulted absent a showing of cause and prejudice, *see United States v. Moss,* 252 F.3d 993, 1001 (8th Cir.2001), ineffective assistance of counsel claims may be raised for the first time in a § 2255 motion regardless of whether they could have been raised on direct appeal. *Massaro v. United States,* 538 U.S. 500, 504 (2003). This exception to the procedural default rule exists to prevent defendants from being forced "to raise the issue before there has been an opportunity to fully develop the factual predicate for the claim." *Id.; see also United States v. Cook,* 356 F.3d 913, 919–20 (8th Cir.2004) (ineffective assistance of counsel claims are only appropriate on direct appeal in "exceptional cases where the record has been fully developed," where necessary "to avoid a plain miscarriage of justice," and where the ineffectiveness of counsel is "readily apparent"); *United States v. Rashad,* 331 F.3d 908, 911 (D.C.Cir .2003) (noting that the same attorney may serve as counsel at the trial and appellate levels and would be unlikely to raise his own ineffective assistance on appeal). As such, barring "unusual circumstances," proof of ineffective assistance of counsel satisfies the cause for default and actual prejudice requirements necessary to raise a constitutional issue for the first time in a § 2255 motion. *United States v. Apfel,* 97 F.3d 1074, 1076 (8th Cir.1996).

In order to succeed on a claim of ineffective assistance of counsel, a litigant must satisfy the two-part standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), requiring proof (1) that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 687, 694; *see also, e.g., United States v. Rice,* 449 F.3d 887, 897 (8th Cir.2006). The first prong requires a showing that counsel's perform-

ance was deficient, measured by an objective standard of reasonableness "in light of professional norms prevailing when the representation took place." *Sinisterra v. United States,* 600 F.3d 900, 906 (8th Cir.2010) (internal citations omitted); *see also Bobby v. Van Hook,* 130 S.Ct. 13, 16 (2009) (per curiam). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Rice,* 449 F.3d at 897 (quoting *Strickland,* 466 U.S. at 689). As a result, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91. As to the second part of the test, the necessary showing of a "reasonable probability" of a different outcome is less than a preponderance of the evidence but greater than just a possibility; it "is a probability sufficient to undermine confidence in the outcome." *Paul v. United States,* 534 F.3d 832, 837 (8th Cir.2008) (internal quotations and citations omitted); *see also Odem v. Hopkins,* 382 F.3d 846, 851 (8th Cir.2004) ("It is not sufficient for a defendant to show that the error has some 'conceivable effect' on the result of the proceeding because not every error that influences a proceeding undermines the reliability of the outcome of the proceeding.") (internal citation omitted).[FN2]

> FN2. As addressed below, Allen invokes additional constitutional rights with respect to certain of his ineffective assistance of counsel claims, and in those instances the Court supplies the relevant constitutional framework in the context of addressing those claims.

### 1. Trial Counsel's Failure to Effectively Argue for Suppression of Allen's Post–Arrest Statements

**\*4** Prior to trial, Allen filed a motion to suppress certain statements he made to law enforce-

ment in which he acknowledged having participated in the robbery and murder at issue. At the hearing on Allen's motion, the Government presented evidence indicating that Allen was properly informed of his *Miranda* rights at the time of his arrest at approximately 2:00 AM on March 18, 1997, and again upon his arrival at police department headquarters a short time later. A few hours later, Special Agent Jan Hartman of the FBI attempted to give Allen a third *Miranda* warning, but he cut her off by requesting an attorney. The Government's evidence further showed that the following morning, Allen participated in a lineup but declined to have counsel present, and that after he was identified, a detective declined Allen's request to "talk about it" based on Allen's previous request for an attorney, whereupon Allen responded that he did not want an attorney and wished to speak to a Lt. Henderson. Testimony indicated that Allen was then directly led to an interview room and given a *Miranda* warning once again, at which point he made the inculpatory statements about his involvement in the robbery and murder.

After receiving the Government's evidence, the presiding magistrate judge noted that Allen would not be able to testify without opening himself up to some cross-examination, as represented in the following exchange between the magistrate judge and counsel for Allen, the Government, and Allen's co-defendant Norris Holder:

THE COURT: I just want the,—I just want to make my point. I don't know what [the Government's] position is, but to avoid this when we're in the middle of it, my position is once an individual takes a witness stand he's there for whatever cross examination that may pop up, especially in a situation like this. So, if you want to limit his testimony to various items, I'm not so sure that I can keep [the Government] to that limitations [sic]. I want to make sure you knew that going in.

CO–DEFENDANT'S COUNSEL: Oh, alright. Well, then let me discuss that with the Defendant.

It would be my position consistent with,—

THE COURT: Unless [the Government] agrees to cross only on the issues addressed in the questioning.

THE GOVERNMENT: Judge, I think once he takes the witness stand, he's,—the issues in the case are the scope of cross examination.

THE COURT: Yeah. Well that's what,—

CO–DEFENDANT'S COUNSEL: Well,—I'm sorry. I didn't mean to interrupt.

THE COURT: No, that's okay. Go ahead.

CO–DEFENDANT'S COUNSEL: No, please, you.

THE COURT: I probably should have let [the Government] make that objection first, but, again, I didn't want to put you in a position of making the ruling before,—or after you had already subjected your client to cross examination. That's my understanding of the law. But if you can convince me otherwise, I'll be glad to listen to it.

CO–DEFENDANT'S COUNSEL: Well, my position,—my argument is, that just as the Government has objected all day long about being limited in the scope of this proceeding, I think that his testimony is limited to the scope of this proceeding.

**\*5** THE COURT: Yeah, it is, except,—I think you're right, except that I just think it goes a lot broader on,—because Mr. Allen and [his co-defendant] Mr. Holder, for that matter,—Mr. Holder and Mr. Allen, I should say, were participants in this questioning and answer process in the police department from get to go [sic], that the cross examination is gonna be a lot wider and more open than I permitted with the police officers who were here to,—or the witnesses who were just here to testify about the specific identi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fication processes.

CO–DEFENDANT'S COUNSEL: Okay. Well, if I could have a few minutes to discuss that with Mr.,—

THE COURT: [Counsel for Allen], are you gonna make the same type of request?

ALLEN'S COUNSEL: Yes, your honor. I had indicated to you in chambers that I had intended to call my client, and I intended to seek an order from the Court in a Motion in Limine to restrict the cross examination to those matters that were brought up and appropriately touched up in the direct examination. It's my understanding that would be, in fact, the rule of law, that there would not be a situation in which they could be questioned about other matters that have not been specifically raised during the course,—or touched upon during the course of direct. Just so the record is clear, and I hope I'm not misstating anything, but, you know, you did indicate to me what your ruling would be in that particular situation and I indicated to you that I would like to make an offer of proof in that regard. I don't know how the Court wants me to do it. I know if we were in state court how you'd want me to do it, okay—

THE COURT: I wouldn't want you to do it, okay. But I'm not gonna let you have—how would you want to make the offer of proof?

ALLEN'S COUNSEL: I could either do it through the testimony of the Defendant or I could do it through the statements that I make to the Court.

THE COURT: Yeah, that's how I would prefer you doing [sic].

Evid. H'rng Tr., Case No. 4:97CR00141 ERW, doc. # <<EmptySet>>, p. 348 l. 8–p. 351 l. 1 (May 16, 1997). Based on this exchange, Allen declined to testify at the suppression hearing, and counsel instead submitted an offer of proof as to Allen's testimony. Allen's account contradicted much of the

Government's evidence, with him representing, among other things, that he was not given a *Miranda* warning before speaking to Agent Hartman, that he was questioned by another detective for approximately three hours after refusing to speak to Agent Hartman, that he was not advised of any right to have counsel present during the lineup procedure, that a detective asked to discuss the alleged crimes with Allen after the lineup, that Lt. Henderson initiated contact with him, and that no officer gave him a *Miranda* warning prior to or during the interrogation that produced the statements at issue. This offer of proof was submitted on June 19, 1997—after the magistrate judge's June 13, 1997 Report and Recommendation ("R & R") recommending the denial of Allen's motion to suppress, but before the magistrate judge issued an amended R & R on July 8, 1997, amending certain limited portions of the R & R but not any of its conclusions.

**\*6** Allen contends that trial counsel was ineffective (i) for failing to present controlling authority that would have required limiting the scope of any cross-examination to matters raised on direct examination, and (ii) for failing to submit an offer of proof of Allen's anticipated testimony before the initial R & R was filed.

i. Failure to Effectively Argue for Suppression

Allen contends that counsel's performance was objectively deficient in that he failed to present directly controlling authority in arguing that Allen's post-arrest statements should be suppressed, specifically Federal Rule of Evidence 104(d) ("The accused does not, by testifying upon a preliminary matter, become subject to cross-examination as to other issues in the case.") and *Simmons v. United States,* 390 U.S. 377, 394 (1968) ("[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.").[FN3]

FN3. To be clear, Allen is not seeking re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

lief under § 2255 with respect to the magistrate judge's "order" on the scope of cross examination—a claim that in any event has been procedurally defaulted as it was not raised on direct appeal and no cause for the default has been given. Allen is also not alleging that counsel provided ineffective assistance by failing to advise him to testify at the suppression hearing, notwithstanding the magistrate judge's statements about the scope of cross examination.

Counsel's performance was not objectively deficient, in that neither Rule 104(d) nor *Simmons* was relevant to the issue decided. This portion of the exchange, reproduced in full above, demonstrates that the dispute was not about whether the scope of cross-examination would cover all issues in the case, but instead, concerned the scope of matters relevant to the motions to suppress:

CO–DEFENDANT'S COUNSEL: Well, my position,—my argument is, that just as the Government has objected all day long about being limited in the scope of this proceeding, I think that his testimony is limited to the scope of this proceeding.

THE COURT: Yeah, it is, except,—I think you're right, except that I just think it goes a lot broader on,—because Mr. Allen and [his co-defendant] Mr. Holder, for that matter,—Mr. Holder and Mr. Allen, I should say, were participants in this questioning and answer process in the police department from get to go [sic], that the cross examination is gonna be a lot wider and more open than I permitted with the police officers who were here to,—or the witnesses who were just here to testify about the specific identification processes.

Evid. H'rng Tr., Case No. 4:97CR00141 ERW, p. 349 l. 11–23 (May 16, 1997). The court agreed with Holder's counsel that the defendants' testimony would be "limited to the scope of [the] proceed-

ing"—that is, limited to matters relevant to the motions to suppress, which might necessarily go beyond only those matters raised by counsel on direct examination—but rejected defense counsel's position that cross-examination might be limited only to certain post-arrest interactions that counsel found relevant to the motions to suppress, and not to the entirety of Allen's or Holder's interactions with law enforcement. The magistrate judge did not suggest that Allen would be subject to cross examination on anything other than the "preliminary matter" of issues relevant to his motion to suppress, making Rule 104(d) inapposite, and *Simmons* was likewise inapplicable because that case governs the admissibility of pre-trial suppression testimony later at trial.

**\*7** As such, the Court concludes that it is apparent from the record that counsel did not provide ineffective assistance in failing to offer these authorities in connection with Allen's motion to suppress statements, and this claim will therefore be rejected without an evidentiary hearing.

ii. Failure to Submit a Timely Offer of Proof

Counsel's performance was not deficient on this matter because, as noted above, counsel submitted an offer of proof concerning Allen's testimony before the magistrate judge issued an amended R & R recommending that his motion to suppress be denied. Although counsel failed to provide the offer of proof before the initial R & R was filed, counsel's submission prior to the amended R & R ensured that the magistrate judge had the opportunity to consider it, and it also served to preserve any objection to the magistrate judge's ruling on the scope of cross-examination. It is clear from the record that these actions by counsel fall "within the wide range of reasonable professional assistance," *Strickland v. Washington,* 466 U.S. 668, 689 (1984), and that, in any event, Allen would not be able to establish prejudice because the offer of proof was available for the magistrate judge's consideration. Accordingly, this claim will also be denied without an evidentiary hearing.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

## 2. Appellate Counsel's Failure to Raise the Suppression Issue on Appeal

Allen asserts that appellate counsel provided unconstitutionally ineffective assistance in failing to argue on appeal that the magistrate judge erred in refusing to limit the scope of cross examination and subsequently denying Allen's motion to suppress without the benefit of his testimony. Specifically, Allen claims that appellate counsel was ineffective for failing to offer Federal Rule of Evidence 104(d) and *Simmons v. United States,* 390 U.S. 377, 394 (1968) as controlling authority. The Court rejected this claim above in Section III.A. 1.i with respect to trial counsel's performance, finding that these authorities would not have affected the magistrate judge's conclusions, and for the same reasons the Court concludes that appellate counsel's decision not to raise these issues on appeal does not constitute objectively deficient performance under the Sixth Amendment. Thus, this claim will be denied without an evidentiary hearing.

## 3. Failure of Trial Counsel to Object to Stun Belt and Secure Adequate Medical Treatment during Trial

In this claim, Allen contends that trial counsel provided ineffective assistance by failing to object to the Court's requirement that he wear a "stun belt"—as Allen describes it, "an electric shocking device that is worn around the waist"—during the guilt and penalty portions of his trial.[FN4] The Government argues that counsel's performance was not deficient, in that the stun belt was not visible to jurors and was a necessary security measure due to the physical layout of the courtroom, and that Allen cannot show prejudice because there is no reason to suspect that the outcome of his trial would have been different absent the belt.

> FN4. Allen also contends in his Motion that the use of the stun belt violated "his rights to the presumption of innocence, to be present at his trial, ... to be free of cruel and unusual punishment, and to due process of law under the Fifth, Sixth, and

Eighth Amendments." These claims have been procedurally defaulted because (1) they could have been raised on direct appeal, but were not; and (2) Allen has not made any allegations that would support a finding of cause for the default and actual prejudice. *See United States v. Moss,* 252 F.3d 993, 1001 (8th Cir.2001).

**\*8** In *Deck v. Missouri,* 544 U.S. 622 (2005), the Supreme Court concluded that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of capital proceeding." *Id.* at 633. As the use of "routinely" suggests, however, this "constitutional requirement ... is not absolute":

It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. In so doing, it accommodates the important need to protect the courtroom and its occupants. But any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial.

*Id.* Although *Deck* by its terms only concerned visible restraints, in *United States v. Honken,* the Eighth Circuit recounted, without criticism, the district court's conclusion below that the use of a stun belt, even if not visible to the jury, "should be subjected to close judicial scrutiny, because of its potentially disruptive effect on the defendant's rights and the fairness of the factfinding process." 541 F.3d 1146, 1164 (8th Cir .2008) (quoting *United States v. Honken,* 541 F.Supp.2d 1010, 1037 (N.D.Iowa 2004)); *see also United States v. Durham,* 287 F.3d 1297, 1306 (11th Cir.2002) (cited by both *Honken* courts for its recognition that stun belts may interfere with "a defendant's ability to follow the proceedings and take an active interest in the presentation of his case," due at least in part to "anxiety over the possible triggering of the belt"). In light of these considerations, the Eighth Circuit concluded in *Honken* that the district court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

had provided more than ample justification for requiring a stun belt in addition to visible shackles, noting the defendant's "dangerousness, martial arts training, and compelling desire to escape." *Honken, 541 F.3d at 1164*.

Allen's trial counsel did not render objectively unreasonable assistance in not objecting to the stun belt. Allen asserts that "the law regarding the forcible restraint of a defendant at trial was well established at the time of trial," but the cited cases indicating that a district court should make particularized findings to justify the imposition of a concealed restraint all post-date Allen's 1998 trial. Counsel's failure to predict the evolution of the law on hidden restraints does not amount to an error so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. Furthermore, Allen does not allege that he ever communicated to counsel that the stun belt interfered with his ability to participate in the proceedings. Absent such a complaint from Allen, trial counsel was not ineffective for failing to argue that Allen should not be forced to wear the belt, given that counsel's objection—following the reasoning of *Honken*—would have had to focus on the belt's effect on Allen's participation.

**\*9** That said, Allen does suggest that there is some question as to whether jurors were truly unaware of the stun belt, but even if the belt had been visible, this claim would fail because he cannot demonstrate actual prejudice. In order to establish the prejudice required for an ineffective assistance of counsel claim, Allen has to show that there is a reasonable probability that the outcome of his trial would have been different but for counsel's failure to make this objection, not just that the objection would have been sustained. *See Strickland v. Washington,* 466 U.S. 668, 694 (1984). Had counsel objected to the stun belt and asserted that the Court was required to make particularized findings with respect to its necessity, the Court—as the Government has speculated—would have referred to the recommendations of the United States Marshals Service concerning security in a somewhat cramped courtroom with multiple exits, and would have also noted its own concern that Allen might be inclined to create a disturbance in an attempt to cause a mistrial.

Even if these considerations were insufficient to justify requiring the stun belt, moreover, Allen's claim of prejudice is still insufficient. As to the effect on the outcome of his trial, Allen alleges generally that the stun belt impeded his ability to actively participate in his defense, but this sort of conclusory claim is insufficient for the Court to find that the lack of objection "undermine[s] confidence in the outcome." *See Paul v. United States,* 534 F.3d 832, 837 (8th Cir.2008). Indeed, this claim strikes the Court as one in which the claim of prejudice is clearly inadequate because the effect of the alleged error is of such a speculative nature that it does not undermine confidence in the overall reliability of the outcome, assuming for the sake of argument that it had any effect whatsoever. *See Odem v. Hopkins,* 382 F.3d 846, 851 (8th Cir.2004). Allen does not refer to any specific instances in which the stun belt interfered with his participation, nor does he offer any examples of contributions to his defense he would have made absent the physical or psychological effect of wearing the belt. In sum, because the Court would have provided specific reasons for requiring the stun belt and therefore denied any objection to its use, and because Allen has not offered any concrete allegations as to how the stun belt limited his ability to participate in his defense, the Court cannot conclude that there is a reasonable probability that he would not have been found guilty and sentenced to death if counsel had objected to it.

