UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

BILLIE JEROME ALLEN,        )
                )
      Petitioner-Appellant,    )
                )
   v.              )     No. 14-3495
                )
UNITED STATES OF AMERICA,   )
                )
      Respondent-Appellee.   )

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
PETITION FOR CERTIFICATE OF APPEALABILITY**

COMES NOW the United States of America, by and through its attorneys,

Richard G. Callahan, United States Attorney for the Eastern District of Missouri,

and Carrie Costantin, First Assistant United States Attorney for said District, and

files its response in opposition to Billie Jerome Allen's Petition for Certificate of

Appealability.

I.     <u>Background</u>

On March 17, 1997, Petitioner Billie Jerome Allen (Allen) and Norris

Holder robbed the Lindell Bank & Trust Company in Saint Louis, Missouri. The

bank robbery resulted in the death, by multiple gunshot wounds, of bank security

guard Richard Heflin.  Allen was indicted for crimes stemming from the armed

bank robbery in April 1997.  Count I of the indictment charged him with killing

Mr. Heflin in the course of committing an armed bank robbery, in violation of 18

1

U.S.C. § 2113(a) and (e) (1994). Count II of the indictment charged Allen with using a firearm to commit a crime of violence resulting in the death of another under circumstances constituting first-degree murder, in violation of 18 U.S.C. § 924(j)(1) (1994 and Supp. II 1996). The Government filed a timely notice of intent to seek the death penalty, and, following a trial, a jury found Allen guilty on both counts. The jury returned a sentence of life imprisonment on Count I, and a sentence of death on Count II.

On direct appeal, this Court affirmed Allen's convictions and sentences. *United States v. Allen*, 247 F.3d 741, 761-64 (8th Cir. 2001). Allen filed a petition for writ of certiorari to the United States Supreme Court. The Supreme Court granted Allen's petition, vacated this Court's decision as to his sentence, and remanded the case to this Court for reconsideration in light of *Ring v. Arizona*, 536 U.S. 584 (2002).

On remand, a panel of this Court initially concluded Allen's sentence of death should be vacated, finding the indictment's failure to charge at least one statutory aggravating factor violated Allen's Fifth Amendment right to indictment by a grand jury. *United States v. Allen*, 357 F.3d 745, 748-51 (8th Cir. 2004). The Court also found the error was not harmless beyond a reasonable doubt. Following a subsequent rehearing en banc, however, this Court affirmed Allen's sentence, concluding the defect in the indictment was both non-structural and harmless

beyond a reasonable doubt. *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005). On December 11, 2006, the Supreme Court denied Allen's petition for writ of certiorari, *Allen v. United States*, 549 U.S. 1095 (2006), and, on February 20, 2007, it denied his petition for rehearing. *Allen v. United States*, 549 U.S. 1246 (2007).

In 2007, Allen filed a Motion pursuant to 28 U.S.C. §2255 in District Court in Case No. 4:07CV00027 ERW. On February 11, 2008, he filed an Amended Motion. On May 10, 2011, in a Memorandum and Order, United States District Judge E. Richard Webber denied all but one claim without an evidentiary hearing. In 2012, the District Court conducted a lengthy evidentiary hearing on Allen's claim that his counsel was ineffective for failing to investigate and present mitigating evidence. On June 25, 2014, in a Memorandum and Order, the District Court denied that claim and denied a certificate of appealability on all claims.

On October 20, 2014, Allen filed a Notice of Appeal. On February 9, 2015, Allen filed a "Petition for Certificate of Appealability." The Court ordered the Government to file a response by March 26, 2015.

II.     Standard for Granting a Certificate of Appealability

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further

proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).

III. Allen Failed To Make a Substantial Showing of the Denial of a Constitutional Right

Allen makes four claims that he contends entitle him to a certificate of appealability. None of these claims amount to a substantial showing of the denial of a constitutional right. Allen claims that:

1) Trial counsel was ineffective for his failure to object to an anonymous jury;

2) Trial counsel was ineffective for his failure to present certain evidence in the guilt phase of the trial that supposedly would have raised a reasonable doubt as to Allen's guilt;

3) Appellate counsel was ineffective for his failure to appeal the District Court's denial of trial counsel's *Batson* challenge;

4) The District Court erred in dismissing Allen's claim without an evidentiary hearing that trial counsel was ineffective at the Motion to Suppress Statements hearing.

The District Court correctly found that these claims were without merit and denied a certificate of appealability.

A. Trial Counsel Was Not Ineffective for His Lack of Objection to an "Anonymous Jury"

Allen contends that trial counsel was ineffective for his failure to object to

an "anonymous jury." As an initial matter, the jury was not anonymous; counsel was provided with their names and addresses. Moreover, the District Court's procedure complied with this Court's guidelines delineated in *United States v. Darden*, 70 F.3d 1507, 1532-33 (8th Cir. 1995).

The jury was not truly anonymous. The District Court ordered that the names and addresses of all jurors on the panel be provided to Allen. 4:97CR 141ERW; Doc. 234; February 2, 1998 Order, p. 68. The jurors were to be addressed in court by numbers only. 4:97 CR141ERW; Doc. 494, February 6, 1998 Pretrial Motion Hrg Trans., p. 3. Panel members completed extensive juror questionnaires. 4:97 CR 141ERW; Doc. 494, Pretrial Motion Hrg Trans., p. 3. These lengthy questionnaires covered, among other topics, the neighborhood in which the jurors resided, their educational background, their current employer and employment history, contact with law enforcement, spouses' occupation, children, medical problems, hobbies, military service, jury service, experience with the criminal and civil justice system, family members' experience with the criminal justice system, sources of news, opinion on the death penalty, religious and ethnic background, and knowledge of the parties. Allen had a plethora of information about the jurors.

In denying Allen's claim, the District Court concluded that trial counsel was not ineffective for failing to object because the jury panel was not truly

anonymous.  4:07 CV 27 ERW; Doc. 147, pp. 20-21.  The District Court found that although it ordered that the venirepersons, and ultimately the jurors, be referred to by number only in open court, Allen and his counsel were provided with their names, a 14-page, 56-question questionnaire completed by each, and an opportunity for follow-up questioning to uncover any biases.

District courts are not required to ensure that the *Darden* factors are met in order to use numbers for identification, where the jury panel is not otherwise anonymous.  In *United States v. Peoples*, 250 F.3d 630, 635 (8th Cir. 2001), this Court found that "[t]he district court has wide discretion to empanel an anonymous jury if it finds that person's life or safety is in jeopardy, or *to require the use of numbers for identification in any case*." (citing *Darden*, 70 F.3d at 1532) (emphasis added).   In *Peoples,* this Court approved the use of an anonymous jury where the defendants were charged with killing a government witness.  This Court noted that the trial court had complied with the statute applicable to capital cases-- Title 18, United States Code, Section 3432--by supplying the parties with the names and place of residence of the venirepersons but then requiring the panel members to be identified in court by number rather than name.  This Court stated that the trial court had wide discretion to use numbers for identification in any case.  *Id.* at 635.

