UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

BILLIE ALLEN,

    Petitioner-Appellant,

v.

No. 14-3495

UNITED STAES OF AMERICA,

    Respondent-Appellee,

RECEIVED

APR 2 7 2015
U.S. COURT OF APPEALS
EIGHTH CIRCUIT

PRO SE REPLY TO THE GOVERNMENT'S OPPOSITION TO
PETITION FOR CERTIFICATE OF APPEALABILITY

This is a pro se filing, responding to the Government's opposition to my petition for
Certificate Of Appealability, for the following issues presented within.


I. HEARING ON MOTION TO SUPPRESS ALLEGED STATEMENT


The government is incorrect in its proposition to the Court that the presentation
of facts and evidence, in connection with the motion to suppress the alleged statement
used by the government at trial has changed and/or that it has varied over time. If anything,
as the reply will show,   the facts have become more clear about what actually took place
while I was in police custody, and the evidence will show how the District Court erred
in dismissing the claim without a hearing.

Like the Magistrate, and the trial court, this Court has relied on highly questionable,
unreliable and untrustworthy testimony of Detective Harper and Lieutenant Ron Henderson,
in reaching the conclusion that 1. Officer's scrupulously honored my Miranda rights after
invoking them  2. That I was "reminded" throughout my arrest that I had asked for counsel
3. That I "initiated" contact with officers, therefore waiving my rights to counsel, by
"asking" to speak with Lieutenant Ron Henderson, because I "supposedly" knew him  from
"another contact. This Court would cite the following facts/testimony in its determination
of the facts:

      "We first briefly "recite" the facts surrounding Allen's arrest,
      interrogation, and confession, "based on the Magistrate judge's
      findings, which were adopted by the district court." (See Allen
      App., Vol. 1 at 114-80, 192-93.)

2. "...and asked Allen, if, in light of his <u>request</u> for counsel..."

3. "...at which point Allen <u>asked</u> to speak with Lieutenant Henderson, <u>an officer Allen knew from an earlier case.</u> Prior to confessing to Henderson, Allen <u>was reminded of his earlier request for counsel</u>..."

4. We have little difficulty determining that <u>Allen's self-initiated request to speak to Henderson amounted to a valid waiver of his rights to have counsel.</u>"

The Court(s) reliance on the testimony of Harper and Henderson are the foundation on which the Court(s) have based their findings and rulings on. But a closer look at the facts and evidence show why this issue is debatable amongst jurist of reason and why a Certificate Of Appealability should be granted.

<u>LIEUTENANT RON HENDERSON</u>

Q. Listen to my question. I don't care if you spoke with Agent Hartman or not. What I want to know is <u>at the time you interviewed Mr. allen, were you aware that he had told Agent Hartman [about the request]</u>

A. No. No, I was not, sir.

This confession by Henderson, (at trial) clearly differs from the testimony he gave under oath, at the suppression hearing, which the Magistrate used in its findings and ruling, which the trial court adopted, and which this Court used in its past rulings. The government makes light of this confession by Henderson (at trial), by simply calling the complete change of testimony a "contradiction." To make light of Henderson's confession is a mistake, in light of the fact that it was the belief that he knew of the "request for counsel", and how and why officers "reminded" me of my request for counsel.

<u>SUPPRESSION HEARING TESTIMONY OF HARPER</u>

A. I'd beeninformed that he had requested an attorney <u>prior</u> to the lineup and, therefore, I was told not to talk to him.

Q. Okay. Who told you that?

A. That would have been <u>Lieutenant Ron Henderson.</u>

The debate in the issue then becomes; how could Henderson inform Harper of something he would later confess to not knowing? The Magestrate never had this testimony before it when making its findings and ruling. And based on how crucial the testimony  given at the suppression hearing was to the Magistrate, the trial court and this Court's rulings, it's only fair to conclude that the prceedings would've been different had Henderson testified at the suppression hearing:

A. No. No, I was not, sir.

To further show how Henderson and Harper's testimony unfairly swayed the Court(s) into making an unreasonable determination of the facts in support of its ruling(s), the Court should further examine it's reliance on the belief that I "initiated" contact with officers, because I "supposedly" knew Hnderson from "an earlier case." As the Court(s) point out.