In connection with this claim, Allen also asserts—in passing, without much discussion—that he received ineffective assistance through counsel's failure to secure adequate medical care for him during trial. Allen claims that he was suffering from allergic symptoms resulting in swollen eyes and headaches throughout his trial, and that he com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

plained to jail personnel but did not receive care adequate to alleviate his symptoms. As a result, Allen states that he was unable to fully concentrate on and understand the proceedings. Allen does not allege, however, that he ever made such complaints to counsel, and he does not provide any legal basis for the Court to conclude that counsel had a professional duty to attend to Allen's medical care. There is also no indication in the record that Allen otherwise complained about his medical care during trial, or that his medical condition impacted his ability to participate in the proceedings. Allen has failed to offer any legal or factual support for this claim, and it will therefore be denied.

**\*10** As such, the Court concludes that any claim of ineffective assistance of counsel related to the stun belt and counsel's alleged failure to secure adequate medical care for Allen will be denied without an evidentiary hearing, as it is apparent from the record that Allen cannot make the necessary showings of deficient performance or actual prejudice.

### 4. Failure of Appellate Counsel to Raise the Stun Belt Issue on Appeal

Allen also contends that appellate counsel provided ineffective assistance by not raising the stun belt issue on appeal for plain error review. The Eighth Circuit has recognized that ineffective-assistance claims are unlikely to be successful in these circumstances:

> Because of [the "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance"] and the reality that effective appellate advocacy often entails screening out weaker issues, the Sixth Amendment does not require that appellate counsel raise every colorable or non-frivolous issue on appeal.... The decision to forgo a plain error claim is usually the result of a reasonable winnowing of weaker appellate claims. Therefore, we rarely conclude that an appellate attorney's performance was constitutionally deficient for not raising such a claim.

*Roe v. Delo,* 160 F.3d 416, 418 (8th Cir.1998) (internal citations omitted); *see also Williams v. Kemna,* 311 F.3d 895, 897–98 (8th Cir.2002). Given the numerous reasons set forth in the preceding sub-section why trial counsel was not ineffective in failing to raise this objection, appellate counsel's decision not to pursue this argument does not present the rare circumstance in which counsel's failure to raise a plain error claim on appeal constitutes unconstitutionally deficient performance. *Compare, e.g., Carter v.. Bowersox,* 265 F.3d 705, 717 (8th Cir.2001) (finding deficient performance where appellate counsel submitted affidavit acknowledging that failure to raise plain error claim concerning a jury instruction—a claim with a high likelihood of success—was due to an accidental oversight and was not a strategic decision). The Court therefore likewise finds that this claim will be denied without an evidentiary hearing.

### 5. Failure of Trial and Appellate Counsel to Make an As–Applied Challenge to the Federal Death Penalty Act[FN5]

> FN5. Although it is not apparent from Allen's Motion that this is purely an ineffective assistance of counsel claim, Allen acknowledged that it is in his Traverse. *See* doc. # 94, p. 35.

In this claim, Allen argues that trial and appellate counsel provided ineffective assistance in failing to make an as-applied challenge to the constitutionality of the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591 – 3598, in light of statistical studies showing disproportionate prosecution of minorities under the FDPA.

The underlying argument Allen asserts that counsel should have made is governed by the Supreme Court's decision in *McCleskey v. Kemp,* 481 U.S. 279 (1987). In *McCleskey,* the plaintiff, convicted of robbery and murder and sentenced to death by a Georgia state court, contended that his death sentence was unconstitutional under the Eighth and Fourteenth Amendments, in light of a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

statistical study showing that capital sentencing determinations were influenced by racial considerations. *See id.* at 282–83, 286. The Supreme Court, however, rejected the notion that the plaintiff could succeed on a selective prosecution equal protection claim by showing through statistical evidence that prosecutors seek the death penalty disproportionately against minority defendants; instead, he had to "prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* at 292 (emphasis in original). To succeed on such a selective prosecution claim, the defendant must show that "(1) he was singled out for prosecution while others similarly situated were not prosecuted for similar conduct, and (2) the decision to prosecute him was based on an impermissible motive such as race, religion, or an attempt by the defendant to secure other constitutional rights." *United States v. Rodriguez,* 581 F.3d 775, 815 (8th Cir.2009) (internal citation omitted). This same standard was in effect at the time of Allen's trial in 1998. *See United States v. Huff,* 959 F.2d 731, 735 (8th Cir.1992).

**\*11** Allen's claim is inadequate on its face because he has not offered any evidence that the decision to prosecute *him* was motivated by an impermissible discriminatory purpose. Appearing to recognize this problem, Allen asserts that the Court should apply the framework of *Batson v. Kentucky,* 476 U.S. 79 (1986)—under which the defendant can make out a prima facie case of discrimination in petit jury selection under the Equal Protection Clause "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose," *id.* at 93–94—and find that the statistical evidence Allen has presented makes out such a prima facie case and entitles him to an evidentiary hearing on this claim. Apart from his attempt to shoehorn *Batson* into this inquiry—without, the Court notes, any authority whatsoever that it is applicable in this context, or any indication that this statistical evidence was available to trial or appellate counsel when they declined to raise this argument—the theory that statistical evidence should give rise to an inference of discriminatory intent,

with respect to Allen in particular, is the same argument that was rejected in *McCleskey* and subsequent cases. *See McCleskey,* 481 U.S. at 293 ("McCleskey argues that the Baldus study compels an inference that his sentence rests on purposeful discrimination. McCleskey's claim [is] that these statistics are sufficient proof of discrimination, without regard to the facts of a particular case...."); *Rodriguez,* 581 F.3d at 815 (rejecting a challenge to the constitutionality of the FDPA based on statistics showing that the prosecution is more likely to seek the death penalty in cases with a white victim); *Huff,* 959 F.2d at 735 (rejecting the defendants' claim that the district court erred in excluding statistical evidence, in support of the defendants' selective prosecution claims, that individuals arrested in "reverse stings" in the city in question were disproportionately African–American).

Allen attempts to distinguish *McCleskey* on the grounds that the statistical evidence at issue in that case related to prosecutorial decisions throughout the state of Georgia, made by numerous different county prosecutors, whereas his statistical evidence concerning federal death penalty prosecutions pertains to prosecutorial decisions by a single decisionmaker—the Attorney General of the United States. While this is an accurate observation, factually speaking, it does not distinguish Allen's case from *McCleskey.* Irrespective of whether Allen's statistical evidence is more narrowly focused than that in *McCleskey,* Allen is still ultimately asking the Court to infer, from the prosecutions of others, a discriminatory purpose as to *his* prosecution, and that is precisely the type of claim that *McCleskey* foreclosed. *See* 481 U.S. at 292–97.

Thus, even if the Court were to agree with Allen that these statistics amount to a compelling indictment of the federal government's use of the death penalty against minority defendants, the law is nevertheless clear that a defendant cannot make out a selective prosecution claim under the Equal Protection Clause without evidence that there was a discriminatory motive to prosecute him in particu-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

lar. Given the absence of any colorable factual allegations to that effect, it is clear from the face of Allen's claim that trial and appellate counsel did not provide ineffective assistance in failing to make an as-applied challenge to the constitutionality of the FDPA. This claim will therefore be denied without an evidentiary hearing.

### 6. Trial and Appellate Counsel's Failure to Object to Anonymous Jury

**\*12** Allen next claims that trial counsel provided ineffective assistance because he failed to object when the Court empaneled an anonymous jury for voir dire, and that appellate counsel was likewise ineffective for failing to raise this issue on appeal.

Courts have recognized that empaneling an anonymous jury has the potential for prejudicing a criminal defendant's Fifth Amendment right to a presumption of innocence and Sixth Amendment right to trial by an impartial jury. *See, e.g., United States v. Ross,* 33 F.3d 1507, 1519–20 (11th Cir.1994). As a result, a district court generally should not empanel an anonymous jury without (1) "concluding that there is strong reason to believe the jury needs protection," and (2) "taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Darden,* 70 F.3d 1507, 1532 (8th Cir.1995) (internal quotations and citations omitted). In *Darden,* the Eighth Circuit helpfully instructed that "some combination" of the following factors is sufficient to justify an anonymous jury: "(1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment." *Id.* (internal quotations and citations omitted).

The Court concludes that trial and appellate counsel were not ineffective for choosing not to litigate this issue because the jury panel was not truly anonymous. Although the Court ordered that the venirepersons, and ultimately the jurors, be referred to by number in open court, Allen and his counsel were provided with their names, a 14–page, 56–question questionnaire completed by each, and an opportunity for follow-up questioning to uncover any biases. District courts are not required to ensure that the *Darden* factors are met in order to use numbers for identification, where the jury panel is not otherwise anonymous. *See United States v. Peoples,* 250 F.3d 630, 635 (8th Cir.2001) ("The district court has wide discretion to empanel an anonymous jury if it finds that person's life or safety is in jeopardy, *or to require the use of numbers for identification in any case.* ") (emphasis added) (citing *Darden,* 70 F.3d at 1532). The Court, exercising that "wide discretion," found that using numbers for identification in open court was an appropriate means of shielding venirepersons from media scrutiny, but took no other steps to conceal their identities. Furthermore, the jury panel was aware that personal information was given to Allen and his counsel, which contradicts Allen's suggestion that the Court's identification procedure may have given venirepersons or jurors the impression that he was dangerous and thereby prejudiced them against him.

**\*13** As such, it is apparent from the face of Allen's claim that trial and appellate counsel's decisions not to litigate this issue did not violate Allen's Sixth Amendment right to counsel, and there is therefore no need to conduct an evidentiary hearing on this claim.

### 7. Trial Counsel's Failure to Follow Allen's Advice Concerning Peremptory Strikes

Allen contends in this claim that trial counsel was ineffective for failing to properly consult with him regarding jury selection, alleging that before becoming ill as counsel was preparing to exercise peremptory strikes, he provided counsel with a list

of three potential jurors who should have been stricken and that "several" of those individuals ultimately served as jurors. This is the extent of information and argument that Allen makes with respect to this claim, and from this alone the Court cannot conclude that trial counsel's performance was deficient or that Allen was thereby prejudiced. To the extent Allen might be asserting that he had an absolute right to be present as peremptory strikes were exercised, he is incorrect. *See United States v. Gagnon,* 470 U.S. 522, 526 (1985) ("The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.") (internal alterations, quotations, and citations omitted); *United States v. Gayles,* 1 F.3d 735, 738 (8th Cir.1993) (defendant's right to presence not violated when he was not present during the exercise of peremptory strikes because he was present for voir dire and when the strikes were given effect). To the extent Allen might be claiming that counsel was ineffective because all of the prospective jurors on his list were not ultimately stricken, this does not constitute *de facto* ineffective assistance, and Allen provides no authority or argument from which the Court could conclude that counsel's performance was objectively unreasonable in that respect. Allen had a full and fair opportunity to participate in jury selection, and the record is devoid of any indication that counsel's performance in exercising peremptory strikes fell outside the wide range of reasonable professional assistance. Accordingly, this claim is facially insufficient and will be denied without an evidentiary hearing.

### 8. Appellate Counsel's Failure to Raise *Batson* Issue on Appeal

In the course of jury selection, trial counsel made *Batson* challenges to five of the Government's peremptory strikes. The Court found that counsel had made a prima facie showing of discrimination, shifting the burden to the Government to provide race-neutral, non-pretextual justifications for the strikes. Allen's counsel waived objections to two of the strikes based on the venirepersons' reservations concerning the death penalty, and with respect to the remaining three challenges, the Court concluded that the Government's reasons were sufficient to justify the strikes. *See Batson v. Kentucky,* 476 U.S. 79, 96–97 (1986). Appellate counsel declined to raise these three preserved *Batson* challenges on appeal, and Allen contends that this decision amounted to ineffective assistance of counsel.

**\*14** The Eighth Circuit has emphasized that the deficient performance and prejudice prongs of the ineffective assistance of counsel analysis are "rigorous." *United States v. Brown,* 528 F.3d 1030, 1033 (8th Cir.2008). With respect to deficient performance, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal,"[FN6] and thus, "[a]bsent contrary evidence, [courts] assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *Id.* (internal quotations and citations omitted). The prejudice prong requires Allen to demonstrate that there is a reasonable probability that he would have been successful on appeal had appellate counsel raised the issue. *See Smith v. Robbins,* 528 U.S. 259, 285–86 (2000). As such, the Court considers the merits of the three challenges—directed at venirepersons 83, 134, and 139—to assess whether Allen has overcome the presumption of a sound decision and demonstrated a reasonable probability that the appeal would have been successful.

> FN6. The Court acknowledges that the "since time beyond memory" language may be a bit hyperbolic.

As laid out above, a defendant's challenge to a peremptory strike under *Batson* consists of a three-step analysis:

First, the defendant must make a prima facie case that the prosecution's strike was motivated by race; second, the prosecution must offer a race-neutral reason for the strike; and third, taking into account all the evidence, the trial court must find whether or not the prosecutor was motivated by

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

purposeful discrimination.

*United States v. Spotted Elk,* 548 F.3d 641, 658 (8th Cir.2008) (citing *Snyder v. Louisiana,* 552 U.S. 472, 476–77 (2008)). "It is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett v. Elem,* 514 U.S. 765, 768 (1995). The Eighth Circuit reviews *Batson* determinations under the clearly erroneous standard because the district court's conclusion with respect to whether there was discriminatory intent is a finding of fact. *See United States v. Ellison,* 616 F.3d 829, 832 (8th Cir.2010) (citing *Batson,* 476 U.S. at 98 n. 21; *United States v. Moore,* 895 F.2d 484, 485 (8th Cir.1990)); *see also United States v. Pherigo,* 327 F.3d 690, 696 (8th Cir.2003) ("The evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.") (internal quotations and citation omitted).

As to venireperson 83, the Government indicated that it struck her because (1) she indicated that she was sympathetic to psychiatric or psychological testimony in response to question 22 on the juror questionnaire; (2) her husband had been charged with a narcotics crime; (3) she was a legal secretary; and (4) she indicated some difficulties with partiality in response to question 54 on the juror questionnaire. The Government represented that the first of those reasons was its primary motivation, and given that No. 83 was the only remaining venireperson at the time of the strike who had answered that question in the affirmative, this was a facially sufficient, race-neutral reason, and accordingly the Court concluded that the Government was not motivated by purposeful discrimination. Allen argues that the Government's failure to question No. 83 about the issue is evidence that its stated purpose was pretextual, but in the cases Allen cites for that proposition—that a failure to question is evidence of pretext—the prosecutor questioned oth-

er prospective jurors who expressed a similar concern or attitude while declining to question the subject of the strike, and that is not the case here. *See Miller–El v. Dretke,* 545 U.S. 231, 244–45 (2005) (opinion on rehabilitation); *Davidson v. Harris,* 30 F.3d 963, 966 (8th Cir.1994) (having young children in case involving relatively young defendant). No. 83's sympathy toward psychiatric or psychological testimony was a race-neutral reason for exercising a peremptory strike against her, and given that she was the only remaining venireperson who had indicated that attitude when she was struck, the Court's conclusion that the Government was not purposefully discriminating against African–American jurors was not clearly erroneous.

**\*15** Turning to venireperson 134, the Government stated that it exercised a peremptory strike against her because she was the only remaining prospective juror who, in response to question 42 concerning attitudes about the death penalty, chose answer "e": "I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose the death penalty if it is called for by the facts and the law in the case." Of prospective jurors who selected this answer, the Government represented that it had struck all from the first pool and all but one from the alternate pool, and that the one exception was due to more compelling reasons for exercising a strike. Additionally, the Government noted that No. 134's brother had been arrested for assault, and that she had visited a nephew while he was incarcerated for some unknown crime. These were race-neutral explanations, and although the one alternate juror who chose "e" and was not struck was in fact Caucasian, the Court's conclusion that there was no purposeful discrimination with respect to No. 134—given her unique combination of choosing "e" *and* having family members in the justice system—was not clearly erroneous.

Lastly, as to venireperson 139, the Government stated that (1) she admitted to having watched news concerning Allen's case after the Court had instruc-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ted her not to; (2) she had a sister who had been convicted of shoplifting and robbery (it is unclear from the record whether it was the same sister) and a brother and cousin convicted of drug possession; (3) she was one of four jurors who indicated they believed that African–Americans are treated unfairly by the justice system, although she said she could put that aside; (4) the Government did not like her "affect" and felt that "she was not interested in pursuing this case," to the extent it might require her to vote in favor of imposing the death penalty. The first reason was not especially persuasive—No. 139 merely reported that she had been watching a news program when a segment concerning the case began, and that she stopped watching once she realized it—but the Court was persuaded by the combination of several family members having been convicted of crimes and her opinion of the justice system's treatment of African–Americans that the Government's motivation for striking her was not based on her race. Although numerous other venirepersons also had family members with criminal convictions, No. 139's sister had been convicted of robbery, creating more of a connection to the facts of Allen's case. Contrary to Allen's suggestion, the Eighth Circuit has also made clear that striking a prospective juror based on her opinion of the justice system's treatment of minorities is a permissible, race-neutral justification under *Batson. See United States v. Jones,* 600 F.3d 985, 991–92 (8th Cir.2010). As with Allen's other *Batson* challenges, the Government's position was facially non-discriminatory and accompanied by a sufficient explanation to support a conclusion that there was no purposeful discrimination, and accordingly there is no reason to believe that an appellate court would find the Court's denial of Allen's challenge to No. 139 to be clearly erroneous.