In this case, the District Court properly exercised its wide discretion to use

numbers in open court as an appropriate means of shielding venirepersons from media scrutiny.  The District Court took no other steps to conceal the venirepersons' identities and, in fact, the jury panel was aware that personal information had been given to Allen and his counsel.  Thus, the use of numbers did not give the impression that Allen was dangerous and thereby prejudice the panel against him.

Even assuming that the jury was "anonymous," there was no violation because the District Court complied with the guidelines for use of an anonymous jury set forth in *Darden*.  *See Darden*, 70 F.3d at 1532-33.  The *Darden* court stated that "...every court that has considered the issue has concluded that in appropriate circumstances the empanelment of an anonymous jury does not infringe on the right to an impartial jury." *Id.* at 1532.  Adopting the guidelines from the Second Circuit, the *Darden* court stated:

> ...a court should not empanel an anonymous jury without "a) concluding that there is a strong reason to believe the jury needs protection, and b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."

*Id.* (citations omitted).

In considering the need for an anonymous jury, the *Darden* court espoused factors enumerated by the Eleventh Circuit in *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir. 1994):

7

> [s]ufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id*. These factors "are neither exclusive nor dispositive, and the district court should make its decision based on the totality of the circumstances." *United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003); *see also United States v. Brown*, 303 F.3d 582, 602 (5th Cir. 2002) ("None of these factors is dispositive; rather, the decision to empanel an anonymous jury should be made on the totality of the circumstances.").

At the time that the jury was empaneled, the District Court was aware of at least two of the *Ross* factors: 1) Allen was facing the death penalty or lengthy imprisonment; and 2) there was extensive publicity about the case. Numerous jurors told the District Court that they had heard about the robbery and murder from newspaper or television. (Veniremembers 15, 20, 32, 35, 37, 40, 41, 55, 80, 3, 4, 7, 8, 9, 30, 31, 43, 44, 47, 51, 63, 67, 70, 75, 100, 98, 97, 91, 124, 120, 139, 140, 143, 144, 145, 146, 147, 162, 66, 190, 104, 110, 112, 113, 132, 136, 57, 158, 154, 117, 127, 177, 178, 199). There was television coverage the night before the first day of jury selection. 4:97 CR 141 ERW; Tr. Trans., 2-9-98, p. 45). Despite being

8

ordered not to view media accounts of the trial, one venireperson stated that she saw television coverage after the first day of trial indicating that jury selection had started. 4:97CR 141 ERW; Tr. Trans., 2-10-98, p. 27).

The third *Darden* factor was also implicated: the defendant's past attempts to interfere with the judicial process. In reviewing whether a defendant is willing to tamper with the judicial process, "...we are not limited to the facts available at the time of the actual empanelment; rather, we may consider any relevant evidence in the record." *United States v. Quinones*, 511 F.3d 289, 295 (2d Cir. 2007). During trial, the Government introduced letters written by Allen to his friend Johnnie Grant. In these letters, Allen told Grant that Grant needed to change his testimony so that Grant did not implicate Allen in the robbery and murder. (Government Exhibit 82-C, "come see me real soon because I need to tell you something about my case that I need you to testify for me about. I don't want to say in the letter because you know how the feds are."; Government Exhibit 82-D, "When I call you and told you I didn't go in the bank, I just drove and they are trying to use it against me. What I need you to say is that I told you that because I was trying to throw them off. Do you feel me?" "I told them that I was never broke and I got my money from rapping with flicks and I told them that you never seen me with [co-defendant]." "My case can be won if you say the right things and I know you know what to say."). Allen was clearly attempting to interfere with the

9

judicial process, which is another factor weighing in favor of an anonymous jury under *Ross* and *Darden*.

In *United States v. Brown*, 303 F.3d 582 (5th Cir. 2002), the court approved the use of an anonymous jury where the defendants were charged with public corruption related to a "sham settlement." The court found that defendants' history of corruption of the legal system, the potential lengthy sentences and publicity justified the use of an anonymous jury. *Id.* at 602-03.

The District Court in Allen's case took appropriate precautionary measures to ensure that he was not prejudiced by the use of an anonymous jury. In *Darden*, this Court stated that "'where jury anonymity is warranted, the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias toward issues in the case or to the defendant himself." (citations omitted). *Darden*, 70 F.3d at 1533. Similarly, in *Brown*, the Fifth Circuit stated, "the court's efforts to provide the defendants with sufficient information on the jurors through extensive juror questionnaires and voir dire adequately protected the defendants' rights and permitted them to select a jury intelligently." *Brown*, 303 F.3d at 603. *See also United States v. Byers*, 603 F. Supp.2d 826, 832-33 (D. Md. 2009). In the instant case, the venire panel completed a thorough 14-page questionnaire and voir dire lasted for five days, including evening sessions. Allen had a great deal of information about each juror.

10

In addition, instructions concerning the presumption of innocence serve to prevent prejudice to defendant from the use of an anonymous jury. *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1035, n. 28 (11th Cir. 2005). Here, the District Court repeatedly instructed the jury on the presumption of innocence. At the beginning of voir dire, the District Court stated, "In a criminal trial the defendant is presumed innocent until proven guilty beyond a reasonable doubt. This presumption remains with the defendant until found guilty by a jury. The obligation is always on the Government to prove the defendant's guilt, and there is no obligation for the defendant to prove his innocence." 4:97 CR 141 ERW; Tr. Trans., 2-9-98, p. 25; 2-10-98, p. 22. Before submission of the case to the jury, the District Court instructed them again on the presumption of innocence. 4:97 CR 141 ERW; Tr. Trans., 2-26-98, p. 12-28, Model Instruction 3.06.

The District Court properly found that an anonymous jury was warranted. Allen cannot show that he was prejudiced by the use of numbers to identify the jurors. *United States v. Scarfo*, 850 F.2d 1015, 1026 (3d Cir. 1988) (noting that the anonymity feature is not intrinsically suggestive of any inference of guilt). Allen has failed to show that trial counsel was deficient for failing to object to the use of an anonymous jury. Allen has not established that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. Trial counsel cannot be found to be ineffective for failing to

11

make meritless arguments.  *See Dyer v. United States*, 23 F.3d 1424, 1426 (8th Cir. 1994).

Nor did the District Court err in denying an evidentiary hearing on this claim.  "A Section 2255 motion 'can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).  The record refutes Allen's claim that he did not know the names and addresses of the venirepersons and the record supports the District Court's use of numbers in compliance with Eighth Circuit requirements.

A certificate of appealability should not be granted because Allen has not made a substantial showing of the denial of a constitutional right.

B.      Trial Counsel Was Not Ineffective for his Failure to Present Allegedly Exculpatory Evidence

Allen next contends that he is entitled to a certificate of appealability because his trial counsel was ineffective for failing to present the following allegedly exculpatory evidence:  1) DNA analysis of the strap; 2) gas chromatographic analysis of his clothing; 3) interviews of Greg Prater and Joe Powell; 4) a report of a fleeing suspect toward the bike path; 5) DNA testing of a

rag; 6) Wayne Ross' statement; 7) interview of Broderick Bonner; and 8) an anonymous telephone call to the FBI. Counsel was not ineffective for failing to present such evidence and Allen cannot show prejudice from these actions and therefore he is not entitled to a certificate of appealability on these issues.