The "earlier case" that officers used to establish that Henderson and I talked prior to my arrest is the murder of my friend Marquise Taylor, where we were the victims. Upon close examination of the reports related to Marquise's murder, the Court need only to look at the report(s) nto see that out of all the officers who arrived at the scene of the crime (exhibit A); Henderson wasn't one of the officers there. And upon review of who the officer was who talked to me; Henderson wasn't the officer. (exhibit B)

Billie Allen v. United States of America
Case 4:07-cv-00027-ERW Doc. #: 379-6 Filed: 07/23/14 Page: 1 of 2 PageID #: 7918
Exhibit 6

*EXHIBIT A*

9

1
95063947

At 9:04 P.M., Wednesday, May 3, 1995, Detective Sergeant Robert Davis, DSN 0441, Crime Scene Supervisor, Homicide Section, was contacted by the Bureau of Investigation Dispatcher and advised Homicide Detectives were being requested to 1815 North Taylor for the victim of a Shooting, with the victim en route to Barnes Hospital.

Accordingly, Sergeant Davis responded to Barnes Hospital and Sergeant Andre Hill, DSN 7245, along with Homicide Detectives Jeffrey Crawford, DSN 3444, Phillip Wasem, DSN 8402, Gerald Young, DSN 2215, Brian McGlynn, DSN 2721, and Thomas Wiber, DSN 7777, responded to the scene, arriving at 9:28 P.M.

At the scene, the Homicide Detectives were met by Captain David Dorn, DSN 7539, Commander District Eight, car 1800; Lieutenant Joseph Hoening, DSN 8435, Watch Commander District Eight, car 2801; Sergeant Cliff Sassenger, DSN 8028, car 2811; Sergeant Jerry Dodson, DSN 5320, car 2812; Police Officers Byron Pargo, DSN 3896, car 2827; Dana Isom, DSN 2789, car 2828; Donish Minor, DSN 3194, car 2826; and Steven Dodge, DSN 4278, car 2823; Area III Detectives Jerome Dyson, DSN 2196, car 6333; Nancy James, DSN 3884, car 6335; and Joan Williams, DSN 2709, car 6328; and Canine Officer Catherine Dennis, DSN 3404, along with canine "Cello", car 7215, who relinquished the scene to the Homicide Detectives at that time.

Officer Isom stated she and Officer Pargo received a radio assignment at 9:00 P.M. directing them to 1815 North Taylor for a report of a "Shooting". Upon their arrival they observed the victim lying on the front steps of the residence at 1815 North Taylor, unconscious and unable to make a statement. At that time they requested EMS and a supervisor, who requested Homicide.

Medic #11, manned by Emergency Medical Technicians Pam Delaney, DM4643, and Joslyn Thomas, DM1650, responded to the scene and conveyed the victim to Barnes Hospital where Dr. Steve Carter pronounced the victim lifeless at 9:35 P.M.

Sergeant Davis viewed the victim in the nude at the hospital and observed the victim evidenced two puncture wounds; one in the left arm pit and one in the right shoulder.

Medical Legal Investigator Francis Dawkins, of the Medical Examiner's Office was contacted and initiated his investigation. He later caused the victim's body to be conveyed to the City Morgue by Glenn Livery Service where it was assigned Morgue number 95-959.

Luberta Taylor, residing at 4541 Cote Brillante, home telephone 454-9631, the victim's mother, responded to the hospital where she identified the victim as her son, Marquise Taylor.

0002042

Billie Allen v. United States of America
Case 4:07-cv-00027-ERW    Doc. #: 379-6  Filed: 07/07/14  Page 2 of 13  PageID #: 7900
Exhibit 6

EXHIBIT B

10

4
95063947

Acres and Shaw stated they were lying in their bed, when they heard approximately seven to eight gunshots coming from outside their residence, apparently from the front. They stated the first shots did not sound as loud as the last two or three. Both subjects stated they looked outside their window but did not see anyone, they only heard people next door (1815 North Taylor) screaming.

    ACRES, ANTHONY       1817 "A" North Taylor, B/M, no phone

Acres stated he heard approximately four or five loud gunshots coming from the front of his residence, but did not see anyone.

    BANKS, JOHN       1819 "A" North Taylor, B/M, 535-6558

Banks stated he heard approximately four to five loud gunshots from the front of his residence, but did not see anyone. Banks stated he is the owner of 1823 North Taylor, the vacant beauty salon where the projectile was recovered from an inside wall. Banks was advised of the damage to his building.

| | |
|---|---|
| 1819 "B" North Taylor | No response |
| 1813 North Taylor | Vacant |
| 1809 North Taylor | Vacant |
| 1803 North Taylor | Vacant |
| 1801 North Taylor | |
| Vacant | |

Detective Robert Jordan, DSN 3167, interviewed the following subject at the Homicide Office.