**\*16** The Court agrees with Allen that he had non-frivolous arguments that these strikes were *Batson* violations—and acknowledged as such in finding that he had made out a prima facie case during jury selection—but due to the clearly erroneous standard of review, appellate counsel did not act

unreasonably in choosing not to pursue these issues on appeal, given the Government's facially race-neutral justifications. *Compare, e.g., Eagle v. Linahan,* 279 F.3d 926, 942 (11th Cir.2001) (appellate counsel deficient for not raising *Batson* issue on appeal where trial court relied exclusively on a comparison of the proportion of African–Americans on the petit jury and in the venire to determine whether there was a *Batson* violation). As such, this ineffective assistance of counsel claim is deficient on its face, and will be denied without an evidentiary hearing.

**9. Trial Counsel's Failure to Further Object to Jury Learning of Subsequent Robbery of the Same Bank**

On February 24, 1998, during the guilt phase of Allen's trial, the Lindell Bank and Trust—the bank that Allen was on trial for robbing—was robbed a second time. Upon learning of this, Allen's counsel requested that the Court interview the jurors about whether they were aware of the second robbery, and if so, whether it had any impact on their ability to serve and render impartial judgments. The Court denied counsel's request, and following trial, counsel again raised the issue in Allen's motion for a new trial. In this claim, Allen argues that trial counsel was ineffective for failing to seek leave to interview the jurors and for failing to ask for the opportunity to present evidence on the issue at a hearing.

In order to protect against the violation of a defendant's Sixth Amendment right to a fair trial by an impartial jury, the Eighth Circuit "has prescribed a procedure to be followed where it appears the jury may have been exposed to adverse publicity or other outside influence during the trial: (1) the district court should determine whether the outside influence creates a danger of substantial prejudice to the accused; (2) if so, the court should poll the jurors individually to see if they were exposed; and (3) if they were exposed, the court should determine the extent and effect of the exposure and decide on appropriate remedial measures." *United States v. Mathison,* 518 F.3d 935, 941 (8th Cir.2008) (citing

*Tunstall v. Hopkins,* 306 F.3d 601, 610 (8th Cir.2002); *United States v. Hood,* 593 F.2d 293, 296–97 (8th Cir.1979) [FN7]). "[I]n the absence of contrary evidence," district courts presume "that jurors will follow court admonitions to avoid media coverage regarding a case upon which they are sitting." *Tunstall,* 306 F.3d at 609 (internal citations omitted).

> FN7. *Hood* articulates this statement of law in essentially the same fashion as *Mathison* and was good law at the time of Allen's trial. *See* 593 F.2d at 296–97.

The jurors in Allen's case received routine instructions to that effect, and after the Court indicated that it would not interview the jurors about the second robbery, counsel performed reasonably in not pursuing further relief because none would have been granted. Allen asserts that counsel should have requested an evidentiary hearing or an opportunity to interview the jurors, but that procedure is only available where the Court makes the threshold determination that "the outside influence creates a danger of substantial prejudice to the accused." *See Mathison,* 518 F.3d at 941; *see also Hood,* 593 F.2d at 296. The Court rejected that notion in declining to interview the jurors itself, and as such, there was no further relief that trial counsel could have obtained at that time. Furthermore, to the extent this claim might be read to suggest that counsel should have independently sought to interview the jurors about whether the second robbery affected their deliberations and ultimate conclusions, it would still be facially insufficient because Federal Rule of Evidence 606(b) "prohibits a juror from testifying at a post-verdict hearing as to whether extraneous information or an outside influence affected that juror's ability to be impartial." *United States v. Honken,* 541 F.3d 1146, 1168 (8th Cir.2008); *see also United States v. Bassler,* 651 F.2d 600, 603 (8th Cir.1981) (Rule 606(b) "prevent[s] any examination into the effect ... extrinsic material had on the mental processes of the jurors."). As such, it is apparent that this claim of ineffective assistance of counsel is insufficient, and it will accordingly be denied without an evidentiary hearing.

### 10. Double Jeopardy Clause Violation, and Failures of Trial and Appellate Counsel to Competently Litigate the Issue

**\*17** Allen contends in this claim that his death sentence violated the Fifth Amendment's Double Jeopardy Clause, and that he received ineffective assistance of counsel through trial counsel's failure to object on those grounds to Allen being tried "for two versions of the same offense," and through appellate counsel's failure to present relevant controlling authority on this issue to the Eighth Circuit. The Court considers the ineffective-assistance-of-counsel claims first because they to some extent affect the Court's ability to consider the free-standing Double Jeopardy Clause claim.

#### i. Trial Counsel's Failure to Object to His Sentence on Double Jeopardy Grounds

Allen claims that trial counsel's failure to object to his sentence under the Double Jeopardy Clause amounted to ineffective assistance because it resulted in plain error review of the issue on appeal. This claim must fail because Allen cannot demonstrate that he was prejudiced by this alleged error. *See Strickland v. Washington,* 466 U.S. 668, 694 (1984) (prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). It is clear from the Eighth Circuit's resolution of the double jeopardy issue that its decision did not turn on the standard of review:

> We therefore conclude, notwithstanding our assumption of the likely failure of the two statutes [under which Allen was convicted] to pass the *Blockburger* test, that Congress fully and clearly intended to permit cumulative punishments for violations of [18 U.S.C.] § 2113 and § 924(j). *See United States v. Kragness,* 830 F.2d 842, 864 (8th Cir.1987) (holding that Congress intended to allow multiple punishments for RICO conspiracies and conspiracies to commit the underlying pre-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

dicate offense even though the offenses were the same under the *Blockburger* test). We also reject Allen's proposed reliance on the rule of lenity because Congress's intent is quite clear and not ambiguous. Based on the foregoing reasons, the district court did not commit plain error under the Fifth Amendment's double jeopardy protections by submitting Counts I and II to the jury or by imposing separate sentences after Allen's conviction on each count.

*United States v. Allen,* 247 F.3d 741, 769 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953 (2002). The Eighth Circuit acknowledged the standard of review, but its conclusion rested on the clear and unambiguous intent of Congress with respect to multiple punishments. As such, it is apparent from the face of Allen's claim that he cannot demonstrate that there was a reasonable probability of a different outcome had counsel objected, and this claim will therefore be denied without an evidentiary hearing.

ii. Appellate Counsel's Failure to Competently Litigate Double Jeopardy Claim

Allen contends that appellate counsel provided ineffective assistance with respect to his double jeopardy claim by "inexplicably" failing to cite to certain Supreme Court cases that establish, in Allen's view, a more favorable double jeopardy standard for capital sentencing proceedings—specifically *Bullington v. Missouri,* 451 U.S. 430 (1981) and its progeny.

**\*18** In *Bullington,* the Supreme Court held that the Double Jeopardy Clause applies to capital sentencing proceedings, and as a result, a defendant sentenced to life imprisonment in a separate sentencing proceeding could not, after he was granted a new trial and convicted again of capital murder, be sentenced to death. 451 U .S. at 446. Later, in *Rumsey,* the Supreme Court—relying on the *Bullington* principle that "an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge"—found a double jeopardy violation where a capital defendant was sen-

tenced to death after his life sentence was set aside on appeal, due to the trial court's error in applying the state capital sentencing law:

Application of the *Bullington* principle renders respondent's death sentence a violation of the Double Jeopardy Clause because respondent's initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding—whether death was the appropriate punishment for respondent's offense. The trial court entered findings denying the existence of each of the seven statutory aggravating circumstances, and as required by state law, the court then entered judgment in respondent's favor on the issue of death. That judgment, based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty.

*Arizona v. Rumsey,* 467 U.S. 203, 211–12 (1984).

The *Bullington*-based argument Allen asserts that appellate counsel should have made begins with the proposition, accepted by the Eighth Circuit in resolving Allen's direct appeal, that the two offenses of which Allen was convicted were the "same offense" for purposes of the Double Jeopardy Clause. [FN8] *See United States v. Allen,* 247 F.3d 741, 768 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953 (2002). [FN9] Allen contends that because these two offenses were the "same offense," his sentence of life imprisonment on Count I amounted to an acquittal on the merits of the death penalty for Count II under *Bullington* and *Rumsey,* and the subsequent imposition of the death penalty for Count II therefore violated the Double Jeopardy Clause.

FN8. To be fair, it may be a bit misleading to say that the Eighth Circuit "accepted" the argument; it acknowledged that it was "err[ing] on the side of leniency" in reaching this conclusion. 247 F.3d at 768.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. In cases involving multiple punishments for the same underlying conduct, establishing that two offenses are the "same offense" is merely the first step in analyzing claimed violations of the Double Jeopardy Clause; multiple punishments are nevertheless constitutional if Congress so intended. *See, e.g., Albernaz v. United States,* 450 U.S. 333, 344 (1981); *see also Blockburger v. United States,* 284 U.S. 299 (1932) (setting forth the *Blockburger* test for determining whether two offenses are, in fact, the "same offense").

The decision not to raise this argument did not make appellate counsel's performance objectively unreasonable because *Bullington* is inapplicable to Allen's case. There are ultimately three categories of actions that implicate the Double Jeopardy Clause: "(1) a second prosecution after acquittal for the same offense, (2) a second prosecution after conviction for the same offense, and (3) multiple punishments for the same offense." *Porter v. Coughlin,* 421 F.3d 141, 144 (2d Cir.2005) (internal citation omitted). As the Government notes, *Bullington, Rumsey,* and the other related cases cited by Allen all address variations on the first and second situations—relitigating the issue of the defendant's eligibility for the death penalty in a subsequent proceeding—whereas Allen's case presents the third scenario. Indeed, in *Bullington,* the Supreme Court recognized that the underlying principle was that the Double Jeopardy Clause prohibits the retrial of a defendant whose conviction is overturned due to insufficient evidence—although it does not prohibit retrials in other circumstances, such as in cases in which trial error caused the defendant's conviction to be overturned—because where a conviction is overturned due to a failure of proof, "the prosecution ... has [already] been given one fair opportunity to offer whatever proof it can assemble." 451 U.S. at 442 (quoting *Burks v. United States,* 437 U.S. 1, 16 (1978)). That principle is simply not implicated here, as Allen was convicted of the charged offenses and sentenced to

death in the context of a single proceeding. Appellate counsel's performance did not fall outside of the wide range of reasonable professional assistance based on the decision not to raise a double jeopardy argument that by its terms is only applicable in the context of a retrial, and not where the defendant is sentenced to multiple punishments for the "same offense." FN10

FN10. As is discussed in the next subsection, Allen did raise this latter type of double jeopardy claim on direct appeal.

**\*19** In sum, it is apparent from the face of Allen's claim that appellate counsel did not provide ineffective assistance in not arguing that Allen's sentence violated the Double Jeopardy Clause, as interpreted in *Bullington,* and the Court will therefore deny this claim without an evidentiary hearing.

iii. Double Jeopardy Clause Claim

Apart from his claims of ineffective assistance of counsel related to the double jeopardy issue, Allen also raises a free-standing claim that his death sentence should be set aside because it violates the Double Jeopardy Clause. The Court is not entitled to consider the merits of this claim in the context of Allen's § 2255 Motion, given that Allen already claimed on direct appeal that his multiple sentences of life in prison and the death penalty for the same underlying offense violated the Double Jeopardy Clause. *See Allen v. United States,* 247 F.3d 741, 767 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953 (2002). Claims that were raised and decided on direct appeal cannot be relitigated in a motion under § 2255 absent a miscarriage of justice, which requires "convincing" newly-discovered evidence of actual innocence or similarly extraordinary circumstances. *See United States v. Wiley,* 245 F.3d 750, 752 (8th Cir.2001). Allen argues that he is "actually innocent" of the death penalty due to trial and appellate counsel's failure to competently litigate the Double Jeopardy Clause issue, but this claim is not based on newly-discovered evidence, and in any event is more properly the subject of Allen's ineffective-assistance-of-counsel

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims related to this issue, which were considered and rejected above. To the extent Allen argues that the Court may consider this double jeopardy claim because it is based on a different theory from that presented on direct appeal,[FN11] this claim was of course not raised on direct appeal, and it has therefore been procedurally defaulted absent a showing of cause and prejudice. *See United States v. Moss,* 252 F.3d 993, 1001 (8th Cir.2001) (internal citation omitted). Allen's allegations of cause and prejudice hinge on ineffective assistance of appellate counsel, and given that the Court concluded above that there was no Sixth Amendment violation, this claim is barred from consideration by the procedural default rule.

> FN11. Whereas Allen claimed on appeal that his multiple convictions violated the Double Jeopardy Clause because they related to the same underlying conduct, *see Allen,* 257 F.3d at 767–69, he now argues, with reference to the double jeopardy analysis in *Bullington v. Missouri,* 451 U.S. 430 (1981), that the jury's recommended sentence of life imprisonment on Count I amounted to an acquittal of the death penalty on Count II. This argument was addressed in the preceding subsection.

The validity of Allen's death sentence under the Double Jeopardy Clause was presented to the Eighth Circuit, on rehearing to the Eighth Circuit *en banc,* and to the Supreme Court on petition for writ of certiorari. It has been fully litigated, and the Court does not possess the authority under § 2255 to revisit its merits again.

**11. Trial and Appellate Counsel's Failures Concerning Government Witness Thomas Mundell's Status as a Paid Government Informant**

At Allen's trial, government witness Thomas Mundell ("Mundell") testified that Allen and his co-defendant Holder had purchased a bulletproof vest from his business prior to the robbery, and the Government then disclosed after trial that Mundell had acted as a paid government informant on sever-

al instances from 1982 through 1986. Upon receiving this information, trial counsel argued in Allen's motion for a new trial that the Government's failure to disclose the Mundell information before trial violated his Fifth Amendment due process right to disclosure of exculpatory evidence—commonly known as a *Brady* claim, *see Brady v. Maryland,* 373 U.S. 83 (1963) —and that this violation was prejudicial in that it prevented him from cross-examining Mundell on the issue of bias. In its response, the Government contended that it did not learn about Mundell's experience as a paid government informant until after Allen's trial had concluded, and that the information should therefore be treated as newly-discovered evidence, which is subject to a more stringent standard in terms of whether the discover entitles the defendant to a new trial. *See United States v. Ali,* 63 F.3d 710, 718 (8th Cir.1995). The Court heard arguments from the parties on Allen's motion for a new trial at a hearing held on June 4, 1998, and the Court then denied Allen's motion on the record. Sent'g Tr., Case No. 4:97CR00141 ERW, doc. # 474, p. 11, l. 1–9. Allen now claims that trial counsel's failure to properly argue the *Brady* claim in Allen's motion and failure to request an evidentiary hearing constituted ineffective assistance of counsel, and that appellate counsel provided ineffective assistance by not raising the *Brady* claim on appeal.[FN12]

> FN12. Although it appears in certain portions of Allen's briefs that he is also attempting to raise a free-standing due process claim under *Brady,* he concedes elsewhere that his claims on this issue are limited to ineffective assistance of counsel. Doc. # 94, p. 84.

**\*20** With respect to trial counsel's assistance, Allen's claim is facially insufficient because he offers no colorable factual allegations that would give rise to an inference of prejudice. To establish prejudice, Allen has to establish that but for counsel's errors, the result of the proceeding would have been different—that is, that if counsel had requested an

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidentiary hearing or more competently argued the issue, Allen's motion for a new trial would have been granted. *See Strickland v. Washington,* 466 U.S. 668, 694 (1984). Allen claims that an evidentiary hearing would have given counsel the opportunity to demonstrate that the knowledge of government agents as to Mundell's previous status as a paid informant should have been imputed to the Government under *Brady,* but there is no indication in the record that the Court rejected his *Brady* claim on this ground, nor is there any reason to believe that the Court would have granted counsel an evidentiary hearing on the issue. As for the quality of trial counsel's argument, Allen argues that the motion was too brief and lacked appropriate citations to authority, but as trial counsel noted during argument, it was a rather lengthy and detailed motion for a new trial under the prevailing standards of the time. Sent'g Tr., Case No. 4:97CR00141 ERW, doc. # 474, p. 2 l. 18—p. 3 l. 4 (June 4, 1998). Counsel effectively raised the *Brady* issue in the motion, and the Court rejects the notion that his performance was objectively unreasonable or prejudicial based on the length of the argument or the number of citations to authority.

The probability that a more detailed motion for a new trial or a request for an evidentiary hearing would have led the Court to grant Allen's motion is entirely speculative and therefore insufficient to undermine confidence in the outcome of the proceeding. *See Paul v.. United States,* 534 F.3d 832, 837 (8th Cir.2008) ("reasonable probability" of a different outcome, for purposes of *Strickland* prejudice, requires "a probability sufficient to undermine confidence in the outcome"). As such, this claim will be denied without an evidentiary hearing.

Appellate counsel's decision not to raise this issue on direct appeal likewise did not amount to ineffective assistance, because the claim was not likely to succeed. *See United States v. Brown,* 528 F.3d 1030, 1033 (8th Cir.2008) (because of "the importance of winnowing out weaker arguments on appeal," there is a presumption "that appellate

counsel's failure to raise a claim was an exercise of sound appellate strategy") (internal citations omitted). As a matter of due process, criminal defendants have a right to the disclosure of information affecting the credibility of government witnesses. *See Giglio v. United States,* 405 U.S. 150, 153–55 (1972). Nevertheless, "the nondisclosure of *Giglio* evidence only justifies a retrial if the withheld evidence is deemed material." *United States v. Garcia,* 562 F.3d 947, 952 n. 7 (8th Cir.2009) (internal quotations and citations omitted). Such evidence or information is material "only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different"—that is, where "the government's failure to disclose undermines confidence in the outcome of the trial." *Id.* at 953 (internal alterations, quotations, and citations omitted).