The Sixth Amendment establishes the right of the criminally accused to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To state a claim for ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice. First, petitioner "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In considering whether this showing has been accomplished, "judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

1.     The Strap

Allen contends that trial counsel was ineffective for failing to perform DNA testing on a strap found in the area that co-defendant Holder was arrested. On March 17, 1997, after the robbery of the bank, Allen and Holder fled in a stolen van which burned in Forest Park, near the intersection of Hampton and Wells Avenues. 4:97 CR 141 ERW; Tr. Trans. 2-19-98, pp. 160-164. Holder was arrested next to the burning van, but Allen escaped by running away from the van

toward Interstate 64, and eventually arriving at the Forestry Area alongside that highway. 4:97 CR 141ERW; Tr. Trans. 2-19-98, pp. 219-221, 242-246. Detective Priest reported to the area in Forest Park where the getaway van burned and recovered evidence, which he delivered to the STLMPD lab. 4:97CR141ERW; Tr. Trans. 2-20-98, pp. 65-83. Among the items he recovered and conveyed to the lab was a "white velcro strip/body armor with blood spattering" which was found in the street. 4:97 CR 141 ERW; DD 0000029-0000030, Addendum 3. The item is also described as a "strip of white cloth with blood, from the street, northeast of van." 4:97 CR 141ERW; DD 0000188-0000189, Addendum 3. The item and its location in the street in relation to the burned getaway van is depicted in the photograph 4:97CR 141 ERW; DD 0000574, Addendum 3. The area where item "Q-4" was recovered was near the area that Holder was taken after his arrest. 4:97 CR 141 ERW; Tr. Trans. 2-19-98, pp. 232-234. Holder was wearing body armor at the time and had suffered a burn, abrasions and bumps. 4:97CR 141ERW; Tr. Trans. 2-19-98, pp. 233, 239. This area was northeast of the burned van, in contrast to the direction which Allen ran, which was southeast.

Records from the STLMPD lab indicate that Det. Priest took the item there on March 17, 1997, where he turned it over to Officer Vincent. 4:97 CR 141ERW; DD 0000172-0000173, Addendum 3. Criminalist Margaret Owens received it on the same date, and later prepared a report in which she identified the item as "Q-

14

4[,] One 2" by up to 10-1/2" piece of cut white elastic strap with red blood stains."

Records further reflect that Criminalist Owens performed a presumptive serological examination of the red stain, which disclosed the presence of apparent blood. She then cut a portion of the strap and forwarded it to the DNA Unit of the lab. Criminalist Donna Becherer then performed DNA analysis on item "Q-4," finding that the DNA did not match the victim or Allen. The item was not examined for the presence of Holder's blood. 4:97CR 141 ERW; DD 0001266.

Far from being a "smoking gun" of the involvement of someone other than Allen in the robbery of the bank, all the circumstances indicate that item "Q-4" was merely a strap from Holder's body armor which probably contained some of Holder's blood. The strap would not exculpate Allen. It was irrelevant to his involvement in the crime.

Furthermore, the evidence was overwhelming that Allen was the robber of the Lindell Bank and Trust who repeatedly shot Mr. Heflin. He confessed to robbing the bank and shooting Mr. Heflin. He was identified as the passenger in the getaway van and as the one who fled from the burning getaway van. Allen's clothing had burnt plastic on it that was consistent with the burnt plastic in the getaway van. His hair and ear were burnt. He made admissions to two acquaintances about his involvement in the robbery. He attempted to convince a friend to lie for him at trial. Under these circumstances, Allen's counsel was not

ineffective for failing to request DNA analysis of the strap. Even if Allen could somehow show deficient performance, he has not and cannot show any prejudice.

2. <u>Gas Chromatographic Analysis</u>

Allen also contends that his trial counsel was ineffective for failing to introduce evidence that gas chromatographic analysis of Allen's clothing was negative for the presence of petroleum distillates. Allen states that this evidence would have impeached Police Officer Carroll's testimony that Allen smelled of smoke when he was arrested. Allen's claim should be denied because 1) the lack of petroleum distillates does not indicate that he did not smell of smoke and 2) trial counsel impeached Officer Carroll with the testimony of two witnesses who stated that Allen did not smell of smoke at the relevant time period.

St. Louis Metropolitan Police Department Criminalist Margaret Owens reviewed the laboratory report that found that there were no petroleum distillates on Allen's clothing. She stated:

> I believe that in this instance, there is no correlation between the smell of smoke on clothes from Mr. Allen and the Laboratory's analysis result that "no petroleum distillates were detected" on the clothes. The method of analysis to which the clothing was subjected was not a test for the presence of smoke.

Criminalist Owens managed the Arson Section at the St. Louis Metropolitan Police Department laboratory and conducted analyses in excess of 200 arson cases. 4:07 CV 27 ERW; Doc. 79; Government's Response, Addendum 4.

16

The lack of petroleum distillates on Allen's clothing is consistent with his clothing smelling like smoke. The van was doused in gasoline by Holder and then set on fire prematurely by Holder as he and Allen were fleeing from the scene. 4:97 CR 141 ERW; Tr. Trans., 2-17-98, pp. 145-6, 148-9. Since Holder poured gasoline on the van and his sleeve, petroleum distillates were likely to be found on his clothing. In fact, the lab report indicates that petroleum distillates were found on Holder's clothing. 4:07 CV 27 ERW; Doc. 79; Government's Response, Addendum 4. Because Allen was in a burning vehicle, he would smell of smoke even if none of the gasoline had been poured on him. There is no inconsistency between Allen smelling like smoke and the finding that there were no petroleum distillates on his clothing.

At the trial, defense counsel impeached Officer Carroll's testimony by presenting testimony from two other witnesses that Allen did not smell of smoke. Lakeisha Williams testified that Allen did not smell of smoke when he was arrested. 4:97 CR 141 ERW; Tr. Trans., 2-24-98, pp. 167-8. Marcie Chowning also testified that Allen did not smell of smoke that evening. 4:97 CR 141 ERW; Tr. Trans., 2-24-98, p. 212. Thus, trial counsel effectively impeached Officer Carroll on this issue. The District Court correctly found that "[i]t is incredibly unlikely that this relatively minor piece of evidence, even if given the import Allen suggests, would have resulted in a different outcome at trial." 4:07 CV 27 ERW;

17

Doc. 147; Memorandum and Order, p. 41. As such, Allen can demonstrate no prejudice and his claim fails.

3.    Greg Prater and Joe Powell

Allen claims that trial counsel was ineffective for his failure to present evidence that "Greg Prater and Joe Powell told police that they observed a man who was 5 feet 8 inches tall, fleeing from the burning van and running through Forest Park." Petition, p. 20. Allen argues that this person was Jerry Bostic, who Allen now claims was the real robber.