    ALLEN, BILLIE       (Identified in Pirs)

Allen stated Eric T., Marquise Taylor (victim) and he were visiting Prentiss C. at his residence at 1815 Taylor. They decided to leave Prentiss' house and go to the residence of a friend named Issac (no further).

Upon leaving the residence, Allen and Marquise Taylor (victim) proceeded to walk north on Taylor approaching Garfield. Prentiss was on the front porch and Eric was on the steps.

0002045

In light of these facts and the evidence to support it, it's clear that

1. Officers couldn't have honored my rights, when there was no way of them to know I invoked them.

2. There was no way that officers could've "reminded" me of my request for counsel, when you can't "remind" someone of something you don't know about.

3. There was no way that officers could've "reminded" me of my request for counsel, before the lineup, when they couldn't have known of the request.

4. There was no way that I could've "initiated" contact with officers, and "asked" to speak with Henderson, "because I knew him from a past case"; when it's clear that the case they rely on shows that Henderson never came to the scene of the crime and that he never interviewed me or my friends.

## COUNSEL'S PERFORMANCE DEFICIENT

Not only was counsel's performance deficient for failing to present the police report at the suppression hearing and at trial to prove that the testimony given to establish a "prior" relationship between Henderson and I never existed. Counsel failed to investigate the case to discover it. The testimony surrounding the "prior" relationship, used by the Court(s), weighed heavily in the Court(s) analysis of the sufficiency of evidence when considering whether I waived my right to counsel, before and after the lineup.

In light of these facts and evidence, it's a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would've been different." Strickland v. Washington, 466 U.S. 668. (1984) And had officers simply told the truth, "the proceedings would've been different."

Because the testimony given by officers were the lychpin that were used to support the Court(s) findings and rulings, it was only right for counsel to also highlight

how counsel erred in not fully understanding the Magistrate's ruling on the scope of cross examination. Especially when the proffer and testimony that would've been given were supported by the facts and evidence put forth in this filing and clearly dispute what officer's testified to at the suppression hearing and what the Court(s) have had to  rely on in making its findings and rulings.

## PREJUDICE

The Magistrate's evidentiary findings and rulings turned on two key points: 1. Officers honored my request for counsel. 2. Officers "reminded me" throughout the arrest that I had requested counsel; therefore they warned that they couldn't talk to me. As show within, it's clear that the facts presented here undermind the facts and evidence that the Magistrate reelied on. Without the alleged confession, the lies told by officers, and other evidence pointing towards innocence, there is a reasonable likelihood that the results would've been different.

I only ask that this Court weigh the facts within this motion and determine whether I received a fair and just hearing and a fair trial, when the facts presented to both can now be seen as false facts/testimony, used to influience a favorable ruling in opposition of suppressing the alleged confession.

The facts show that this issue is debatable and warrants a granting of a certificate Of Appealability.

## II. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT EXCULPATORY EVIDENCE

### A. THE STRAP

The "strap", which had traces of DNA on it, which was tested by the government, it was only tested against me and the victim in this case, Mr. Heflin. Because of the government's selection on who to do the testing on, it's clear that the government hoped to exclude the victim's DNA, with the hopes of linking me to that evidence and to the scene of the crime. Because the results would exclude me (calling into question my presence because of the results), the government then speculates that the DNA now belongs to Holder. If that was the case, why then try to link me to

evidence they now are sure belong to Holder? Any testing on the strap would take
away any and all speculation by either party, and if the results come back the way
we point out; it would then prove to the Court that JB and not myself actually committed
the crime for which I've been convicted for.

The government and the district court have both claimed that it was trial counsel's
strategy not to present the results of the DNA findings to the jury. But, as a letter
to trial counsel will show, (exhibit C), trial counsel not only didn't investigate
the results; he would state that had he known about the results, he would've presented
them to the jury.

B. _GAS CHROMATOGRAPHIC ANALYSIS_

While the results of the Gas Chromatographic Analysis call into question Officer
Carroll's testimony about me "reeking" of smoke, when no other officer or person
testified to smelling smoke on me while in my presence, it too undermines the government's
forensic expert's testimony that I had to be in the getaway van, when the expert
would testify that the van was soaked in gasoline. The results call into question
whether or not I was in a van that was soaked in gasoline at the time it crashed
and burned.

Again, in a letter sent to counsel, when asked if he would've known about the
results, would he investigated the reports and/or presented the findings to my jury,
counsel would state yes. There was no strategy in not doing so.