**\*21** Allen's inability to cross-examine Mundell about his potential bias does not undermine the Court's confidence in the outcome of his trial. Although Allen characterizes Mundell as the only witness who provided evidence that Allen actively planned the robbery with co-defendant Holder, that assertion is flatly refuted by the record. Lieutenant Ronald Henderson and Detective Clifford Harper both testified as to Allen's post-arrest statements, admitted over his objection, which corroborated Mundell's account of Allen and Holder going to his business to purchase a bullet-proof vest and provided additional detail about the planning of the robbery. Bank teller Lisa Moore testified that Allen came to the bank with Holder and "look[ed] around" the week before the robbery. Wayne Ross, an acquaintance of Holder, testified about a conversation between Allen and Holder that he had overheard, suggesting that they were planning on carrying out some sort of plan, seemingly a robbery. Moreover, even assuming that Mundell's testimony was critical and not cumulative of other evidence, information that he acted as a paid government informant more than ten years prior to the events at issue in the case is not sufficiently compelling to undermine confidence in the jury's conclusions. It is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

clear from the record that appellate counsel provided reasonable professional assistance in choosing not to pursue this issue on appeal, and as such, this claim will be denied without an evidentiary hearing.

### 12. Trial Counsel's Failure to Obtain Relief when the Government Indicated Allen Had Gang Affiliations, and Appellate Counsel's Failure to Raise the Issue on Appeal

Allen filed a pre-trial motion *in limine* asking the Court, among other things, to prohibit the Government from suggesting that Allen was involved in gang activity, and the Court granted his motion on that issue. Allen contends that trial counsel was ineffective for failing to obtain relief when the Government violated the Court's order by (1) eliciting testimony from Officer Thomas Carroll ("Carroll") that Allen was wearing blue pants underneath gray sweatpants at the time of his arrest; (2) questioning Carroll about a tattoo on Allen's person that contained the words "cash" and "money," but that was initially misidentified by Carroll as reading "crips" instead of "cash"; and (3) during the penalty phase, questioning defense witness Eric Taylor ("Taylor") about whether it was "just a coincidence" that Taylor was dressed in blue during his court appearance, and about whether Taylor had previously told FBI agents that Allen was "a gang wanna-be." Allen further claims that appellate counsel provided ineffective assistance in not raising these issues on appeal.

Considering first the sweatpants issue, trial counsel's performance was not objectively unreasonable because the color was mentioned in passing, without any attempt to connect it to gang activity. Furthermore, as the Government notes, the clothing worn by Allen and Holder around the time of the robbery was relevant at trial because there were varying descriptions of the clothing worn by the robbers, both of whom had concealed their faces with masks. For example, witnesses Bobby Harris and Bruce Norman, who testified to giving Allen a ride to a Metrolink station after encountering him in

a park following the robbery, both stated that Allen was wearing dark blue pants underneath gray pants at the time. Given the relevance of the color of Allen's pants to the Government's case, and that the Government made no attempt to suggest a gang connection, trial counsel was not ineffective in failing to object to this testimony.

**\*22** As for the tattoo, the record plainly refutes Allen's contention that counsel's performance was deficient. As soon as Carroll stated that the tattoo read "crips," trial counsel requested a sidebar conference and noted the Court's order concerning evidence of gang affiliations. It then became apparent that Carroll had misread the tattoo, and the Court therefore ordered the Government to lead Carroll into recognizing that it actually stated "cash," which he subsequently acknowledged. The Court also ordered the jury to disregard Carroll's previous statement about "crips." Counsel performed competently and professionally in addressing this issue, and Allen's suggestion that counsel was ineffective for not also moving for a mistrial will be rejected.

Moving to Taylor's testimony, trial counsel reasonably decided not to object to the penalty-phase cross-examination of Taylor because counsel's strategy at that point was to emphasize Allen's difficult upbringing. When trial counsel broached the gang issue through witness Shimeka Taylor, the Government objected on relevance grounds, leading trial counsel to explain this change in strategy:

THE COURT: Throughout the earlier part of trial the government under an agreement was precluded from mentioning the word gang or anything associated with gang activity. And in this phase of the trial the defendant has repeatedly referred to this. Sort of give us some explanation.

COUNSEL: Sure, the first of the—the first part of the case my concern was whether or not they were going to allege there was any gang affiliation with Mr. Allen. It had be[en] my understanding from discussions with them and all the

discovery that I received that basically he was friendly with various members of all the gangs and not a member of any particular gang and that he had never acted with any particular gang. I think it's important to establish kind of the environment that he was living in and I'd refer to the environment in terms of my opening statement and the fact that Cote Brilliante is a street that's sort of like bordered and bounded by these various gangs, none of which he was affiliated with, but people he knew. And basically how they had behaved, what they had to do living in this particular neighborhood. I think I established contacts with how he lived and how he had to live is an important element of our case.

Trial Tr. Vol. XVI, Case No. 4:97CR00141 ERW, doc. # 462, p. 131 l. 25–p. 132 l. 23 (March 4, 1998). The Court agreed with counsel and overruled the Government's objection, and as a result, from that point on counsel would have had a very difficult time convincing the Court to exclude gang-related evidence. Furthermore, when Taylor was subsequently called to testify, he provided extensive testimony on direct examination about gang activities in the neighborhood and the effect on Allen's life, including statements that he and Allen had been attacked by gang members on various occasions, and the Government's subsequent cross-examination was therefore properly within the scope of direct examination and targeted at Taylor's credibility. Counsel's decision not to object to this questioning was dictated by a shift in strategy, and as such, this claim is both refuted by the record and facially insufficient.

**\*23** Lastly, turning to appellate counsel's performance, Allen's claim fails for the same reasons as set forth above. Appellate counsel reasonably decided not to raise these claims on direct appeal because they were unlikely to succeed, especially to the extent they would have been subject to plain error review. *See Roe v. Delo,* 160 F.3d 416, 418 (8th Cir.1998) ("The decision to forgo a plain error claim is usually the result of a reasonable winnow-

ing of weaker appellate claims."). It is apparent that appellate counsel's performance was reasonable with respect to this issue, and that raising these claims was not reasonably likely to lead to the reversal of his conviction.

In sum, then, the Court concludes that these claims will be denied without an evidentiary hearing, as it is clear that trial and appellate counsel did not provide ineffective assistance in dealing with issues involving alleged gang affiliations.

**13. Trial Counsel's Failure to Investigate and Offer Exculpatory Evidence in the Guilt Phase**

Allen argues in this claim that trial counsel was ineffective in failing to investigate or present evidence on a number of issues during the guilt phase of his trial. Although the Court is inclined to simply state that Allen cannot demonstrate that he was prejudiced by any of these alleged failures due to the amount of inculpatory evidence the Government presented at trial, the Court will address these matters briefly, in turn.

Allen first claims that counsel should have further investigated evidence from a June 5, 1997 DNA report indicating that blood from item Q–4, a white strap found in the course of the police investigation,[FN13] did not match that of Allen or Mr. Heflin, the individual Allen was found guilty of murdering. Allen claims that counsel was ineffective in not seeking further testing because such testing could have revealed that the blood was from one Jerry Bostic, who according to Allen may have been the individual who carried out the robbery with Holder. This claim is entirely speculative and insufficient to warrant an evidentiary hearing, given the lack of any colorable allegations linking Bostic to the crimes for which Allen was convicted.[FN14] Even if the blood were Bostic's, moreover, the evidence still would not undermine the Court's confidence in the accuracy of the outcome, given Allen's confession, extensive evidence concerning Allen and Holder's planning of the robbery, and the numerous eyewitness reports describing the robber ultimately found to be Allen as 5'8" to over 6' tall, in

contrast to Bostic's undisputed height of 5' 5".

> FN13. It appears fairly clear from the materials submitted by the parties that this was a strap from Holder's bullet-proof vest, but given some minor inconsistencies in the documentation, the Court will give Allen the benefit of the doubt and assume it is of unknown origin.

> FN14. The Court addresses the Jerry–Bostic–was–the–real–murderer/robber theory in more detail below.

Next, Allen claims that counsel should have presented evidence of a gas chromatographic analysis of the clothing he was wearing when he was arrested. It was established at trial that the robbers' get-away van caught fire on their way to a secondary vehicle, and the arresting officer testified that Allen smelled strongly of smoke when he was arrested; thus, Allen contends that counsel should have attempted to impeach the officer's testimony with the gas chromatographic analysis. The Government presented evidence in response to Allen's Motion from Forensic Scientist Margaret Owens, manager of the St. Louis Metropolitan Police Department's Arson Section, stating that a test for petroleum distillates is "not a test for the presence of smoke" and that "there is no correlation between the smell of smoke on clothes from Mr. Allen and the Laboratory's analysis result that 'no petroleum distillates were detected' on the clothes." Even without this evidence, it is apparent that "petroleum distillates" refers to actual petroleum products, not to trace evidence left by smoke. Furthermore, as noted above, and as will be restated multiple times in this section, it is incredibly unlikely that this relatively minor piece of evidence, even if given the import Allen suggests, would have resulted in a different outcome at trial. Trial counsel's decision not to attempt to impeach Officer Carroll with it did not violate Allen's Sixth Amendment right to counsel.

**\*24** Allen also contends that trial counsel was deficient in failing to investigate statements made to police by witnesses Greg Prater and Joe Powell, who according to Allen "observed a man who was 5 feet 8 inches tall, fleeing from the burning van [that was the alleged get-away vehicle] and running through Forest Park." Allen grossly mischaracterizes the substance of the police report containing these individuals' statements, which states as follows:

> Both were working at the corner of Kingshighway and Lindell for the City Water Department and saw the following described subject standing on the southeast corner:

>> Black, male, 23 to 27 years of age, 5 feet 8 inches tall, 160 pounds, thin build, with red, frizzy hair combed straight back, wearing a multi-colored shirt and grey pants ... possibly sweat pants.

> The subject was last seen walking south on the east side of Kingshighway from Lindell at about 12:00 PM.

It is undisputed that this sighting took place approximately an hour and a half after the robbery, on the opposite end of the park, approximately 2.5 to 3 miles from where the Lindell Bank and Trust is located. There is no indication in the report that the individual was fleeing from a burning van. There is also no compelling reason to believe that this individual was Jerry Bostic, to the extent Allen claims that this is a possibility, and even if there were some reason to believe that it was, that fact would not undermine confidence in the jury's verdict given the remaining evidence of Allen's guilt. The record clearly demonstrates that counsel's decision not to present this claim was objectively reasonable.

The next piece of evidence at issue is a police report containing a statement from witness James Combs, director of Deaconess Hospital security, FN15 who made a report following the robbery of having seen a suspicious black male in the hospital. Specifically, Combs related that the individual was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

acting suspiciously while waiting in the lobby area, and that when Combs proceeded to call police, the black male appeared to pretend to make a telephone call from a pay phone in the lobby in order to attempt to overhear Combs' conversation, and then hurriedly exited the building. Combs noted that the black male then drove away in a brown Jeep Wagoneer operated by another black male. Allen again claims that this person may have been Jerry Bostic, but as the Government notes, Allen's own evidence concerning Bostic indicates that he was 5'5" tall and weighed 135 pounds. Additionally, there is no evidence that a brown Jeep Wagoneer was in any way involved in the robbery. As such, the record refutes Allen's claim that counsel was ineffective in not pursuing this matter.

> FN15. Deaconess Hospital is located several blocks from the Lindell Bank and Trust.

Moving on, Allen claims that counsel should have cross-examined prosecution witness Wayne Ross about statements he made to the FBI about a phone call Holder received from "J.B." prior to the robbery. The relevant portion of the FBI report states as follows:

**\*25** When asked if he was familiar with anyone named JB, Ross advised that either Wednesday or Thursday of Spring Break, a group of friends were at Ross's grandmother's residence playing playstation when Holder was paged. Shortly thereafter, someone called for "808," a nickname for Holder. Ross asked who was calling, and the caller told him JB. Ross asked Holder who it was, and Holder told him one of Bill's "cats."

Allen argues that this was compelling evidence of J.B.'s involvement in the robbery—again, the theory is that J.B. was Jerry Bostic—as Lieutenant Henderson testified at trial that Allen told him that J.B. stole two vans that would be used in the robbery. Although this evidence, assuming it means what Allen claims it means, might tend to inculpate the since-deceased Jerry Bostic, it does not in any

way suggest that Allen was *not* involved in the robbery. There is no reason to believe that this evidence would have resulted in a different outcome at trial with respect to Allen's guilt, and accordingly this claim will be rejected.

In his Amended Motion, Allen further claims that trial counsel was ineffective in failing to cross-examine prosecution witness Michael West concerning his identification of Allen, using West's prior statement that he did not see either suspect's face due to their masks and could not offer any opinion of either's age. In response, the Government pointed out that West did not identify Allen at trial, and Allen did not rebut this persuasive point in his Traverse. Accordingly, this claim will be denied as it is refuted by the record.

Allen next argues that trial counsel should have called Broderick Bonner to impeach the testimony of prosecution witness Wayne Ross. Ross testified at trial about a conversation he overheard at a bowling alley between Allen and Holder, seemingly discussing the robbery, and Bonner gave a statement indicating that he was present when Holder met another man at a bowling alley—presumably the same occasion—but that he did not overhear any conversation about a robbery or know anything about Holder planning to rob a bank. Counsel reasonably decided not to call Bonner because (1) his statement did not squarely refute Ross's; it could very well be that Ross overheard the conversation in question, while Bonner did not; and (2) Bonner also related in his statement that he had been to Holder's residence, where he saw "all kinds of guns," and provided general descriptions of firearms consistent with those used in the robbery. Counsel's decision not to call Bonner was competent professional assistance, and it is clear from the record that it did not violate Allen's Sixth Amendment right to counsel.

The next claim in Allen's Amended Motion is that counsel should have called Jeffrey Moore, who also would have contradicted Wayne Ross's testimony by testifying that Ross was not sitting at the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

same table as Allen and Holder that evening in the bowling alley. The Government noted in its Response that Moore's testimony did not refute Ross's, in that Ross never claimed that he was sitting with Allen and Holder when he overheard their conversation. In his Traverse, Allen did not attempt to refute this assertion, and he did not provide any other argument with respect to counsel's ineffectiveness on this issue. As such, the Court concludes that the claim will be denied as it is refuted by the record.

**\*26** Lastly, Allen alleges that trial counsel should have further investigated an anonymous call to the FBI on March 17, 1997, the date of the robbery. According to the FBI report, the caller related that he had seen Holder at a bowling alley approximately one week prior to the robbery and had heard Holder discussing a bank robbery with an individual named "DeMarco." Two police officers who frequented the bowling alley believed that person was likely DeMarco Roberts, a regular patron. As with counsel's decision not to cross-examine Wayne Ross about "J.B.", it was reasonable for counsel not to pursue this issue because the report did not undermine any of the prosecution's evidence of Allen's guilt. Ross testified that he observed Allen and Holder having a conversation at the bowling alley about the robbery two days before it occurred, whereas the anonymous call concerned a conversation a week beforehand. While the call might be evidence that "DeMarco" *did* have some involvement in the robbery, it does not suggest, as Allen claims, that "DeMarco," and not Allen, was Holder's co-conspirator in the robbery. Furthermore, Allen's assertions of prejudice are entirely speculative, based on suppositions that counsel would have ultimately discovered further evidence demonstrating that Allen was mistakenly charged with a crime committed by Holder and "DeMarco," in comparison to the concrete, persuasive evidence of Allen's guilt, including the testimony about his post-arrest confession and the numerous pieces of evidence linking him with Holder and showing that they had been planning a robbery together. The record clearly refutes Allen's contentions that counsel

performed deficiently and that he was prejudiced by counsel's performance, and this claim will therefore be denied.

In sum, then, these ten ineffective-assistance claims concerning matters counsel should have investigated or presented at trial will all be denied without an evidentiary hearing, because they are all either facially insufficient or refuted by the record.

### 14. Trial Counsel's Failure to Investigate and Present Evidence at the Penalty Phase

Allen makes several inter-related ineffective-assistance-of-counsel claims concerning counsel's assistance in the penalty phase, generally claiming that they were ineffective in failing to make timely preparations for the proceedings and in failing to properly investigate and present evidence of his abusive childhood. In order to provide the necessary context for these claims, the Court first sets forth the background of what actually took place during the sentencing proceedings, and then turns to the merits of Allen's claims.