Allen has completely misstated the interviews of Mr. Prater and Mr. Powell. Their entire statements were as follows:

> Both were working as the corner of Kingshighway and Lindell for the City Water Department and saw the following described subject standing on the southeast corner:
>> Black, male, 23 to 27 years of age, 5 feet, 8 inches tall, 160 pounds, thin build, with red, frizzy hair combed straight back, wearing a multi-colored shirt and grey pants...possible sweat pants. The subject was last seen walking south on the east side of Kingshighway from Lindell about 12:00 p.m.

4:07 CV 27 ERW; Doc. 79; Government's Response, Addendum 5.

Mr. Prater and Mr. Powell saw a black man with frizzy red hair standing on a street corner--at the complete opposite end of Forest Park from the burning van. The man was walking south at noon. Allen cannot show any relevance to a man walking an hour and a half after the robbery at the opposite end of the park from the robbery. The District Court found that "[t]here is also no compelling reason to

believe that this individual was Jerry Bostic, to the extent Allen claims that this is a possibility, and even if there were some reason to believe that it was, that fact would not undermine confidence in the jury's verdict given the remaining evidence of Allen's guilt. The record clearly demonstrates that counsel's decision not to present this claim was objectively reasonable." 4:07 CV 27 ERW; Doc. 147; Memorandum and Order, p. 42. Thus, there was no deficient performance on counsel's part or prejudice to Allen.

4.      Police Report of Fleeing Suspect

Allen references a report of a person at 11:12 a.m. "going north and east towards the bike path towards Kingshighway" and the fact that the robbery occurred at 10:30 a.m. as evidence that Allen could not have committed the robbery and murder. Petition, p. 20. This is another attempt to reassert his tardy claim that Chris Shegog would have testified that Allen was at Northwest Plaza at the time of the robbery. The Court properly rejected this claim as follows:

> Mr. Allen contends counsel's performance was deficient for failing to present evidence establishing a witness, Chris Shegog, purportedly saw Mr. Allen at a shopping mall at the same time other witnesses saw a fleeing suspect in Forest Park. However, Mr. Allen presents this theory for the first time in this Rule 59 Motion. "Rule 59(e) motions cannot be used to introduce new evidence, tender new legal theories, or raise new arguments which could have been offered or raised prior to the entry of judgment." *Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 934 (8th Cir. 2006). Moreover, the Court could not have manifestly erred in ruling on a matter not presented to it. Therefore, the Court will not consider the newly asserted theory regarding Chris Shegog in ruling the instant Motion.

4:07 CV 27 ERW; Doc. 382, Memorandum and Order, p. 14.

Moreover, even if addressed, the claim is meritless. As can be seen from the various statements that Mr. Shegog has given, he has not provided a consistent account of when he met Allen at Northwest Plaza and their activities after that time. 4:07 CV 27 ERW; Doc. 379-4. No records support the time that he met Allen at Northwest Plaza. However, Mr. Shegog has repeatedly stated that Allen had a blister consistent with a burn on his ear, that Allen spent a large amount of money on clothing that day and brought cash and gifts to women Mr. Shegog assumed were Allen's girlfriends, and that Allen did not appear upset. 4:07 CV 27 ERW; Doc. 379-4, pp. 21-22, 29-31, 34. It is clear that trial counsel was aware of Mr. Shegog as a witness. 4:07 CV 27 ERW; Doc. 379-4, p. 8 (memo from Connie Supranovich to Richard Sindel 1/29/1998) p. 1-2 (memo from Andrew Rackers to Richard Sindel).

Allen told St. Louis City police officers that when he fled from the burning van after he committed the robbery, he paid two City workers to take him to the MetroLink. He took the MetroLink to the St. Charles Rock Road stop where he caught a bus to Northwest Plaza. He shopped at Northwest Plaza. 4:97 CR 141 ERW; Tr. Trans., 2-26-98, pp. 149-150. Marsha Chowning testified that she spoke to Allen on a three way conversation with Lakeshia Williams when he was at Northwest Plaza anytime between 11 a.m. and 3 p.m. on the day of the robbery.

20

4:97 CR 141 ERW; Tr. Trans., 2-24-98, p. 190.  Ms. Williams testified that the phone call occurred around 3 or 3:30 p.m. that day. 4:97 CR 141 ERW; Tr. Trans., 2-24-98, p. 138.

Mr. Shegog would have confirmed that Allen had a burn on his ear and suddenly had large sums of money to spend.  He would have confirmed, in part, the accuracy of Allen's statement to the police.  Thus, it was not ineffective assistance for trial counsel to conclude that Mr. Shegog's testimony would not be beneficial to Allen overall.   The evidence that Allen was the robber of the bank was extremely strong—his confession, eyewitness identification, admissions to acquaintances of his involvement, and physical evidence such as burnt plastic on his clothing.  Mr. Shegog's testimony would have established that Allen used the stolen money to go on a shopping spree a short time after the murder of Mr. Heflin. This would have reinforced the Government's argument that Allen lacked remorse after the killing as evidenced by his shopping at Northwest Plaza shortly after the murder.  4:97 CR 141 ERW; Tr. Trans., Government Closing Argument, 3-9-98, p. 60.   The District Court properly found that trial counsel was not deficient for failing to present Mr. Shegog as a witness.  4:07 CV 27 ERW; Doc. 382, Memorandum and Order, p. 14, n. 9.

5.      <u>DNA Testing of Rag</u>

Allen claims that counsel was ineffective for failing to present DNA evidence from a "damp rag" seized from another car to be used in the getaway. Allen and Holder fled the robbery in a van that Holder subsequently set on fire. Near the corner of Clayton Avenue and Faulkner Drive in Forest Park, police found the second getaway vehicle, a Dodge van which had been stolen overnight. Inside the Dodge van, the police recovered a 12 gauge shotgun with pistol grips, owned by Norris Holder. It was fully loaded with eight rounds of 12 gauge ammunition. Some of this ammunition was also triple aught buckshot of the type found in the pocket of the jacket Allen discarded in Forest Park. The route Allen and Holder took from the bank would have led directly to the Dodge van had the getaway van not caught fire and burned. 4:97 CR 141 ERW; Tr. Trans. 2-20-98, pp. 115-117; 151-154. Also seized from the Dodge van was a "damp rag – found on driver's seat." 4:07 CV 27 ERW; Doc. 381, Ex. 1.

The rag was tested for presence of any petroleum distillates. Ex. 1; 4:97 CR 141 ERW; Defendant's Discovery 0000147. No petroleum distillates were found. The rag was not tested for blood; unlike the bloody strap found near Holder's arrest, there is no indication that blood was found on the strap.

Allen claims that "the results of such a test would likely help identify the second suspect." Petition, p. 21. This assertion is entirely speculative. There is no

evidence that material was on the rag that *could* be tested for DNA, let alone that any such result would identify another suspect.