C. Greg Prater, Joe Powell, police report of fleeing suspect, Wayne Ross,
Broderick Bonner, FBI report of Anonymous call

The reports related to these individuals helop to further me from the crime
scene, establish that someone other than myself committed the crime, and that Holder
had talked to and planned to rob the bank with someone other than me. Counsels failure
to present these reports/witnesses to the jury, in light of the fact that there was
evidence pointing towards innocence, clearly shows that counsel's performance fell
below the standards set forth in Strickland, 466 U.S. 668 (1984)

D. THE "DAMP RAG"

The government makes light of what the "damp rag" and its location show. As reports and witnesses accounts point out; the person running away from the scene of the crash site had an injury to their hand. If true, and if the injury was big enough to be seen, then one can and should conclude that the injury was one where DNA would've been left behind. If Holder was caught at the scene of the crime and the DNA was found in a vehicle tied to the robbery, and was only known to the robbers, then testing on the rag should be done to determine if the results exclude or link me to it. (It couldn't have come from Holder because he was arrested a nice distance away from where the damp rag was located.) Then, the fact that thee rag was "damp", clearly shows that it was left behind recently.

To support why testing should be done, the Court should take into account an eye witnesses account on a dispatch tape, which clearly establishes that someone fitting the discription of the sewcond suspect was running through the park with an injury to the hand. (Contridicting the testimony of two park workers, who would first tell police that they never gave me a ride, then change their testimony on the eve of trial, to fit the government's case.)

In order to establish ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice. The facts and evidence to support this issue clearly show that counsel's performance was deficient, because of his admission tHat he never considered and/or investigatewd the DNA, Damp rag and other evidence in preporation for my trial. To not do so falls way beelow deficient performance, and denied me of my Sixth Amendment rights, guaranteed under Strickland.

For the reasons in the motion, and the debatability of the issue and facts within, this issue warrants certificate of appealability.

Respectfully submitted,

4/22/15

Mr. Sindel,                                    7/1/14

How are you? I'm sure that this letter must come as a surprise, but I'm reaching out to you personally because I need your help.

I'm not sure if you've been keeping up with my case, but just this week, the Court turned down my appeal; putting me one more step closer to death's door. (A fate that I believe you don't want me to share.)

I'm writing because some facts and evidence in my case have developed/come to my attention and I was wondering if you could tell me if any of the facts and/or evidence would've been used by you or investigated, before or at trial, had you known about them?

As you and I both know, getting a hearing on guilt issues or receiving a new trial is a hard, if

not almost impossible task because of the roadblocks put up by the Courts. But if I can show that you would've done something different, or investigated facts of the case, or evidence, had you known about them at trial; it would better my chances at saving my life with a new trial or hearing.

I'm in no way asking for you to lie for me or say things just to save my life. I only want your true answers to some of the questions I have. I'm also in no way trying to make you look bad, just to save my life. I just want your honest answers and/or opinions...

1) Before and/or during my trial, if you had known that the government discovered traces of DNA at the crime scene, and after testing, the results excluded me and the victim; would you have investigated this evidence further and/or presented the results to my jury to establish reasonable doubt?

2) Before and/or during my trial, if you had known that the government was in possession of recordings

(3)

of witnesses, who were at the crime scene; would you have wanted those recordings in determining what to present on my behalf and/or to use in cross examining the witnesses; being that witnesses stories would change at trial from what was in their police or F.B.I. 302 forms?

3) Before and/or during my trial, had you known that the government would test my clothes for traces of gasoline, (in hopes of linking me to the crime), but the results would later exclude my clothes for traces of gasoline; would you have investigated this further or presented this to my jury to establish reasonable doubt?

4) Before and/or during my trial, had you known that officers lied about Henderson and I knowing each other from the Marquise murder and evidence could prove the lie; would you have investigated this evidence and/or presented it to impeach the witnesses?

5) Before and/or during my trial, had you known

the government planned to use charges in my indictment to establish motive (and other things) and the charges would later be ~~struck~~ revealed to be done by someone else; would you have investigated these facts, kept them from being heard by my jury, or had them removed from the record all together?

6) Before and/or during my trial, had you known that someone name Jerry Bostic or (⚡JB) could be linked to the DNA found at the crime scenes and that he had possible links to the planning and possibly the crime; would you have investigated him and/or presented him as a witness, or ask for testing to link him to the crime?

I also plan to ask John the same vestions and to hopefully use the answers in my C.O.A. filing. With the evidence that has come to my attention,

I believe that if I'm correct; you would've investigated and presented the things I've mentioned. One can't overlook how strong these things are and how they would've changed a lot!

Thanks for your time and I hope that you can help me by answering these questions.

Take Care,

Billie Allen

26901-044

P.O. BOX 33

Terre Haute, IN,

47808

?.S. Can you make a copy of this letter with your answers?