#### i. The Penalty–Phase Proceedings

By way of background, the FDPA provides that a jury must make three distinct determinations in the penalty phase before it can impose the death penalty in a homicide case:

> First it must find, unanimously and beyond a reasonable doubt, that the defendant acted with the requisite *mens rea. See* 18 U.S.C. § 3591(a)(2). Second, again unanimously and beyond a reasonable doubt, it must find the existence of at least one statutory aggravating factor. *See* 18 U.S.C. §§ 3592(c), 3593(d). If the above two requirements are satisfied, the jury must then determine whether the aggravating factors, both statutory and non-statutory, "sufficiently outweigh" the mitigating factors presented by the defendant to justify a death sentence, "or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify" that sentence. *See* 18 U.S.C. § 3593(e).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

**\*27** *United States v. Purkey,* 428 F.3d 738, 749 (8th Cir.2005).

In the penalty phase of Allen's trial, the Government submitted two statutory aggravating factors and three non-statutory aggravating factors with respect to both charged Counts. The Government relied on the evidence offered in the guilt phase to prove the statutory factors: knowingly creating a grave risk of death to persons other than the victim in the commission of the offense, and committing the offense in the expectation of the receipt of something of pecuniary value. The non-statutory factors were (1) that Allen's "conduct in committing the offenses was substantially greater in degree than that described in the definition of the crime, apart from the statutory aggravating factors," (2) that Allen would be "a continuing and serious threat to society" due to the likelihood that he would commit future criminal acts of violence, and (3) that victim "Richard Heflin's personal characteristics as an individual human being and the impact of the death of Richard Heflin upon his family make this crime more worthy of the death penalty than other murders." The Government again relied on the guilt-phase evidence for the first of these factors, but with respect to the second factor, it presented the testimony of Byron Woodard, Allen's probation officer, who testified to Allen's continuing violations of the conditions of his probation, his intention to place Allen in an "intensive supervision" program had he not been arrested for the bank robbery, and his average to above-average intelligence. Johnnie Grant, a (former) friend of Allen's, also testified that Allen had previously earned a reputation in their neighborhood for selling individuals fake drugs, and he read some letters Allen had sent him from prison, in which Allen focused on what he intended to do once he got out of prison, failed to express any remorse for his crimes, and appeared to ask Grant to perjure himself to assist in Allen's case. As to the third factor, the Government presented victim-impact testimony from Mr. Heflin's mother, his three children, his ex-wife and mother of his children, his wife, two siblings, two

co-workers, and a former co-worker, all of which was uniformly positive about Mr. Heflin's character and relationship with his family.

In response, Allen's trial counsel submitted the following four statutory mitigating factors:

Billie Allen's capacity to appreciate the wrongfulness of his conduct to the requirements of the law was significantly impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge;

Billie Allen does not have a significant prior history of other criminal conduct;

Billie Allen committed the offenses under severe mental or emotional disturbance; and

Other factors in Billie Allen's background, record, or character or any other circumstances of the offenses that mitigate against imposition of the death sentence.

**\*28** Trial counsel also submitted the following twenty-two non-statutory mitigating factors:

Billie Allen suffered brain damage that impaired his ability to focus his attention, to learn and use good judgment, or that impeded his personality development.

Billie Allen demonstrated severe learning problems in school which led to academic failure, increased frustration, and eventual dropout.

Billie Allen's family was unable to assist him in dealing with his problems in making the transition from childhood to adulthood.

Billie Allen was born with a predisposition toward alcoholism or other substance abuse.

Billie Allen has suffered from longstanding depression.

Billie Allen has an impaired ability to cope with stress.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

At the time of the offenses for which he stands convicted, Billie Allen suffered from post-traumatic stress disorder resulting from the shooting death of his best friend.

At which time of the offenses for which he stands convicted, Billie Allen was abusing marijuana in an effort to self-medicate for depression or other symptoms of post-traumatic stress disorder.

Billie Allen has consistently demonstrated impaired judgment, no real leadership potential, the personality characteristics of a "follower," or an incapacity to plan an event as complicated as the offenses for which he has been convicted.

Billie Allen was only 19 at the time of the offenses for which he stands convicted.

In the events underlying his conviction, Billie Allen was associated with an older individual at a time when Billie Allen was suffering from emotional problems.

In the killing for which Billie Allen was convicted, the wounds to the pelvis were from bullets that struck Mr. Heflin after ricocheting off the floor.

Billie Allen grew up in a neighborhood that was surrounded by gang factions.

Billie Allen lost several close friends to gang violence.

The offenses for which Billie Allen has been convicted are inconsistent with his prior behavior.

Billie Allen was known as a likeable, gentle, lighthearted person.

Billie Allen was not considered aggressive or violent.

Billie Allen is a creative, artistic person.

Billie Allen has demonstrated the capacity to be a loving and caring person.

Billie Allen is part of an extended family whose members will assist him in his adjustment to incarceration.

Billie Allen can be adequately managed in a prison setting.

Billie Allen will not be a threat to society if he is sentenced to life imprisonment without the possibility of release.

In support of the statutory and non-statutory mitigating factors, trial counsel offered testimony from 36 witnesses—12 family members, 10 friends or neighbors, 12 teachers, coaches, or school administrators, and two expert clinical psychologists. The non-expert witnesses provided largely consistent testimony to the effect that Allen had come from a difficult background but was friendly and not prone to violence. The experts opined, among other things, that neuropsychological brain defects and post-traumatic stress disorder may have impacted Allen's actions. The Government then offered rebuttal expert testimony from a forensic psychiatrist and a clinical psychologist, disputing the conclusions of Allen's experts.

**\*29** Following deliberations, the jury returned identical findings on the aggravating and mitigating factors for each Count. The jury unanimously found the statutory aggravating factors and the first non-statutory aggravating factor. As to the mitigating factors, the jury unanimously found the fourth statutory factor—concerning "other factors" that suggest that the death penalty should not be imposed—and the non-statutory factor that the offenses for which Allen was convicted were inconsistent with his prior behavior. The jury also unanimously found an additional non-statutory factor—that he had no strong guiding influence in his home. On Count I, the jury returned a sentence of life imprisonment without parole, and on Count II, death.

ii. Allen's Claims of Ineffective Assistance of Counsel

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

Allen contends that trial counsel provided ineffective assistance in the penalty phase by failing to conduct a timely mitigation investigation, failing to timely prepare the mitigation expert for trial, failing to properly investigate and present evidence of Allen's abusive upbringing, and failing to provide adequate time and background mitigation information for the evaluations of defense mental health experts.

With respect to counsel's performance, Allen's claims focus on counsel's allegedly rushed and incomplete investigation into potential mitigating evidence. In September 1997, approximately six months before Allen's trial began in February 1998, trial counsel retained Professor Craig Haney, Ph.D., J.D., to consult on Allen's case as a mitigation expert. Counsel sent materials to Professor Haney for his review, and based on an apparent misunderstanding between counsel and Professor Haney about his role—counsel believed that Professor Haney "would assume responsibility for the day-to-day preparation of the penalty phase," while Professor Haney was under the impression that counsel would supply him with most of the background information, and he would then identify certain areas to research further and would testify as an expert witness at sentencing about Allen's mitigating social history in general—Professor Haney had done nothing in preparation for the case as of early January 1998, when counsel contacted him to discuss his progress. Trial counsel submitted declarations in support of Allen's Motion, therein stating that they were responsible for this misunderstanding and that as a result, the defense team did not investigate and present a thorough mitigation case.

Upon realizing that Professor Haney had not completed any work on the case, counsel immediately hired a replacement, Dr. David Randall, Ph.D, to take over preparation of the mitigation case. Dr. Randall quickly realized that, in his words, "there was no way an adequate investigation could be completed" before the scheduled start of trial, as neither Dr. Haney nor counsel had performed any

significant work on investigating the mitigation aspects of the case. On urging from Dr. Randall, counsel sought a continuance of 120 days, supported by an affidavit and in-court testimony from Dr. Randall, but that request was denied. Dr. Randall represents that with significant reluctance, he nevertheless agreed to work on Allen's case, even though he believed that preparing a competent case in the time remaining was "a virtually impossible task." He states that "that decision was a serious error, in that our work may have presented a 'veneer of competence or adequacy' to the mitigation investigation and sentencing phase, where none existed."

**\*30** Allen asserts that the limited time available resulted in a "shotgun approach" in terms of mitigation theories, with counsel offering evidence of whatever potential mitigating factor was available, and an approach to locating evidence that necessarily resulted in a focus on quantity of witnesses over quality. More specifically, trial counsel and Dr. Randall opine that the limited preparation time led to the following general deficiencies in Allen's mitigation case:

• Because the mitigation investigation had not completed prior to trial, counsel was unable to voir dire prospective jurors based on planned mitigation evidence or to frame guilt-phase issues in light of mitigation evidence that counsel might later offer.

• Allen was largely estranged from his father's side of the family, causing the defense team to focus on potential mitigating evidence from the maternal side. As a result of this reliance, the defense team did not want to alienate his mother, Juanita Allen, and failed to develop the rapport necessary to discuss with her the abuse Allen suffered from her and others as a child. Dr. Randall states that it was "clear that Ms. Allen was one of the primary abusers of her son," but that he was unable to build enough trust to discuss these issues with her in the time available.

• According to Dr. Randall, he strongly suspected family abuse and dysfunction based on Allen's history and his interactions with Juanita Allen, but that he was unable to obtain concrete evidence with just over one month of time for the investigation.

• The defense team was unable to prepare witnesses with "sufficient depth," leading them to repeatedly focus on Allen being a "follower," being afflicted with a variety of childhood illnesses, and having a difficult time adjusting to being a minority student at a predominantly white school. Dr. Randall represents that the defense focused on this school adjustment theme because teachers and school officials were readily accessible and could coherently articulate the theme, but that this otherwise would have been a limited part of the mitigation case.

• Counsel's sentencing presentation included evidence that Allen suffered from post-traumatic stress disorder ("PTSD") arising out of the shooting death of a childhood friend, and Dr. Randall states that the defense team decided to focus on the shooting as the underlying trauma based on limited available information, but that with further research, counsel would have been able to show that the trauma was based on "a much richer trauma history and predisposition," beginning with his abusive childhood.

• Counsel presented evidence that Allen suffered from an organic brain impairment, based on evidence of childhood febrile seizures, lead poisoning, asthma, lack of school achievement, emotional liability, and head injuries. Dr. Randall asserts that this presentation was incomplete, as it failed to include since-discovered evidence of maternal in-utero alcohol and tobacco abuse, and was based on a neuropsychological assessment conducted hastily on the day before jury selection by retained expert Dr. Gelbort. To highlight this point, Dr. Randall contrasts Dr. Gelbort's assessment and sentencing testimony with the "far more comprehensive testing and reporting" sub-

mitted by Allen's current counsel in conjunction with this Motion.

**\*31** • In general, Dr. Randall claims that the expert testimony at sentencing, from Dr. Gelbort and Dr. Cuneo, was necessarily based on cursory, last-minute, reviews and evaluations, and as a result, was superficial and incoherent. For example, Dr. Cuneo was originally retained in order to assess whether Allen was competent to stand trial and not for mitigation purposes, and his expert report was based entirely on information obtained for competency purposes.

• The defense team was never able to choose specific mitigation theories or themes to focus on at sentencing; instead, the time constraints caused them to present evidence on any topics they could find.

• The defense team was unable to properly interview and prepare witnesses. Dr. Randall states that he was still "scrambling" to locate penalty-phase witnesses late at night as the sentencing proceedings were ongoing, and that some of the witnesses who testified on Allen's behalf were interviewed only briefly or not at all.

• As compared to the information that the defense team was able to assemble in their one month of preparation for the mitigation case, Dr. Randall states that the declarations and other evidence compiled by § 2255 counsel concerning Allen's background and upbringing "present a dramatically more severe and clinically significant picture of the mitigating evidence and psychological conditions that confronted Mr. Allen in his developmental years," specifically with respect to physical and emotional abuse from both parents that Dr. Randall only suspected at the time. Dr. Randall opines that with this evidence, counsel could have framed Allen's behavior in the proper context, as the outgrowth of "a lifetime of neglect, abandonment, and physical abuse in the home," instead of being caused solely by the shooting of his childhood friend when he was teenager.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Allen further contends that had counsel conducted a professionally reasonable investigation, they would have uncovered and presented significantly more mitigating evidence at sentencing concerning Allen's abusive childhood, including the following:

• testimony from Allen's uncle, Billy Wayne Allen ("B.W.Allen"), that Allen's mother was an alcoholic, that he and Allen's father regularly used and sold drugs in front of Allen, that Allen was regularly beaten with "straps, shoes, broom handles and pretty much anything that was around," and that he and Allen's father introduced Allen to the drug trade, which culminated in Allen going to work for a rival drug dealer who specialized in heroin;

• testimony from Allen's mother, Juanita Allen, about her alcohol abuse, Allen's father's drug abuse, her physical and emotional abuse of Allen, including beating him repeatedly and throwing him out of the house as a young boy for days at a time, and about how these circumstances had transformed Allen into a violent drug user and seller by the age of fourteen;

• testimony from Cathy Toliver, a friend of the family, that Juanita Allen neglected and abused Allen and his siblings as small children, refusing to change their diapers and shaking Allen when he experienced asthmas attacks, and that Juanita Allen continued to abuse Allen physically and emotionally throughout his adulthood;

**\*32** • testimony from numerous other witnesses about the physical abuse Allen suffered from Juanita Allen and other relatives as a child, and about how his parents would lock him out of their house as a child and force him to fend for himself on the streets.

In light of this evidence that was not offered at sentencing, Allen's § 2255 counsel retained Dr. Pablo Stewart, M.D., to conduct a forensic examination to determine whether Allen was suffering from any mental health-related conditions that would be relevant in a capital sentencing proceeding and to the criminal conduct with which he was charged. In preparing his report, Dr. Stewart relied on the evidence available to counsel during trial, a subsequent neuropsychological and psychological report carried out in June 2009, the declarations gathered by § 2255 counsel concerning mitigating evidence that should have been offered at sentencing, additional interviews with members of Allen's family, and a two-day in-person interview Dr. Stewart conducted with Allen in December 2008.

Dr. Stewart's declaration highlights the allegedly un-presented or under-presented themes of traumatic childhood abuse and abandonment. The declaration also notes that in January 1997, a few months before the robbery, Ms. Allen refused to allow Allen into her home, "ostensibly for good," after her home was "shot up" that month in apparent retaliation for Allen cheating someone on a drug deal. Dr. Stewart opines that this "final act of abandonment" is "of great significance from a clinical and forensic perspective," given that it came shortly before the bank robbery.

Based on these conclusions, among others, Dr. Stewart represents in his declaration that Allen suffers from post-traumatic stress disorder, chronic dementia, recurrent major depressive disorder, recurrent substance abuse, and borderline personality disorder, and that the evidence to support these findings was available but was not presented at trial. Dr. Stewart further states that the sentencing presentation was inadequate and erroneous in that it, among other things, contained representations that Allen had had a loving and caring upbringing, misidentified the precipitating trauma for his PTSD as the shooting of his friend, and included expert testimony on Allen's mental health condition without the benefit of information about his history of childhood abuse. Dr. Stewart also refers to Dr. Gelborts' "tentative opinions" at sentencing about possible brain damage, which according to Dr. Stewart have been "confirmed and amplified" by more recent testing.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

Specifically, § 2255 counsel retained Dr. Daniel Martell, Ph.D., a forensic consultant, to review the testing conducted by Dr. Gelbort and presented at sentencing and to conduct an independent neuropsychological assessment of Allen. In reaching his conclusions, Dr. Martell reviewed the materials compiled by counsel and presented in support of this Motion, including the evidence actually presented at sentencing, and also personally examined Allen for approximately 14 hours over a three-day period in early 2009. Similarly to Dr. Stewart, Dr. Martell asserts that the expert evidence presented at sentencing "fell short of the standard of care expected in forensic practice" because Dr. Gelbort was not provided with Allen's complete history, which led him to not apply the full battery of relevant tests and reach incomplete or inaccurate conclusions. Based on the body of information available, including the reports of childhood abuse and neglect that were not available to Dr. Gelbort, Dr. Martell reached the following conclusions with respect to what expert opinions about Allen's mental health should have presented in mitigation but were not:

**\*33** • That Mr. Allen's complicated history of risk factors for brain damage and psychiatric disorder; including his abusive and dysfunctional family environment, fetal and early childhood exposure to neurotoxins, febrile seizures, uncontrolled asthma, head injuries, learning disability, and community exposure to trauma and gun violence all had direct implications for his neuropsychological status, mental state, and behavior.

• That Mr. Allen had brain damage that impacted his neurobehavioral function in multiple areas, including memory, language, motor skills, and executive functioning including impulse control.

• That the neuropsychological testing supports a diagnosis of Dementia due to Multiple Etiologies, a neuropsychiatric disorder that influenced his behavior.

• That psychodiagnostic testing indicates that Mr.

Allen suffers from symptoms of an Affective disorder (Major Depression or Bipolar II Disorder) together with Post Traumatic Stress Disorder.

• That Mr. Allen was effortful and not malingering during testing.

The Supreme Court has in recent years issued a series of opinions considering ineffective-assistance-of-counsel claims addressing counsel's performance in capital sentencing proceedings. In *Williams v. Taylor,* 529 U.S. 362 (2000), the Supreme Court focused on counsel's "obligation to conduct a thorough investigation of the defendant's background." *Id.* at 395. The majority found that counsel had failed to satisfy that obligation because they, among other things, did not begin to prepare for the penalty proceeding until a week before trial, did not conduct an investigation that would have "graphically described" the defendant's "nightmarish childhood" based on a mistaken belief that state laws barred access to such records, did not present evidence that the defendant was "borderline mentally retarded" and had not advanced beyond the sixth grade in school, did not obtain prison records that included commendations for the defendant's help in breaking up a prison drug ring, and failed to seek the testimony of prison officials who had described the defendant as among those inmates "least likely to act in a violent, dangerous or provocative way." *Id.* at 395–96. Agreeing with the trial court's conclusion that counsel's failure to present this evidence was prejudicial, the Court found that the postconviction record of these omitted matters, "viewed as a whole and cumulative of mitigation evidence presented originally, raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Id.* at 398–99.