The District Court properly concluded that:

Even more speculative is Mr. Allen's contention the "damp rag" constitutes exculpatory evidence. Mr. Allen has provided no citations to the record suggesting a damp rag tested negative for his blood. In fact, in a pro se pleading, Mr. Allen concedes the damp rag was never tested against himself, the victim, or Holder. ECF No. 363 at 15. In his arguments regarding the damp rag, Mr. Allen provides a single citation to the record: an "Evidence Technicians Report," which states, inter alia, "Damp rag – found on [illegible] seat of vehicle – DNA testing." ECF No. 381-1. At most, this document suggests the damp rag was sent for DNA testing; it by no means, however, establishes the rag had any biological material on it at all.

4:07 CV 27 ERW; Doc. 382, p. 12, n. 5.

6. Wayne Ross

Allen claims that trial counsel was ineffective for failing to cross-examine Wayne Ross about his statement to the FBI that "J.B." had called his grandmother's house looking for Holder.  Petition, p. 21.  In fact, any such cross-examination would have only tied Allen closer to Holder.

As the District Court noted in its Memorandum and Order, the relevant portion of the FBI report states:

When asked if he was familiar with anyone named JB, Ross advised that either Wednesday or Thursday of Spring Break, a group of friends were at Ross's grandmother's residence playing playstation when Holder was paged. Shortly thereafter, someone called for "808," a nickname for Holder.  Ross asked who was calling, and the caller

23

told him JB.  Ross asked Holder who it was, and Holder told him one of Bill's "cats."

4:07 CV 27 ERW; Doc. 147, p. 43.  Lt. Henderson testified at trial that Allen told him that J.B. stole two vans to be used in the robbery that Allen and Holder had committed.  4:97 CR 141 ERW; Tr. Trans., 2-17-98, p. 156.  Cross-examination on Mr. Ross would have confirmed that J.B. was an associate of Allen and partially corroborated Lt. Henderson's testimony.  Allen has failed to show deficient performance of trial counsel, let alone that cross-examination would have resulted in a different outcome at trial.

7.     Broderick Bonner

Allen alleges that counsel was ineffective for failing to present the testimony of Broderick Bonner.  He states that, based on the FBI report of Mr. Bonner's interview, Mr. Bonner would have testified that he did not sit with Allen and Holder and did not hear any discussion of a bank robbery.  Allen posits that this testimony would have contradicted Wayne Ross' trial testimony that he overheard Allen and Holder discussing a bank robbery.  Petition, p. 22.

Mr. Bonner's statement to the FBI did not contradict Mr. Ross' testimony. Mr. Ross testified that he, Mr. Bonner, Mr. Moore, Mr. Smith and Holder went to a bowling alley a few days before the robbery.  4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 12. They waited at the bowling alley because Holder planned to meet someone.  4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 14.  Holder met Allen. 4:97

24

CR 141 ERW; Tr. Trans., 2-18-98, p. 15. Allen and Holder sat down about three tables down. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 16. Mr. Ross was at the next table and was leaning back to listen to their conversation. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 16. He heard Allen and Holder discussing a robbery. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 16. He was sitting facing his friends and was leaning back listening to Allen and Holder. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 21. Allen and Holder were leaning toward each other and whispering. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 21. Allen and Holder got up and moved two tables down. 4:97 CR141 ERW; Tr. Trans., 2-18-98, p. 23. Mr. Ross and Mr. Smith moved down so that they could listen to Allen and Holder. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 23. Mr. Ross heard more discussion of the robbery. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, pp. 23-4. Allen and Holder told him to leave because they were talking business and Mr. Ross got up and walked toward the door. 4:97 CR 141 ERW; Tr. Trans., 2-18-98, p. 24.

Mr. Bonner's statement to the FBI was that Holder met a guy at a bowling alley. He did not hear the conversation between them because he was at another table. 4:07 CV 27 ERW; Doc. 94, Ex. 47. This statement does not contradict Mr. Ross's statement that, although he was at another table from Holder and Allen, he leaned back so that he could hear the conversation. Furthermore, when Allen and

Holder moved tables to avoid Mr. Ross, Mr. Ross and Mr. Smith (not Mr. Bonner) moved to the table next to them so that Mr. Ross could overhear the conversation.

Furthermore, Mr. Bonner would have provided damaging testimony against Allen. As the District Court stated in its Memorandum and Order, Bonner told the FBI that he had been to Holder's residence and had seen "all kinds of guns." His description of the weapons was consistent with those used in the robbery. 4:07 CV 27 ERW; Doc. 147, p. 44. Once again, Allen has failed to establish deficient performance by trial counsel or prejudice.

8.      FBI Report of Anonymous Phone Call

Allen claims that trial counsel was ineffective for failing to investigate and present evidence concerning an anonymous phone call to the FBI. The anonymous caller reported that he had seen Holder at a bowling alley approximately a week before the robbery and heard Holder discussing a bank robbery with "DeMarco." Two police officers who were patrons of the bowling alley indicated that "DeMarco" was likely Demarco Roberts, another patron. 4:07 CV 27 ERW, Doc. 147, p. 44. Allen states that this evidence would have impeached the allegation that Holder planned the robbery with Allen. Petition, p. 22.

The District Court correctly found that:

…it was reasonable for counsel not to pursue this issue because the report did not undermine any of the prosecution's evidence of Allen's guilt. Ross testified that he observed Allen and Holder having a conversation at the bowling alley about the robbery two days before it

26

occurred, whereas the anonymous call concerned a conversation a week beforehand. While the call might be evidence that "DeMarco" did have some involvement in the robbery, it does not suggest, as Allen claims, that "DeMarco," and not Allen, was Holder's co-conspirator in the robbery. Furthermore, Allen's assertions of prejudice are entirely speculative, based on suppositions that counsel would have ultimately discovered further evidence demonstrating that Allen was mistakenly charged with a crime committed by Holder and "DeMarco," in comparison to the concrete, persuasive evidence of Allen's guilt, including the testimony about his post-arrest confession and the numerous pieces of evidence linking him with Holder and showing that they had been planning a robbery together.

4:07 CV 27 ERW; Doc. 147, pp. 44-45.

Allen has not established ineffective assistance of trial counsel nor prejudice.

C.     Appellate Counsel Was Not Ineffective for His Failure to Appeal the District Court's Denial of Trial Counsel's *Batson* Challenge

Allen alleges that appellate counsel was ineffective for declining to appeal the District Court's denial of trial counsel's *Batson* challenge to three venirepersons:  numbers 83, 134, and 139.  Because these strikes were proper, Allen's claim fails.

This Court has described the procedures set by *Batson:*

Under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), if the objecting party makes a prima facie showing that a peremptory strike was racially discriminatory, and if the striking party responds with a facially-neutral explanation for the strike, the district court must decide whether the objecting party has met his burden of proving purposeful race discrimination. [citations omitted]. We review the court's determination of this issue for clear error.

*United States v. Love*, 419 F.3d 825, 827 (8th Cir. 2005).