The Supreme Court revisited the required scope of counsel's background investigation in *Wiggins v. Smith,* 539 U.S. 510 (2003). In that case, trial counsel had sought to bifurcate the guilt and pen-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

alty aspects of defendant's trial for capital murder, and after that motion was denied, counsel mentioned the defendant's difficult life history in the opening statement but did not ultimately present any evidence on the topic. *Id.* at 515–16. Counsel also made an offer of proof concerning mitigation evidence to preserve the bifurcation issue for appeal, which included evidence about the defendant's limited characteristic and nonaggressive nature, but did not include evidence on any aspects of his background. *Id.* at 516. Trial counsel's investigation into the defendant's background drew solely from two sources: the presentence investigation report ("PSI"), including a one-page summary of the defendant's personal history, and department of social services ("DSS") records documenting the defendant's history in the state foster care system, neither of which uncovered readily-available evidence that the defendant had been a victim of sexual abuse. *Id.* at 523–24.

**\*34** The Court concluded that this investigation was substandard in light of prevailing standards at the time, noting that standard practice in the state for capital cases involved preparing a social history report, for which the public defender's office made funds available to retain a forensic social worker, and also that American Bar Association Guidelines then in effect required "efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence" offered by the prosecution. *Id.* at 524. The Court also found the investigation unreasonable based on the information in the DSS records, which should have alerted counsel to numerous difficulties in the defendant's upbringing that called for further investigation. *Id.* at 525. In addition to these two factors—the unreasonableness of counsel's performance in light of prevailing standards and in light of information already in their possession—the Supreme Court also noted that counsel's decision not to conduct a thorough investigation appeared to have resulted "from inattention, not from reasoned strategic judgment," in that counsel had represented that it was ready to proceed with a mitigation case in the event

the trial court denied the motion to bifurcate. *Id.* at 526. In ultimately concluding that counsel's investigation was unreasonable in light of the circumstances, the Court emphasized that it was basing its conclusion on the "limited principle that strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation"; it was not suggesting that *Strickland* requires counsel to investigate every possible line of mitigating evidence or to present mitigating evidence at sentencing in every case. *Id.* at 533 (internal quotations and citations omitted).

Finally, in *Rompilla v. Beard,* 545 U.S. 374 (2005), the Supreme Court again considered the competence required of counsel at a capital sentencing proceeding, specifically with respect to matters the prosecution intends to offer as evidence of aggravation at the sentencing phase. *Id.* at 377. Although the Court found in that case that there was "room for debate" about trial counsel's investigation into the defendant's background for possible mitigating evidence, it concluded that counsel's performance was clearly deficient in not examining the court file on the defendant's prior conviction, because they knew that the prosecution intended to seek the death penalty by establishing the statutory aggravator of his having a significant history of felony convictions involving the use or threat of violence. *Id.* at 383. In so concluding, the majority's opinion focused on counsel's knowledge that the past conviction materials would definitely be at issue at sentencing, in contrast to a situation in which it is alleged that counsel should have conducted a search for mitigation evidence that may or may not have proved fruitful:

> **\*35** Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. [citation omitted]. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell de-

fense counsel something about the prosecution can produce.

The dissent thinks this analysis creates a "rigid, *per se* " rule that requires defense counsel to do a complete review of the file on any prior conviction introduced, [citation omitted], but that is a mistake. Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce [the defendant's] prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case. The unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt.

*Id.* at 389–90. The Court went on to note the wealth of mitigating evidence about the defendant's childhood that counsel would have uncovered from reviewing the conviction file, and finding that it "add[ed] up to a mitigation case that [bore] no relation to the few naked pleas for mercy actually put before the jury," concluded that prejudice was established because that evidence was "sufficient to undermine confidence in the outcome actually reached at sentencing." *Id.* at 393 (internal quotations and citations omitted).

Based on the foregoing, the Court is persuaded that Allen's allegations are sufficient to establish the deficient performance prong of an ineffective-assistance claim. With respect to counsel's performance, the *Williams* court emphasized counsel's "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. 362, 396 (2000). Thus, regardless of whether trial counsel's alleged errors resulted from a misunderstanding with Professor Haney or not, the Court must assess whether counsel conducted a thorough investigation of Allen's background. In *Williams,* the Supreme Court focused on two spe-

cific factors in concluding that counsel performed unreasonably in failing to locate evidence of the defendant's childhood abuse: (1) that the evidence at issue was readily available had counsel sought to obtain it; and (2) that the decision not to investigate was not strategic. *See id.* at 395; *see also Foster v. Lockhart,* 9 F.3d 722, 726 (8th Cir.1993) ("Although we generally give great deference to an attorney's informed strategic choices, we closely scrutinize an attorney's preparatory activities.") (internal citation omitted).

These two factors are present in this case, assuming the veracity of Allen's factual allegations and of the statements in the declarations he has submitted in support of his Motion, as the Court is required to do in determining whether Allen is entitled to an evidentiary hearing. The thrust of Allen's claim is that counsel failed to obtain readily-available evidence of a much more severe history of abuse than was actually depicted at sentencing, and the primary sources of evidence to that effect are Allen's mother and uncle, Juanita Allen and B.W. Allen. In the declarations submitted in support of Allen's Amended Motion, both represented that they would have offered information on this topic but were not asked. Specifically, Juanita Allen states:

> ***36** Billie's lawyers at trial did not spend very much time with me at all. They would give me some basic information about the case, like when the next court date was. But they never really sat with me to hear my story. I told them some information, and they seemed to focus on the story about Marquise Taylor and the shooting. Had they spent more time with me, and asked about my background, problems and those of Billie's father, I would have told them. But, as I said, it is hard for me to discuss these topics. I only came to do so with Billie's current lawyers after spending so many hours over many days with them. Billie's current lawyers have also asked me a lot of different types of questions, which have helped me to understand what information would

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

be important to help Billie's legal case. Billie's trial lawyers were always so rushed and never seemed to have time for me or my family. I recall speaking with an investigator for them, but even then he seemed rushed.

Decl. Juanita Allen, ¶ 14, doc. # 94–30. B.W. Allen relates the following experiences with trial counsel:

I was aware when Billie was tried for capital murder in St. Louis. Except for my time in the Air Force, I am a life-long resident of the St. Louis area. At the time of his trial, I never met with anyone working on Billie's case. My only contact with Billie's lawyers came when I telephoned them after Juanita asked me to. I spoke briefly on the phone with someone I thought was his attorney on that occasion and maybe one other time. I received no other phone calls from Billie's lawyers or their associates. The phone call did not last for more than about 10 minutes. The person I spoke with asked me if I could be a "character" witness for Billie. When I asked what that meant, the person told me that he wanted to hear "good" things Billie had done. I really wanted to help, but I could not think of much Billie had done in his young life that was "good." Billie had a very hard life, and I had lots of information to share about that, but I was never asked about those details until Billie's current lawyers began to speak with me and asked me to complete this statement. I wanted to attend the trial, but when the person on the phone heard that I had nothing "good" to say about Billie, he told me it would be best for Billie if I stayed away.

Decl. Billy Wayne Allen, ¶ 2, doc. # 94–33. If these recollections are indeed accurate and not misleading, they at least arguably suggest that counsel failed to obtain readily-available evidence about Allen's background for use in his mitigation case. An evidentiary hearing is necessary to permit the Court to assess the credibility of this evidence and to determine the extent to which it is relevant to whether counsel fulfilled their "obligation to con-

duct a thorough investigation of the defendant's background." *Williams,* 529 U.S. at 396.

Allen's allegations with respect to prejudice are also sufficient to require an evidentiary hearing. The Supreme Court has recently re-affirmed that the *Strickland* prejudice inquiry with respect to sentencing presentations must be "probing and fact-specific": "to assess the probability of a different outcome under *Strickland,* we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Sears v. Upton,* 130 S.Ct. 3259, 3266 (2010) (quoting *Porter v. McCollum,* 130 S.Ct. 447, 453–54 (2009)) (internal alterations and quotations omitted). In so stating, the Supreme Court also acknowledged that this standard "will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Id.* at 3266–67.

**\*37** As set forth above, Allen has presented broad allegations concerning additional, or different, mitigating evidence that could have been presented at sentencing, including detailed expert reports from Drs. Stewart and Martell, containing numerous diagnoses and conclusions not offered at sentencing. Given that Allen has made the necessary threshold allegations with respect to the deficient performance prong, the Court finds that it would be improper to attempt to conduct the required "probing and fact-specific" prejudice inquiry without the benefit of an evidentiary hearing. The Court cannot simply sift through the materials Allen has provided and attempt to compare them to the mitigating and aggravating evidence actually introduced at sentencing, especially given the inability to make credibility determinations. In short, it is not apparent from either the face of Allen's claim or the record that Allen was not prejudiced by counsel's failure to introduce the above-discussed mitigating evidence, and this claim therefore requires

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

further proceedings.

Allen's allegations that he was denied effective assistance of counsel with respect to counsel's investigation of relevant mitigating evidence are sufficient to entitle him to an evidentiary hearing. While the Court is well aware of the extensive evidence that was presented in mitigation, the Court finds that an evidentiary hearing is necessary to properly weigh his new evidence against that presented at sentencing.

### 15. Trial Counsel's Failure to Object to Prejudicial Victim Impact Evidence

Allen contends in this claim that trial counsel was ineffective in failing to object to unduly prejudicial and irrelevant victim impact testimony during the guilt and sentencing phases of trial. Trial counsel filed a pre-trial motion *in limine* concerning this evidence, which was denied. Allen asserts that counsel should have renewed the motion or objected when this evidence was introduced.

With respect to the allegedly objectionable matters introduced during the guilt phase, Allen specifically refers to portions of the testimony of bank employee witnesses Michael West, Mary Garvels, Lisa Moore, Amy Boehjle, Sandy Foppe, and Virginia Michael about their personal relationships with victim Richard Heflin. The following exchange between the Government and Michael West is representative of the type of exchange Allen asserts was objectionable:

Q: How did you know Rich Heflin?

A: I met him when he first started working there. And he was just a nice guy. We just talked to one another and, you know, just—

Q: Did you develop a relationship with him?

A: Yes, I did.

Q: Could you describe for the jury your relationship with Mr. Heflin?

A: Well, it was like this. You know, we would joke around and we would, you know, like—you, like—if he have something that was bothering him, he would tell me; and if I had something that was bothering me, I would tell him, you know.

**\*38** And like I had promised to give him this lawn mower one time. And he kept saying, "When am I getting my lawn mower? When am I getting my lawn mower, man?" Just like that, you know. And I said, well, I will bring it the next day. But I would always forget to bring it, you know.

So you know, the day before his demise he had wanted me to bring the lawn mower again. I said, "I'll bring it tomorrow for sure." That's the last thing I said to him.

Q: Is it fair to say Mr. Heflin was a friend of yours?

A: Yes.

Trial Tr. Vol. VII, Case No. 4:97CR00141 ERW, doc. # 499, p. 148 l. 7–p. 149 l. 7 (Feb. 18, 1998). Similarly, Mary Garvels and Virginia Michael both testified that they were good friends with Mr. Heflin and his wife. Lisa Moore related joking around with Mr. Heflin on various occasions, including about her pregnancy, and Amy Boehjle stated that she "consider[ed] him a friend." Sandy Foppe likewise testified that Mr. Heflin was "a friend" and "was always hanging out in [her] department."

The record refutes Allen's claims that counsel's performance was deficient and prejudicial. As the Government correctly states, in each of the instances quoted above, the Government immediately followed the exchange by asking the witness to identify a photograph of Mr. Heflin. As such, establishing their relationship with Mr. Heflin was simply a means of laying the necessary foundation for the identification and for their subsequent testi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

mony about the circumstances surrounding his murder. Regardless of whether Allen attempts to characterize this evidence as victim impact evidence, as unduly prejudicial, or as irrelevant, it is apparent from the record that any objection would not have been likely to succeed, and counsel therefore performed objectively reasonably in not raising the objection. Furthermore, these were all brief exchanges that occurred as counsel was establishing background information at the beginning of each of these witnesses' testimony, and there is no reason to believe that they had an impact on the outcome of Allen's trial, given the voluminous trial record and evidence presented.

As for the victim impact evidence introduced at sentencing, Allen argued on direct appeal that it was improperly admitted, subject to plain error review, *see United States v. Allen,* 247 F.3d 741, 778–79 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953 (2002), and now contends that counsel was ineffective in failing to object and preserve the issue. Allen cannot demonstrate that he would have succeeded under an abuse of discretion standard—that is, that he was prejudiced by this alleged failure—because the Eighth Circuit expressly concluded that "the district court did not commit *any error,* much less plain error, in its decision to deny Allen's motion in limine at the outset of the sentencing hearing and later to permit all of the government's victim impact evidence to come into the record without objection." *Id.* at 779 (emphasis added). The Government also notes persuasively that any claim of prejudice directed at this evidence cannot be reconciled with the jury's decision not to credit the non-statutory aggravating factor concerning victim impact. Thus, it is clear that Allen was not prejudiced by this alleged mistake.

**\*39** As such, Allen's ineffective-assistance claim concerning victim impact testimony will be denied without an evidentiary hearing, as his contentions that counsel performed unreasonably and that he was prejudiced thereby are both refuted by the record.

### 16. Trial Counsel's Failure to Properly Object to the Government's Penalty Phase Arguments

Here, Allen asserts that he was denied effective assistance of counsel through trial counsel's failure to make proper objections to a number of allegedly improper statements during closing arguments. The Court first considers Allen's claim concerning statements about a lack of a nexus between the offense and the mitigating factors, because it presents a somewhat distinct issue, and then addresses counsel's failure to object to the remainder of the allegedly objectionable statements.

#### i. Arguments Concerning a Nexus between the Offense and the Mitigating Factors

During closing argument, the Government repeatedly argued that the mitigating factors and evidence introduced by Allen were unrelated to the offenses with which he was charged. The following are a few examples of such statements:

And the bottom line on all those things, post-traumatic stress disorder, depression, is there any connection this crime? And there's not. This was a rational act.

Trial Tr. Vol. XIX, Case No. 4:97CR00141 ERW, doc. # 503, p. 62, l. 11–14 (March 9, 1998). Ladies and gentlemen, the only person in this courtroom who doesn't believe that every human being has value is sitting right there [indicating], because he didn't think that Richard Heflin had enough value to live because he was between this defendant and money. The fact that [Allen] had a bad father or a drinking father has nothing to do with what he did in the Lindell Bank and Trust, has nothing to do with him cold bloodedly murdering Richard Heflin.

*Id.,* p. 96 l. 13–21.
All these mental defenses you are hearing about, there is no connection to this defendant walking into that bank and killing for money. They're just sitting out there kind of floating out in space, no nexus, no causation, no connection of any kind between those little things and what this defend-

ant did.

> *Id.,* p. 100 l. 20–25.
> You weigh the cold-blooded murder of Richard Heflin against the evidence he put on in mitigation, that he's kind and gentle and artistic. [He] wasn't artistic on the day of this robbery. What was he creating that day?

> *Id.,* p. 109 l. 6–10. Allen claims that counsel should have objected to these arguments because there is no requirement that there be a nexus between mitigating evidence and the charged offense.

"[T]he Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty," and from that principle the Supreme Court has found that it is impermissible, under both the Eighth Amendment and as a matter of due process, to "prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty." *Penry v. Lynaugh,* 492 U.S. 302, 317, 318 (1989) (*Penry I* ) (internal citations omitted), *abrogated in part on other grounds by Atkins v. Virginia,* 536 U.S. 304 (2002). Thus, in *Tennard v. Dretke,* the Supreme Court reaffirmed that the relevance standard for mitigating evidence in a capital case "is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death," and therefore concluded that the jury must be permitted to give weight to evidence of a defendant's low IQ in deciding whether to sentence him to death, irrespective of whether he established that the criminal act was attributable to that condition. 542 U.S. 274, 286–87 (2004).

**\*40** Both *Penry I* and *Tennard,* however, deal with the defendant right to have the jury "give effect to" mitigating evidence; neither suggests that the prosecution cannot argue that mitigating evidence should not be credited or that capital jurors are required to credit certain mitigating evidence. *See*

*Penry v. Johnson,* 532 U.S. 782, 797 (2001) (*Penry II* ) ("[T]he key under *Penry I* is that the jury be able to 'consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence .' ") (quoting *Penry I,* 492 U.S. at 319) (emphasis and latter alteration in original); *Abdul–Kabir v. Quarterman,* 550 U.S. 233, 246 (2007) ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.") (internal citations omitted). Indeed, under the procedures set forth in the FDPA, even if a jury finds that a given mitigating fact has been proven by a preponderance of the evidence, it nevertheless may conclude that it is outweighed by an aggravating factor. *See United States v. Rodriguez,* 581 F.3d 775, 799 (8th Cir.2009); 18 U .S.C. § 3593(c), (e). Thus, prosecutors are free to argue that a given mitigator should not be given any weight in the circumstances of the case, so long as the prosecutor does not argue or assert that jurors are forbidden from considering it. *Abdul–Kabir,* 550 U.S. at 259 & n. 21 ("A jury may be precluded from [having a 'meaningful basis to consider the relevant mitigating qualities' of a defendant's proffered evidence] not only as a result of the instructions it is given, but also a result of prosecutorial argument dictating that such consideration is forbidden.") (internal citations omitted); *United States v. Johnson,* 495 F.3d 951, 978 (8th Cir.2007) ("The prosecutor was not arguing that the jurors could choose to ignore the mitigators or exclude them from consideration, but rather that they were insufficient to outweigh the gravity of the offense.... [A]s long as the jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight.").