27

Five of the Government's peremptory challenges were of African-American venirepersons. Trial counsel objected to the strikes and the District Court found that counsel had made a prima facie showing--thus shifting the burden to the Government to provide race neutral, non-pretextual reasons for the strikes. The Government provided explanations for all five strikes. Trial counsel then withdrew its objections to two of the strikes. The District Court found that the Government had provided race-neutral reasons to justify the strikes. Allen now contends that appellate counsel was ineffective for failing to appeal the District Court's findings. Because the District Court properly found no discriminatory motive in the strikes, there was no basis for appellate counsel to include a *Batson* claim on appeal.

1.    Venireperson 83

Allen claims that the District Court incorrectly found that there was no discriminatory purpose in the Government's strike of Venireperson 83; however, the District Court's finding was supported by the record.

When the Government struck number 83, it stated that the main reason was "she was the only person at the time of the strikes were left who indicated that she was sympathetic to psychological reasons–to psychological testimony as a mitigator for the death penalty." 4:97 CR 141 ERW; Trial Trans., 2-13-98, evening session, p. 125. On the juror questionnaire, she had indicated on question 22 that

28

she had a prejudice in favor of psychiatric or psychological testimony. She also indicated that she, her sister and her mother had all been treated for depression. The Government also noted that her husband had been charged with narcotics crimes, that she was a legal secretary, and had indicated that she had some problems with partiality in answer to question 54.

Allen contends that two other jurors–121 and 169–had similar answers on question 22 indicating that they favored psychiatric testimony. However, *neither of these venirepersons was available at the time the strikes were made*. 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, pp. 105-107. The strikes were made from the first 165 venirepersons. 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, p. 105. Therefore, number 169 was not available to serve. Number 121 was also not one of the eligible venirepersons. 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, pp. 105-7. Number 121 was an extra panelist and was excused by the Court when a sufficient number of eligible venirepersons was reached. 4:97 CR 141 ERW; Tr. Trans., 2-12-98, pp. 4-311 - 4-313. Because those jurors were not available to be on the jury (and therefore not subject to strikes), the Government did not exercise its peremptory strikes in an inconsistent manner. The District Court found that the reason provided by the Government was non-discriminatory.

The District Court rejected Allen's claim in his §2255 motion that the Government's explanation was pretextual. The District Court stated:

> No. 83's sympathy toward psychiatric or psychological testimony was a race-neutral reason for exercising a peremptory strike against her, and given that she was the only remaining venireperson who had indicated that attitude when she was struck, the Court's conclusion that the Government was not purposefully discriminating against African-American jurors was not clearly erroneous.

4:07 CV 27 ERW; Doc. 147, p. 24.

2. <u>Venireperson 134</u>

Allen claims that the Government improperly struck Venireperson 134. The District Court found that the Government's reasons were race neutral.

When the Government struck number 134, it stated that she had answered question 42 with response "E," that she was generally opposed to the death penalty but believed she could set aside her feelings. The Government stated that with respect to venirepersons who had answered "E," they struck all persons in the regular pool and all but one in the alternate pool. 4:97 CR 141 ERW; Tr. Trans., 2-13- 98, evening session, pp. 125-6. In addition, the Government also noted that she had an incarcerated nephew who she had visited in prison and that her brother was arrested for assault. The Government struck venirepersons who were generally opposed to the death penalty in a case in which the death penalty was a possible sentence. Venireperson 134 both answered "E" to question 42 and had an incarcerated family member who she had visited in prison. This was a unique

combination that was the basis of the Government's strike of number 134. Allen cannot identify a similarly situated venireperson who served on the jury.

The District Court held that:

These were race-neutral explanations, and although the one alternate juror who chose "e" and was not struck was in fact Caucasian, the Court's conclusion that there was no purposeful discrimination with respect to No. 134 – given her unique combination of choosing "e" and having family members in the justice system – was not clearly erroneous.

4:07 CV 27 ERW; Doc. 147, p. 25.

3.    Venireperson 139

Allen claims that the Government's reasons for striking Venireperson 139 were discriminatory. The District Court disagreed and found that the strike was race neutral.

The Government struck number 139 for multiple race neutral reasons. The Government stated that she "after being told not to watch anything about this incident on television, watched it on television." 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, p. 127. She had a brother arrested for drug possession, a cousin in the penitentiary, and a sister charged with shoplifting and robbery. 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, p. 127-8. She answered that she agreed with the statement that sometimes African-American males are treated unfairly by the criminal justice system. 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, p. 127; Tr. Trans., 2-10-98, p. 104. The Government also noted

that the venireperson's demeanor indicated that she was not interested in pursuing the case. 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, p. 127. Finally, the Government stated that number 139 had asked whether she would have to impose the death penalty, thus indicating her discomfort with the death penalty. 4:97 CR 141 ERW; Tr. Trans., 2-13-98, evening session, p. 128, 131. The Government's reasons were not pretextual.

Venireperson 139 had a sister who had been arrested for robbery; Allen was charged with robbery and murder. 4:97 CR 141 ERW; Tr. Trans., 2-10-98, p. 113. The record does not indicate that there was another venireperson who had a close relative convicted of robbery that served on the jury. In addition, number 139 indicated an unwillingness to participate in a vote to return a verdict of death.

> MR. LANDOLT: All of you could do that as well? I see everybody nodding their heads. I want you to assume just for a moment, ma'am, that we're in the second phase, you found the defendant guilty in the first phase, all the other requirements you need to beyond a reasonable doubt, unanimously with your fellow jurors. You have engaged in the weighing process, and you found that the aggravating factors sufficiently outweigh the mitigating factors such that a sentence of death is justified. In that situation, can you vote to return a verdict of death against this defendant?
>
> JUROR 139: I could but I need a little clarification. I don't have to vote, do I?
>
> THE COURT: Was your question?
>
> JUROR 139: I don't have to, right? I could, but I'm thinking back to what you said when you first brought all this evidence, I mean, the description of the CASE [sic], I wouldn't have to.

4:97 CR 141 ERW; Tr. Trans., 2-13-98, pp. 48-9. Number 139 indicated

significant hesitancy in her ability to impose the death penalty.  All these were race

neutral reasons to strike the venireperson.

The District Court found that:

…the Court was persuaded by the combination of several family members having been convicted of crimes and her opinion of the justice system's treatment of African-Americans that the Government's motivation for striking her was not based on her race. Although numerous other venirepersons also had family members with criminal convictions, No. 139's sister had been convicted of robbery, creating more of a connection to the facts of Allen's case. Contrary to Allen's suggestion, the Eighth Circuit has also made clear that striking a prospective juror based on her opinion of the justice system's treatment of minorities is a permissible, race-neutral justification under *Batson*. See *United States v. Jones*, 600 F.3d 985, 991-92 (8th Cir. 2010). As with Allen's other *Batson* challenges, the Government's position was facially non-discriminatory and accompanied by a sufficient explanation to support a conclusion that there was no purposeful discrimination, and accordingly there is no reason to believe that an appellate court would find the Court's denial of Allen's challenge to No. 139 to be clearly erroneous.

4:07 CV 27 ERW; Doc. 147, pp. 25-26.