Counsel performed reasonably in not objecting to these statements because none of them rose to the level of instructing the jury that they were re-

quired to ignore Allen's mitigating evidence. In arguing that Allen's mitigating evidence should not be given effect because it had no factual connection to the bank robbery and murder he carried out, the Government was doing what the above-cited authorities explicitly give it license to do: contend that the mitigating factors, even if proven, were not entitled to any weight given the circumstances of the crime. Furthermore, with respect to the jury's ability to give effect to the mitigating evidence, the verdict form expressly set forth statutory and non-statutory mitigating factors for the jury to consider, and the jury filled out the form by indicating the number of jurors who found each factor. The verdict form also provided space for the jurors to note additional mitigating factors, of which they found three, to varying degrees. Nothing prevented the jurors in Allen's case from giving effect to the mitigation evidence presented; they simply chose not to, at least to the extent Allen desired. Under *Penry I* and *Tennard,* Allen had the right to have the jury be given an opportunity to consider and give effect to his mitigating evidence, irrespective of its factual connection to the criminal conduct of which he was found guilty, and the sentencing proceeding and verdict form satisfied that right. Allen has not identified any constitutional or federal statutory right, however, that would prohibit the Government from stating to the jury that the mitigating evidence presented had no connection to the crime and therefore did not affect Allen's culpability. As such, this claim is insufficient on its face and will be denied without an evidentiary hearing.

### ii. Other Statements in Closing Argument

**\*41** Allen claims that trial counsel provided ineffective assistance by not objecting, on various grounds, to numerous additional statements from the Government during closing argument. Specifically, Allen claims that the following statements were improper emotional appeals:

> He wants to go to prison for life. He wants to go there and he wants to watch movies and read books, he wants write letters and have visits from

his relatives, he wants to exercise and play basketball and volleyball. Richard Heflin can do none of those things because of his absolutely voluntary intentional acts Richard Heflin can never do any of those things. And this defendant doesn't deserve to either because of what he did to Richard Heflin. Don't let him down there dribbling basketballs on Richard Heflin's grave; it wouldn't be right.

Trial Tr. Vol. XIX, Case No. 4:97CR00141 ERW, doc. # 503, p. 97 l. 23–p. 98 l. 8 (March 9, 1998).

> Richard Heflin didn't think this guy with the mask, armed for war, armed to kill, was kind, lighthearted, or gentle. He thought he was a murderous dog coming in there to kill people for money. That's what Richard Heflin thought.

*Id.,* p. 105 l. 24—p. 106 l. 3.

> And remember when you're back there deliberating, the last thing Richard Heflin ever saw was these two come in and start blazing at him, blow him down—and the terrible irony is he survived Vietnam, survived Vietnam, managed to live through having to fight people with guns just like that, and he's killed at High [sic] Point in St. Louis City on St. Patrick's day, that is a terrible irony.

*Id.,* p. 106 l. 3–10.

> You cannot find a case that more cries out for a jury to impose the death penalty than the facts of this case, the cold-blooded, wanton murder and attempted murder and putting other people's lives at risk for money and really for fun.

*Id.,* p. 107 l. 12–17.

> But when you're back there I want you to remember one thing—three things, really: That Richard Heflin's mother on Christmas day will always have an empty chair at her Christmas table. Justin Heflin when he's hitting a home run or making a great play in baseball will never look up and see his father sitting in those stands cheering for him. And Dana Heflin, when she looks out her win-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

dow and sees those doves on Richard Heflin's bird feeder, her heart is going to break yet again.

*Id.,* p. 111 l. 13–22. Next, Allen argues that these statements improperly introduced the prosecutor's own beliefs and opinions:

The next statutory mitigator that they're suggesting to you, that he had a severe mental or emotional disturbance. I think that's a joke.

*Id.,* p. 60 l. 5–7.

He smoked pot to self-medicate. I think he smoked pot because he liked to get high. And he always did what he wanted to do, not what he should do. That had nothing to do with self-medication or post-traumatic stress disorder.

*Id.,* p. 64 l. 7–11.

He is capable of absolute inhumanity. I would hate to be at his mercy.

***42** Id.,* p. 100 l. 13–14.

I am honored to present this case on behalf of Richard Heflin who died doing what he always did, protecting others. Who died doing what he always did, protecting others.

*Id.,* p. 111, l. 3–6. Lastly, Allen contends that these statements improperly assumed facts not in evidence:

This is a violent bank takeover, the kind you just don't see.... This crime that was committed by these defendants is much greater in degree than would normally be seen in a bank robbery.

*Id.,* p. 50 l. 16–p. 51 l. 7.FN16

> FN16. The Court notes here, because it will not have occasion to do so below, that Allen grossly mischaracterizes this quotation, in that the ellipsis represents approximately half of a page of transcript recounting facts that *were* in evidence.

This defendant contributed to the violence in this city. On March 17th he contributed to the violence in this city. He contributed to this violence

before that when he apparently got Marquis killed because somebody was trying to kill this defendant, probably because he had ganked them. FN17

> FN17. This statement refers to Marquis (or Marquise) Taylor, a friend of Allen's who was the victim of a fatal shooting before the events at issue in this case.

*Id.,* p. 105 l. 13–18. Allen contends that counsel was ineffective because these statements, viewed together,FN18 required a mistrial as to sentencing because they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. United States,* 477 U.S. 168, 181 (1986) (internal quotations and citation omitted). Allen also asserts that appellate counsel was ineffective for not raising this issue on direct appeal.

> FN18. In his Traverse [doc. # 94], Allen offers a number of additional statements during closing arguments he contends were improper. It suffices to say that they are of a similar character as those set forth above.

A criminal defendant's Sixth Amendment right to counsel does extend to a right to effective assistance during closing argument, but the Supreme Court has cautioned that "counsel has wide latitude in deciding how best to represent a client and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry,* 540 U.S. 1, 5 (2003). Allegations of improper statements during closing arguments amount to allegations of prosecutorial misconduct, for which there is a two-part test to determine whether the defendant is entitled to a new trial: "first, the prosecutor's conduct or remarks must have been improper, and second, the remarks or conduct must have prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial." *Graves v. Ault,* 614 F.3d 501, 507 (8th Cir.2010) (internal alterations, quotations,

and citation omitted). As a general matter, statements in closing arguments that appeal to emotion, and "against a rational decision by the jury," are improper because they are "contrary to a fair proceeding." *See Weaver v. Bowersox,* 438 F.3d 832, 841 (8th Cir.2006) (internal citations omitted). Nevertheless, courts are not required to consider whether a given remark was improper if the defendant cannot establish that it deprived him of a fair trial. *Id.*

Trial counsel was not ineffective with respect to this issue. In order to establish prejudice, Allen needs to show that there was a reasonable probability of a different outcome had counsel objected to these statements—that is, that there was a reasonable probability that he would not have been sentenced to death, due to a curative instruction or a grant of a new trial as to sentencing, one that did not result in a death sentence, or possibly because the act of making the objection would have dissuaded further improper statements. *See Sears v. Upton,* 130 S.Ct. 3259, 3264–65 & n. 8 (2010) (discussing the prejudice standard in the capital sentencing context). Viewing the sentencing record as a whole, these allegedly improper statements are negligible portions of a well-developed and persuasive closing statement emphasizing the aggravating factors ultimately found by the jury,[FN19] and de-emphasizing the mitigating factors by showing that Allen's conduct was the product of a reasoned decision to arm himself and rob the Lindell Bank and Trust. Furthermore, these statements did not involve attempts to manipulate or misstate the evidence, a key factor in determining whether improper prosecutorial statements amount to a due process violation. *See United States v. Allen,* 247 F.3d 741, 777 (8th Cir.2001) (citing *Mack v. Caspari,* 92 F.3d 637, 643 (8th Cir.1996)), *vacated on other grounds,* 536 U.S. 953 (2002). Lastly, as the Eighth Circuit noted on direct appeal, the jury's sentence of life on one count and death on the other is "strong evidence that its decisions were not based on passion," and the Court also instructed the jury that its decision was to be based on the evidence, and that

statements by attorneys were not evidence. *Id.* Thus, there is no basis for concluding that these statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Darden v. United States,* 477 U.S. 168, 181 (1986) (internal quotations and citation omitted), such that this Court or a reviewing court would have granted a new trial, nor is there any non-speculative ground for believing that a new sentencing proceeding would have had a different outcome absent these few statements.

> FN19. The jury unanimously found that that Allen knowingly created a grave risk of death to persons other than the victim in the commission of the offense, that he committed the offense in the expectation of the receipt of something of pecuniary value, and that his conduct in committing the offense was substantially greater in degree than that described in the definition of the crime, apart from the statutory aggravating factors.

**\*43** In short, the record clearly refutes any claim that there was a reasonably probability that Allen would not have been sentenced death if trial counsel had objected to these allegedly improper statements, or that these alleged errors should undermine the Court's confidence in the outcome. As such, there is no need to hold an evidentiary hearing on this claim. Allen's claim directed at appellate counsel, asserting that counsel should have raised these issues on appeal, will be denied for the same reasons as stated above. Additionally, the Court notes that appellate counsel did raise the "murderous dog" comment on direct appeal for plain error review, and the Eighth Circuit concluded that although it was likely improper, it was not prejudicial. *See Allen,* 247 F.3d at 775–77.

### 17. Trial and Appellate Counsel's Failure to Object to "Pecuniary Gain" as a Statutory Aggravator

Allen was charged in Count I of the indictment with bank robbery in violation of 18 U.S.C. § 2113,

a necessary element of which is a theft or attempted theft. At sentencing, the Government submitted the "pecuniary gain" statutory aggravating factor, requiring proof that Allen committed the offense in the expectation of the receipt of something of pecuniary value, and the jury unanimously found this factor to exist. Allen contends that trial and appellate counsel were ineffective in failing to argue that using one of the elements of the underlying offense as a statutory aggravator violates the Fifth Amendment's Double Jeopardy Clause and the Eighth Amendment's prohibition on cruel and unusual punishments.[FN20]

> FN20. The Government devoted a significant portion of its argument on this claim to arguing that the "pecuniary gain" factor is applicable in the circumstances of a bank robbery, and not only in a "murder-for-hire" scenario. Allen, however, does not contend in his Amended Motion or elsewhere that counsel was ineffective with respect to arguing or not arguing that issue.

Counsel was not ineffective in litigating this issue. First, trial counsel *did* object to the Government's pursuit of this statutory aggravator on Eighth Amendment grounds, in Allen's motion to dismiss the Government's notice of intent to seek the death penalty [Case No. 4:97CR00141 ERW, doc. # 172, p. 15–16], and Allen offers no authority or argument as to how or why trial or appellate counsel should have further pursued that claim after the motion was denied. Second, with respect to the double jeopardy issue, the Double Jeopardy Clause is not implicated by the Government's pursuit of a statutory aggravator because "[a]ggravating circumstances are not separate penalties or offenses, but are standards to guide the making of the choice between the alternative verdicts of death and life imprisonment." *Poland v. Arizona,* 476 U.S. 147, 156 (1986) (internal alterations, quotations, and citation omitted). Thus, trial and appellate counsel acted reasonably in electing not to object on those

grounds. This claim is both insufficient on its face and refuted by the record, and will therefore be denied without an evidentiary hearing.

### 18. Trial and Appellate Counsel's Failure to Object to the Non–Statutory Aggravator

In seeking the death penalty, the Government submitted the following non-statutory aggravating factor: "Was Billie Jerome Allen's conduct in committing the offenses substantially greater than that described in the definition of the crime, apart from the statutory aggravating factors?" Trial counsel objected to this factor on Eighth Amendment grounds in Allen's motion to dismiss the Government's notice of intent to seek the penalty. *See* Case No. 4:97CR00141 ERW, doc. # 172. Allen claims that trial counsel was ineffective in not objecting to this factor when it was submitted to the jury, and that appellate counsel was ineffective in not raising the issue on direct appeal. Specifically, Allen argues that the factor is unconstitutionally vague in light of the Eighth Amendment's requirement that for purposes of the selection component of the capital decision-making process—where the sentencer decides if an individual already deemed eligible for the death penalty should in fact receive that sentence—the sentencer must make "an individualized determination of the basis of the character of the individual and the circumstances of the crime." *See Tuilaepa v. California,* 512 U.S. 967, 972 (1994) (internal quotations and citations omitted).

**\*44** Allen cannot succeed on this claim because he cannot demonstrate that he was prejudiced by these alleged errors. As to the probability of a different outcome at trial, Allen offers no argument or authority as to why the Court would have sustained an Eighth Amendment objection to the jury instruction, where the Court had already rejected that precise argument earlier in the case. It is true, as Allen asserts, that a subsequent objection would have led to a more favorable standard of review on appeal, but Allen cannot show a reasonable probability that the Eighth Circuit would have accepted this claim and vacated his death sentence, because the Eighth

Circuit rejected this argument in considering the appeal of Allen's co-defendant Holder:

The jury found that Holder's "conduct in committing the offense was substantially greater in degree than that described in the definition of the crime, apart from the statutory aggravating factors." [citation omitted]. Holder argues that this factor is unconstitutionally vague. We disagree. The "substantially greater in degree" language, combined with the district court's submission to the jury of the statutory elements of each offense to which Holder was convicted, provided the jury a sufficient common-sense core meaning of the aggravating factor that it was capable of understanding and applying. The relative seriousness of a crime is a factor that is routinely taken into account by sentencing courts. *See, e.g., United States Sentencing Guidelines,* § 5K2.0 (allowing an upward departure "if the factor is present to a degree *substantially in excess* of that which ordinarily is involved in the offense") (emphasis added). We therefore find no vagueness problem with this aggravating factor.

*United States v. Allen,* 247 F.3d 741, 786 (8th Cir.2001), *vacated on other grounds,* 536 U.S. 953 (2002). Allen contends that his situation was different from Holder's because the Government in Allen's case argued that the robbery was not a "normal" robbery, but as the Government correctly notes, it made essentially the same argument in both trials:

Let's look at the fact that the crime is greater in degree than that described in the definition. This is a violent bank takeover, the kind you just don't see. They are heavily armed with military weapons. They've got 205 rounds of ammunition. They have a second shotgun in the second van. You know what that's for. That's to stop anybody from getting their cash money from them when they're getting away. And you know this defendant was carrying these and his extra rounds of the Chinese gun because he was literally going to be riding shotgun with this, ready to kill anyone who

tried to take their money from them or tried to stop them from getting away.

They intended to burn that van. That is extreme in degree. The defendant had all of those rounds for killing. His intent was obvious. Trying to shoot at another person like Michael West. This crime that was committed by these defendants is much greater in degree than would normally be seen in a bank robbery.

**\*45** There was absolute violence, total intimidation, massive force, extravagantly planned, elaborately planned with total destruction and mayhem in mind.

Trial Tr. Vol. XIX, Case No. 4:97CR00141 ERW, doc. # 503, p. 50 l. 14–p. 51 l. 11 (March 9, 1998) (Allen).

Let's look at the first one, that the crime is greater in degree than that described in the definition of the offense.

I have really discussed already in many ways [sic].

But the definition of the offense is for someone to go into the bank, take money that is in the care and custody of the bank, by force, violence or intimidation, and that the money is insured.

They did much worse than that, in every way.

The violent takeover, the three getaway vehicles, planning to burn one, the incredible arsenal of weapons that they had, the six—five or six extra clips that you see here on the table this defendant had ready for more killing.

The danger that they presented all of these people at the bank and in the park.

The extravagant planning for a period of months before this crime, a plan that had nothing in it but eventual mayhem, total maliciousness and mayhem were the end result of this plan from the beginning.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Absolute violence, total intimidation, massive force.

That was the plan; and that's what they did.

Trial Tr. Vol. XII, Case No. 4:97CR00141 ERW, doc. # 524, p. 173 l. 11–p. 174 l. 8 (April 3, 1993) (Holder). Because Allen's vagueness claim presents precisely the same issue as the claim rejected by the Eighth Circuit in the context of Holder's appeal, Allen cannot demonstrate a reasonable probability of a different result if trial counsel had preserved the issue or if appellate counsel had raised it on direct appeal, regardless of the applicable standard of review.

Thus, this claim will be denied without an evidentiary hearing because it is insufficient on its face.

### 19. Appellate Counsel's Failure to Provide Authority Concerning Evidence of Statutory Aggravating Factors Presented to the Grand Jury

As the Court discussed in greater detail in Section I of this Memorandum and Order, following remand from the United States Supreme Court, the Eighth Circuit was tasked with determining the Fifth Amendment significance of the indictment's failure to include the statutory aggravating factors that trigger eligibility for the death penalty, in light of the Supreme Court's decision in *Ring v. Arizona,* 536 U.S. 584 (2002) (holding that the aggravating factors are elements of a capital offense for Sixth Amendment purposes). A panel of the Eighth Circuit concluded that the error was not structural, and that Allen's death sentence must therefore be vacated unless the error was harmless beyond a reasonable doubt, which the panel found was not the case. *United States v. Allen,* 357 F.3d 745, 758 (8th Cir.2004). On rehearing *en banc,* however, the Eighth Circuit affirmed Allen's sentence, finding that the error was indeed harmless beyond a reasonable doubt. 406 F.3d 940, 948 (8th Cir.2005). In this claim, Allen contends that he was denied effective assistance through appellate counsel's failure to competently argue that the indictment error

was structural and therefore required that his conviction be vacated without any consideration of whether the error was harmless. Specifically, Allen claims that there is a reasonable probability that the Eighth Circuit would have found the error structural had counsel argued the issue under *Campbell v. Louisiana,* 523 U.S. 392 (1998) and *Russell v. United States,* 369 U.S. 749 (1962).