During the trial, the District Court stated that "[t]here is no showing that the

reasons given for any of the strikes or either of them are generally or merely

pretext for purposeful discrimination. There is no showing whatsoever of any

purposeful discrimination in the strikes that have been made."  4:97 CR 141 ERW;

Tr. Trans. 2-13-98, evening session, p. 137. A reviewing court gives great

deference to a trial court's findings. *Batson,* 476 U.S. at 98, n. 21.

Since factual findings concerning the basis of strikes turn largely on credibility evaluations, they are due great deference and the Court of Appeals reviews for clear error. *United States v. Mallett*, 751 F.3d 907 (8th Cir. 2014); *United States v. Young*, 753 F.3d 757 (8th Cir. 2014); *United States v. Allen*, 644 F.3d 748, 753 (8th Cir. 2011) ("The district court is afforded deference in its determinations of the credibility of the prosecutor and the race-neutral explanations offered.").

As the District Court stated "…due to the clearly erroneous standard of review, appellate counsel did not act unreasonably in choosing not to pursue these issues on appeal, given the Government's facially race-neutral justifications." 4:07 CV 27 ERW; Doc. 147, p. 26. There is no reasonable probability that the claim would have succeeded on appeal and therefore it was not deficient performance of appellate counsel not to raise it.

IV.     Hearing on Motion to Suppress Statements

Allen's claims concerning the motion to suppress hearing have varied over time. Now Allen claims that the District Court erred by determining that the Magistrate Court did not permit an overbroad examination of Allen, that the District Court should have granted an evidentiary hearing to determine counsel's understanding of the ruling and that the District Court erred in finding that trial

34

counsel submitted a timely offer of proof. None of his allegations establish ineffective assistance of counsel.

1.      Factual Background

Allen filed a motion to suppress statements he made to law enforcement in which he admitted his participation in the robbery and murder. United States Magistrate Judge Thomas C. Mummert held a hearing on motions to suppress statements by both Allen and co-defendant Holder. At the hearing, the Government presented evidence that Allen received Miranda warnings at the time of his arrest on March 18, 1997, and an hour later when he was brought to the St. Louis Metropolitan Police Department headquarters. At four a.m. on March 18, FBI Special Agent Jan Hartman attempted to inform Allen again of his Miranda rights but he requested an attorney before she finished. 4:97 CR 141 ERW; Hrg. Trans. 5-16-97, pp. 152-155. Allen was placed in a lineup that morning after he declined the presence of counsel for the procedure. 4:97 CR 141 ERW; Hrg. Trans. 5-16-97, pp. 248-251. After Allen was identified in the lineup by several witnesses, a detective informed him that he had been identified but the detective did not question Allen. 4:97 CR 141 ERW; Hrg. Trans. 5-16-97, pp. 247-248. Allen told the detective that he wanted to talk but the detective told him that the police could not talk to him because he had previously requested an attorney. Allen insisted that he did not want an attorney and asked to speak with Lt. Ronald

Henderson. 4:97 CR 141 ERW; Hrg. Trans. 5-16-97, pp. 248-250. Allen was taken to an interview room and was advised of his Miranda rights. Allen then admitted participation in the robbery and shooting of the victim. When questioned about details, Allen told the detectives that he did not wish to discuss the case anymore. The interview then ceased. 4:97 CR 141 ERW; Hrg. Trans. 5-16-97, pp. 250-255.

After the Government's evidence at the motion hearing, during the following exchange, Magistrate Judge Mummert indicated that, if either defendant testified, they would be cross-examined on some issues. The attorney for Holder (Mr. Dede) told the Court that he intended to call his client to testify at the motion hearing. The following exchange occurred:

> THE COURT: I just want the, --I just want to make my point. I don't know what Mr. Landolt's position is, but to avoid this when we're in the middle of it, my position is once an individual takes a witness stand he's there for whatever cross examination that may pop up, especially in a situation like this. So, if you want to limit his testimony to various items, I'm not so sure that I can keep Mr.,--I won't keep Mr. Landolt to that limitations (sic). I want to make sure you knew that going in.

> MR. DEDE: Oh, alright. Well, then let me discuss that with the Defendant. It would be my position that consistent with,--

> THE COURT: Unless Mr. Landolt agrees to cross only on the issues addressed in the questioning.

> MR. LANDOLT: Judge, I think once he takes the witness stand, he's, --the issues in the case are the scope of cross examination.

THE COURT:   Yeah.  Well, that's what,--

MR. DEDE:   Well,--I'm sorry.  I didn't mean to interrupt.

THE COURT:   No, that's okay.  Go ahead.

MR. DEDE:   No, please, you.

THE COURT: I probably should have let Mr. Landolt make that objection first, but, again, I didn't want to put you in a position of making the ruling before,--or after you had already subjected your client to the cross examination.  That's my understanding of the law. But if you can convince me otherwise, I'll be glad to listen to it.

MR. DEDE: Well, my position,--my argument is, that just as the Government has objected all day long about being limited in the scope of this proceeding, *I think that his testimony is limited to the scope of this proceeding.*

*THE COURT: Yeah, it is, except, --I think you're right, except that I just think it goes a lot broader on, --because Mr. Allen and Mr. Holder, for that matter,--Mr. Holder and Mr. Allen, I should say, were participants in this questioning and answer process in the police department from get to go (sic), that the cross examination is gonna be a lot wider and more open than I permitted with the police officers who were here to, --or the witnesses who were just here to testify about the specific identification processes.*

MR. DEDE: Okay.  Well, if I could have a few minutes to discuss that with Mr.,--

THE COURT: Mr. Sindel, are you gonna make the same type of request?

MR. SINDEL: Yes, your Honor.  I had indicated to you in chambers that I had intended to call my client, and I intended to seek an order from the Court in a Motion in Limine to restrict the cross examination to those matters that were brought up and appropriately touched up in the direct examination.  It's my understanding that that would be, in fact, the rule of law, that there would not be a situation in which they

could be questioned about other matters that have not been specifically raised during the course, --or touched upon during the course of direct. Just so the record is clear, and I hope I'm not misstating anything, but, you know, you did indicate to me what your ruling would be in that particular situation and I indicated to you that I would like to make an offer of proof in that regard. I don't know how the Court wants me to do it. I know if we were in State Court how you'd want me to do it, okay--

THE COURT: I wouldn't want you to do it, okay. But I'm not gonna let you have, --how would you want to make the offer of proof?

MR. SINDEL: I could either do it through the testimony of the Defendant or I could do it through the statements that I make to the Court.

THE COURT: Yeah, that's how I would prefer you doing.

4:97 CR 141 ERW; Hrg. Trans. 5-16-97, pp. 348-351 (emphasis added).

The District Court correctly found that the Magistrate Court limited the potential cross-examination to the issues relevant to the motion to suppress. The Magistrate Judge merely observed that these matters would necessarily be broader than earlier witness testimony because Allen was involved in multiple contacts with the police officers that day as opposed to another witness who simply testified about the lineup mechanics. As the District Court stated, "The magistrate judge clarified this concept when he contrasted Mr. Allen – who participated in the 'questioning and answer process' – with other witnesses 'who were just [there] to testify about the specific identification processes.'" 4:07 CV 27 ERW; Doc. 382, p. 7, citing 4:97CR141 ERW; Hrg. Trans. 5-16-97, pp. 349:15-23. The District

38

Court did not err in finding that the Magistrate Judge had limited Allen's possible cross-examination to issues concerning his motions to suppress.