**\*46** The Eighth Circuit based its conclusion that the indictment defect was non-structural on two Supreme Court cases— *Arizona v. Fulminante,* 499 U.S. 279 (1991) and *Neder v. United States,* 527 U.S. 1 (1999)—that expressly address the issue of what types of constitutional errors are structural. 406 F.3d at 943–45. The *en banc* court found that the Supreme Court's lists of structural errors in those cases were intended to be exhaustive, and that because a defective indictment like Allen's was not among those errors, the harmless error standard applied. *Id.* at 944. The Eighth Circuit also noted that the *Neder* court had analyzed for harmless error the district court's Sixth Amendment failure to have the petit jury determine an essential element of the charged offense, and found that in Allen's case, the failure under the Fifth Amendment to have the grand jury consider an essential element of the charged offense presented an analogous situation and therefore called for the same analysis. *Id.* at 944–45.

In light of this cogent analysis, based on a dissection of cases directly addressing the issue in Allen's case—to what extent certain constitutional errors are or are not structural—it is clear that appellate counsel provided reasonable professional assistance in not citing *Campbell* and *Russell.* The passages Allen asserts that counsel should have cited contain some grand language about the importance of the grand jury system—language that Allen apparently believes would have proven persuasive—but neither passage dictates or even suggests a different result with respect to determining whether a capital indictment's failure to include the statutory aggravating factors is a structural error:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The grand jury, like the petit jury, "acts as a vital check against the wrongful exercise of power by the State and its prosecutors." *Powers, supra,* at 411; 111 S.Ct., at 1371. It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision to charge a capital crime. *See Vasquez v. Hillery,* 474 U.S. 254, 263, 106 S.Ct. 617, 623–624, 88 L.Ed.2d 598 (1986).

*Campbell,* 523 U.S. at 399.

The constitutional provision that a trial may be held in a serious federal criminal case only if a grand jury has first intervened reflects centuries of antecedent development of common law, going back to the Assize of Clarendon in 1166. [footnote omitted]. 'The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes.' *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397. [additional citations omitted].

**\*47** *Russell,* 369 U.S. at 761. There is no reason to believe that these sweeping statements would have led the Eighth Circuit to a different conclusion in its analysis under *Neder* and *Fulminante,* which were unquestionably on point. Furthermore, to the extent Allen suggests that these cases are in line with the Supreme Court's "recent emphasis" on the Founders' intent in constitutional interpretation, the Supreme Court's denials of Allen's subsequent petitions for writ of certiorari and for rehearing indicate that it was satisfied with the Eighth Circuit's conclusions on remand. *See United States v. Allen,* 549 U.S. 1095 (2006) (denying petition for writ of certiorari); *United States v. Allen,* 549 U.S. 1246 (2007) (denying petition for rehearing). It is clear from the

face of Allen's claim that appellate counsel's decision not to cite these cases or argue the issue in the precise manner advocated by § 2255 counsel did not violate Allen's Sixth Amendment rights, and this claim will be denied without an evidentiary hearing as a result.

### 20. Appellate Counsel's Failure to Raise Issue of Penalty–Phase Jury Instruction

In his last ineffective-assistance claim, Allen asserts that appellate counsel was ineffective for failing to raise the issue on appeal that the jurors should have been instructed that in order to impose a death sentence, they had to find beyond a reasonable doubt that the aggravating evidence outweighed the mitigating evidence. Allen claims that appellate counsel should have been alerted to this argument by the Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466 (2000), decided while Allen's appeal was pending before the Eighth Circuit, and that counsel therefore should have raised the issue in a supplemental brief.

In *Apprendi,* the Supreme Court considered the constitutionality of a New Jersey statute that provided for "an extended term" of imprisonment of 10 to 20 years for individuals convicted of crimes, if the trial judge found, by a preponderance of the evidence, that the crime was intended to intimidate an individual or group on the basis of race, color, handicap, religion, sexual orientation, or ethnicity. *Id.* at 468–69. The *Apprendi* majority first recognized that two constitutional protections "of surpassing importance"—the right to due process of law and the Sixth Amendment's guarantee to criminal defendants of "the right to a speedy and public trial, by an impartial jury"—"indisputably entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at 476–77 (internal quotations and citations omitted). Based on this principle, and on an examination of the body of case law that has followed from it, the Supreme Court concluded that "any fact that increases the penalty for a crime beyond the pre-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

scribed statutory maximum," other than proof of a prior conviction, "must be submitted to a jury, and proved beyond a reasonable doubt," and thus rejected New Jersey's argument that the application of the statute was a matter properly within the trial judge's sentencing discretion. *Id.* at 490. As a result, the New Jersey statute was found unconstitutional, because it authorized an increase in the maximum punishment to which the defendant was exposed, based a finding by a "mere" preponderance of the evidence. *Id.* at 491–92, 495.

**\*48** Thus, following *Apprendi,* the Supreme Court concluded in *Ring v. Arizona* that the Sixth Amendment requires that the aggravating circumstance required for imposition of the death penalty be found by a jury, as it is that circumstance that increases the punishment to which the defendant is exposed. 536 U.S. 584, 609 (2002). In so concluding, the majority found it necessary to overrule *Walton v. Arizona,* 497 U.S. 639 (1990), to the extent it had held that aggravating elements are not elements of an offense for purposes of the Sixth Amendment. *Id.* Shortly thereafter, in the present case, the Supreme Court, recognizing that the Eighth Circuit had relied on *Walton* in rejecting Allen's argument that the statutory aggravating factors had to be charged in the indictment and found by the grand jury, granted Allen's petition for writ of certiorari, vacated the Eighth Circuit's decision, and remanded in light of *Ring. See Allen v. United States,* 536 U.S. 953 (2002) (granting petition).

On remand, the Eighth Circuit concluded, after granting rehearing *en banc,* that the same facts that a jury must find beyond a reasonable doubt in a federal prosecution under the Sixth Amendment—those that increase the maximum penalty for the crime, with the exception of prior convictions—must also be found by the grand jury and charged in the indictment in federal prosecutions as a Fifth Amendment matter. *United States v. Allen,* 406 F.3d 940, 942–43 (8th Cir.2005) (*Allen II* ) (internal citations omitted). Although neither *Apprendi* or *Ring* were directly on point because both

involved state prosecution, the *en banc* court noted that the Supreme Court had previously held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* (quoting *Jones v. United States,* 526 U.S. 227, 243 n. 6 (1999)). Thus, "[t]he indictment must include at least one statutory aggravating factor to satisfy the Fifth Amendment because that is what is required to elevate the available statutory maximum sentence from life imprisonment to death," and "[i]n turn, at least one of the statutory aggravating factors found by the petit jury in imposing the death sentence must have been one of the statutory aggravating factors charged by the grand jury in the indictment." *Id.* at 943 (internal citation omitted). The *en banc* court found that the same is true with respect to the mens rea requirement. *Id.* As such, the Eighth Circuit concluded that Allen's indictment was defective because it failed to include the two statutory aggravating factors and men rea ultimately found by the jury, *id.,* but that the defect did not require that Allen's death sentence be vacated because it was non-structural and harmless beyond a reasonable doubt. *See id.* at 943–49. The Supreme Court subsequently rejected Allen's petitions for writ of certiorari and for rehearing. 549 U.S. 1095 (2006); 549 U.S. 1246 (2007).

**\*49** In sum, then, *Apprendi* and *Ring* made clear that in state and federal prosecutions, the Sixth Amendment requires that any fact that increases the maximum penalty to which the defendant is exposed, including a fact that is necessary for imposition of the death penalty, must be proven to the petit jury beyond a reasonable doubt. *Allen II* recognized that the Fifth Amendment requires that a federal grand jury—the Fifth Amendment's grand jury requirement does not apply to the states—find those same facts in the indictment, because the Supreme Court previously held in *Jones* that the requirements of the Fifth and Sixth Amendments are

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

equivalent for these purposes.

Here, Allen's claim is that the jury should likewise have to find beyond a reasonable doubt that the aggravating evidence outweighed the mitigating evidence in order to impose the death penalty. In so arguing, Allen conflates two distinct aspects of the capital decisionmaking process under the Supreme Court's Eighth Amendment jurisprudence: the eligibility decision and the selection decision. *See Tuilaepa v. California,* 512 U.S. 967, 971–73 (1994) (explaining the distinction between the two). As the Court explained in *Tuilaepa,* "[t]o render a defendant *eligible* for the death penalty in a homicide case, ... the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id.* at 971–72 (emphasis added) (internal citations omitted). As set forth above, *Apprendi, Ring, Jones,* and *Allen II* all addressed this eligibility decision, for purposes of which the jury is required to find all necessary facts beyond a reasonable doubt.

The selection decision, in contrast, is what occurs when the sentencer decides whether an individual already found eligible for the death penalty should indeed receive that sentence, and it is for purposes of this decision that the Eighth Amendment requires "an individualized determination on the basis of the character of the individual and the circumstances of the crime"—a requirement that is met "when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Id.* at 972–73 (internal citations omitted). The jury does not have to find beyond a reasonable doubt that the aggravating evidence outweighs the mitigating evidence, because at that point the defendant's eligibility for the death penalty has already been established; the finding with respect to aggravating vs. mitigating evidence does not increase the maximum penalty to which the defendant is exposes, and *Apprendi* and its progeny are therefore inapplicable.

The Eighth Circuit's decision in *United States v. Purkey,* 428 F.3d 738 (2005), although it post-dates the matters at issue in this case, makes this conclusion evident. In that case, the Eighth Circuit rejected the defendant's argument that his indictment was defective under the Fifth Amendment because it did not include the prosecution's non-statutory aggravating factors or the issue of whether the aggravating factors outweighed the mitigating factors:

**\*50** The indictment must charge at least one of the statutory aggravating factors that is ultimately found by the petit jury because 'that is what is required to elevate the available statutory maximum sentence from life imprisonment to death.' " [ *Allen II,* 406 F.3d at 943.] In other words, including that factor in the indictment is required to make the defendant *eligible* for the death penalty. [citation omitted]. We now make clear what *Allen [II]* merely implied: "There is no requirement that the indictment allege *all* of the factors that might be weighed by the jury when deciding whether to impose a death sentence." [citation omitted].

*Id.* at 749. The panel also noted that "it makes no sense" to view the process of weighing aggravating and mitigating evidence as a fact that must be found by the grand jury, given that the process is described by statute as a "consideration"—"that is, the lens through which the jury must focus the facts that it has found to produce an individualized determination" about whether the defendant should receive death or a lesser sentence. *Id.* at 750 (citing 18 U.S.C. § 3593(e)). Because it is established that Fifth and Sixth Amendment require the same facts to be found by a grand jury and then proven beyond a reasonable doubt to the petit jury, *see Allen II,* 406 F.3d 942–43; *Jones,* 526 U.S. at 243 n. 6, it necessarily follows that a fact that does not need to be found by the grand jury—under *Purkey,* that includes non-statutory aggravating factors and the weighing decision—likewise does not need to be found beyond a reasonable doubt by the petit jury.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

*See also Kansas v. Marsh,* 548 U.S. 163, 175 (2006) ("In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here.").

As such, the Court concludes that appellate counsel was not ineffective for failing to argue that *Apprendi* required Allen's jury, in order to impose the death penalty, to find beyond a reasonable doubt that the aggravating evidence outweighed the mitigating evidence. Under *Apprendi* and subsequent cases, the Sixth Amendment requires jurors to find facts that increase the punishment to which the defendant is exposed beyond a reasonable doubt. Because the weighing of aggravating and mitigating evidence occurs after the jury has already found the defendant eligible for the death penalty, this process does not increase the defendant's maximum penalty and accordingly need not be found beyond a reasonable doubt. This claim is therefore deficient on its face and will be denied without an evidentiary hearing.

**B. Manner of Execution**

Moving beyond Allen's claims of ineffective assistance of counsel, Allen also claims that his execution under current Bureau of Prisons protocols would violate the Eighth Amendment. Allen asserts that because that protocol is subject to revision at any time, it would be a waste of resources for the Court to consider the issue now, and that the Court should instead merely acknowledge that he has raised the issue and "defer its resolution to another proceeding at another time."

**\*51** Leaving aside the issues of whether this claim is subject to procedural default or whether it is foreclosed by the Supreme Court's decision in *Baze v. Rees,* 553 U.S. 35, 53, 61–63 (2008) (plurality) (upholding Kentucky's three-drug lethal injection protocol, the same protocol used by the federal government), this claim, as Allen seems to recognize, is not properly brought under § 2255.

The statute provides a remedy for a federal prisoner who contends that (1) the "sentence was imposed in violation of the Constitution or the laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; (3) "the sentence was in excess of the maximum authorized by law"; or (4) the sentence "is otherwise subject to collateral attack." § 2255(a). Allen acknowledges that he is not claiming that lethal injection *per se* violates the Eighth Amendment; instead, his claim is targeted specifically at the manner by which he would be executed, as determined by the Bureau of Prisons. Put another way, Allen concedes that there would be some constitutional manner of executing him under the Eighth Amendment, and as such, this is not a challenge to his death sentence and § 2255 is inapplicable.

The Supreme Court has come to a similar conclusion in the § 2254 context. *See Hill v. McDonough,* 547 U.S. 573 (2006). In that case, a state prisoner brought an action under 42 U.S.C. § 1983 to enjoin the state from executing him by means of a specific three-drug sequence on grounds that it constituted cruel and unusual punishment, and finding that this claim was the functional equivalent of a petition for writ of habeas corpus under § 2254, both the district court and the Eleventh Circuit concluded that it was barred as a successive petition, given that the prisoner had already sought habeas relief. *Id.* at 578. The Supreme Court disagreed, concluding that because the prisoner's claim was directed at the specific manner of his execution, the state would be able to execute him by another manner even if his claim was successful. *Id.* at 580–81. Thus, the suit was properly brought under § 1983, because "the injunction [the defendant sought] would not necessarily foreclose the State from implementing the lethal injection sentence under present law, and thus it could not be said that the suit seeks to establish 'unlawfulness [that] would render a conviction or sentence invalid.' " *Id.* at 583 (internal citations omitted).

As such, if a state prisoner may use § 1983, and

not a habeas petition under § 2254, to challenge the manner of his execution, a federal prisoner making the same type of challenge should use a *Bivens* action instead of § 2255. *See Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 81–82 (2001) (Stevens, J., dissenting) (recognizing the *Bivens* suit against federal actors as the "federal counterpart" to the § 1983 suit against state actors); *see also id.* at 66–74 (majority opinion) (discussing the nature of the *Bivens* suit). Furthermore, Allen acknowledges that this claim is not ripe because it concerns Bureau of Prisons protocols that are possibly not yet in place, which means that he cannot allege—or even prove—facts that would entitle him to relief under the Eighth Amendment and § 2255. Thus, the Court will deny Allen's claim without an evidentiary hearing because it is clear from its face that it cannot succeed.

### C. Cumulative Effect of Violations

**\*52** In his last claim for relief, Allen contends that his sentence should be vacated based on the cumulative effect of the instances of prosecutorial misconduct and ineffective assistance of counsel alleged in his Amended Motion.

This claim will be denied as insufficient on its face because cumulative error cannot give rise to a finding of prejudice, as the Eighth Circuit has clearly held:

> We repeatedly have recognized [that] "a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." *Hall v. Luebbers,* 296 F.3d 685, 692 (8th Cir.2002) (citation omitted); *see, e.g., United States v. Robinson,* 301 F.3d 923, 925 n. 3 (8th Cir.2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); *Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir.1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)); *Scott v. Jones,* 915 F.2d

1188, 1191 (8th Cir.1990) (holding "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own" (citation omitted)).

*Middleton v. Roper,* 455 F.3d 838, 851 (8th Cir.2006). With the exception of his ineffective-assistance claim concerning his sentencing presentation, the Court has concluded that none of Allen's allegations of constitutional violations were sufficient to undermine the Court's confidence in the outcome of his trial, and *Middleton* and the cases cited therein make clear that Allen cannot obtain relief on a cumulative error theory. Accordingly, there is no need to hold an evidentiary hearing on this claim.

### IV. CONCLUSION

With one exception, Allen's claims for relief under § 2255 are either insufficient on their face or refuted by the record, and accordingly will be denied without an evidentiary hearing. With respect to that one exception, the Court finds that Allen is entitled to an evidentiary hearing on his claim alleging ineffective assistance of counsel based on counsel's failure to properly prepare and investigate his mitigation case. In that hearing, the Court expects respective counsel to make presentations addressing the totality of available mitigating evidence—that adduced at trial and that offered by Allen in support of his Amended Motion—in order to enable the Court to reweigh that evidence against the aggravating evidence offered at sentencing. *See Sears v. Upton,* 130 S.Ct. 3259, 3266–67 (2010).

Accordingly,

**IT IS HEREBY ORDERED** that with the exception of his Claim J—alleging ineffective assistance of counsel based on counsel's alleged failure to investigate and present mitigating evidence at sentencing—Movant Billie Jerome Allen's Amended Motion under 28 U.S .C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody under a Sentence of Death [doc. # 60] is **DENIED.** Allen's Amended Motion shall re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)
**(Cite as: 2011 WL 1770929 (E.D.Mo.))**

main before this Court pending the outcome of an evidentiary hearing on that claim.

**\*53 IT IS FURTHER ORDERED** that the evidentiary hearing on the aforementioned Claim J will be held before this Court on *August 1, 2011* at *9:00 A.M.* in Courtroom 17 South of the United States District Court in St. Louis, MO.

E.D.Mo.,2011.
Allen v. U.S.
Not Reported in F.Supp.2d, 2011 WL 1770929 (E.D.Mo.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.