Allen now claims that his trial counsel was ineffective for failing to understand the ruling, not asking for clarity if he did not understand the ruling, and for not properly advising Allen about testifying in light of the ruling. These specific claims were not raised by Allen in his earlier petitions. As the Court noted in its May 10, 2011 order, "Allen is also not alleging that counsel provided ineffective assistance by failing to advise him to testify at the suppression hearing, notwithstanding the magistrate judge's statements about the scope of cross examination." Document 147, p. 10, n. 3. The original claim was limited to trial counsel's alleged failure to argue effectively for suppression and to submit a timely offer of proof. The District Court held that "'Rule 59(e) motions cannot be used to introduce new evidence, tender new legal theories, or raise new arguments which could have been offered or raised prior to the entry of judgment.' *Metro. St. Louis Sewer Dist.,* 440 F.3d at 934. Because Mr. Allen has never before asserted this argument, it is not the proper subject of his instant Rule 59(e) Motion, and relief will not be granted on this ground." 4:07 CV 27 ERW; Doc. 382, p. 8.

Furthermore, even considering the claim on its merits, trial counsel was not ineffective for failing to understand the ruling; it is clear that he knew that Allen would be subjected to cross examination beyond the narrow limits of direct

39

examination and could be questioned about his contacts with multiple officers that day concerning his statements.  Allen now postulates that trial counsel would have advised him to testify if counsel understood the Magistrate Judge's ruling and that trial counsel would have no reasonable basis for advising Allen not to testify.  The record refutes this speculation—the Magistrate Judge advised counsel that Allen was subject to cross-examination on all matters related to his questioning and counsel elected to proceed with an offer of proof.  Moreover, it was reasonable to advise Allen not to testify at the motion to suppress.  The offer of proof concerned all of Allen's contacts with police officers and agents on March 18th and 19th. 4:07 CV 27 ERW; Doc. 94, p. 20, n 3.  Thus, the proper scope of cross examination would necessarily be broad--and dangerous--given that his testimony would have contradicted the testimony of multiple police officers and agents. Counsel did not render ineffective assistance by advising Allen not to testify at the motion to suppress hearing.  In addition, Allen cannot demonstrate prejudice; that is, if he had testified, the Magistrate Judge would have suppressed his statement.

Finally, Allen contends that trial counsel was deficient for failing to present a timely offer of proof to the Magistrate Judge.  This issue was correctly resolved by the District Court in its Memorandum and Order of May 10, 2011 and its Memorandum and Order of August 29, 2011 denying the Motion for Reconsideration.  The suppression hearing was held on May 16, 1997.  The

Magistrate Judge issued his initial Report and Recommendation on June 13, 1997, which, among other findings, rejected Allen's Motion to Suppress Statements. On June 19, 1997, Allen's trial counsel filed a Motion to Supplement containing his offer of proof which asserted that he was not advised of his Miranda rights until 4 a.m. on March 18 by the FBI agent, that he then invoked his rights, that detectives continued to question him, that he was not identified in the lineup but was told that he had been identified, and that he continued to be questioned by detectives and Lt. Henderson despite his invocation of his rights.

On July 8, 1997, the Magistrate Judge granted the Motion to Supplement, adding the following explanation:

> Pending before the undersigned United States Magistrate Judge is the motion of defendant Billie Jerome Allen to file an Offer of Proof . . . in order to supplement the record on his motions to suppress evidence, identification, and statements. Defendant explains in that motion that the offer of proof was prepared in accordance with the undersigned's order granting him leave at the conclusion of the evidentiary hearing to file an offer of proof detailing what the testimony of defendant would have been had the Court allowed him to testify under the limitations he requested; however, the offer of proof was inadvertently never filed with the Court.

4:97CR141 ERW, Doc. 104. The same day, the Magistrate Judge issued a Supplemental Order and Amended Findings of the United States Magistrate Judge, which amended factual findings unrelated to the offer of proof but continued to deny Allen's Motion to Suppress Statements. 4:97CR141 ERW, Doc. 103. Subsequently, both the Government and Allen filed Objections to the Report and

Recommendation of the Magistrate Judge.  On August 13, 1997, the District Court adopted the Magistrate Judge's Report and Recommendation and denied Allen's Motion to Suppress Statement.  Thus, trial counsel preserved Allen's objection to the admission of his statements by filing a written offer of proof.  The written offer of proof was before the Magistrate Judge when he issued his Supplemental Order and Amended Findings and before the District Court when it issued the order denying Allen's Motion to Suppress Statements.

Trial counsel's actions fall "within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984).   The offer of proof was before the Magistrate Judge and the District Court before final rulings.

Moreover, Allen cannot show prejudice.  He alleges that Detective Harper testified at the motion hearing that Lt. Henderson gave instructions not to ask Allen any questions because Allen had invoked his right to counsel.  Allen claims that Lt. Henderson contradicted this testimony at trial when he stated that he was unaware that Allen had invoked his right to counsel to FBI Agent Hartman.  Allen claims that this amounts to a fraud on the court. He claims that counsel was ineffective for failing to point out the discrepancy and implies that Allen's motion testimony would have caused his statements to be suppressed.

The District Court properly rejected his claim noting:

Nothing in this testimony contravenes the notion Mr. Allen's *Miranda* rights were scrupulously honored. To the extent Movant points out a

42

minor discrepancy between Lieutenant Henderson's testimony and Detective Harper's testimony, the Court is not convinced this slight inconsistency amounts to a fraud on the Court, or otherwise affects the credibility of the officers so deeply as to change the outcome of the motion to suppress.

4:07 CV 27; Doc. 373, p. 2. In other words, *all* officers testified that Allen's Miranda rights were respected; the only possible dispute is which officer or agent had told which officer or agent that Allen had invoked his rights. Allen cannot establish that this fact would cause a different outcome in the motion to suppress hearing. This Court discussed the validity of Allen's Miranda waiver at length, and affirmed the denial of his motion to suppress statements. *United States v. Allen*, 247 F.3d 741, 764-67 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002).

V.     Movant's Petition for Certificate of Appealability Should Be Denied

Allen's claims were fully considered by the District Court and properly denied. In his petition, Allen has wholly failed to show the denial of a constitutional right and thus he is not entitled to the issuance of a certificate of appealability. *See* 28 U.S.C. §2253(c)(2).

WHEREFORE, for the foregoing reasons, the Government respectfully requests this Honorable Court deny Mr. Allen's Petition for Certificate of Appealability.

Respectfully Submitted,

RICHARD G. CALLAHAN
United States Attorney

*/s/ Carrie Costantin*

Carrie Costantin, #35925MO
First Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2015, the foregoing was filed electronically with the Clerk of the Court and served electronically on all parties of record.

*s/Carrie Costantin*

Assistant United States Attorney